$\Lambda$-88

SUPERIOR COURT
OF THE
STATE OF DELAWARE

WILLIAM C. CARPENTER, JR.
JUDGE

NEW CASTLE COUNTY COURTHOUSE
500 NORTH KING STREET. SUITE 10400
WILMINGTON, DELAWARE 19801-3733
TELEPHONE (302) 255-0670

January 20, 2004



Cynthia Kelsey, Esquire
Allison Peters, Esquire
Department of Justice
820 N. French Street
Wilmington, DE 19801

X Jerome Capone, Esquire
4 East 8th Street, #200
Wilmington, DE 19801

Michael Heyden, Esquire
1201 King Street
Wilmington, DE 19801

> RE: State v. Jason Hainey
> Criminal ID No. 0306015699

Submitted: January 16, 2004
Decided: January 20, 2004

On Defendant's Motion in Limine. Granted in part. Denied in part.

Dear Counsel:

While the evidentiary hearing focused on the admissibility of the ballistics
evidence, the Motion in Limine really relates to three separate areas:

(a)    The admissibility of the ATF agent's testimony regarding the similar characteristics of the gun seized from the defendant's possessions and the bullets used in the homicide;

(b)    The admissibility of evidence regarding the defendant's arrest on September 12, 2001, several weeks after the murder for robbery and the discovery of the Colt 38 revolver; and

(c)    The admissibility of statements made by the defendant to other state witnesses that he feared that after his arrest on the robbery charge the police may discover that the gun seized was the murder weapon.

The Court finds that the evidence as to (a) and (b) above is not admissible and reserves decision as to (c) until the issue arises at trial.

## I. Ballistics Evidence

After learning of the connection between the firearms seized by the Delaware State Police during the investigation of a robbery at the Abbey Walk Apartments committed by the defendant on September 12, 2001 and the murder of Michael Mercer on August 21, 2001, the Wilmington Police Department obtained custody of the firearm and submitted it to the Bureau of Alcohol, Tobacco and Firearms for comparison with the bullets recovered from the crime scene. There is no dispute that the Colt Cobra 38 revolver seized at the time of the defendant's robbery arrest had rifling characteristics of six lands and grooves with a left twist. In addition, there appears to be no dispute that the bullets that were used to murder Michael Mercer also were fired from a weapon that had six lands and grooves with a left twist. While the expert could match one corresponding microscopic marking when he compared the bullets from the murder scene from those test fired from the Colt Cobra, he is unable to testify that this is the gun that was used in the murder. Unfortunately, the poor condition of the bullets seized at the crime scene make further identification impossible and at best the expert can only say that the bullets are consistent with those fired from a Colt Cobra 38 revolver. However, the expert admits that this may be true of tens of thousands of similar such handguns in the universe of guns made by several different manufacturers of revolvers. Simply put, there is no way to identify the seized firearm as the murder weapon by ballistic testing.

While the State tries to distinguish this case from that found in the Supreme Court case of *Farmer v. State*[1] the Court finds that the concerns found in *Farmer* also exist here. Without the scientific link certified by an expert, a substantial risk exists that the jury will reach an unfounded conclusion based upon their own view of the exhibits introduced during the experts' testimony that the gun seized was in fact the murder weapon. Under the facts of this case that potential prejudice is so great that it overwhelms any potential probative value to the State. Ballistic comparison, like fingerprinting, is an art and when views by professionals can provide a level of confidence in the conclusions that those experts provide. But, when those experts agree that the bullets seized from the crime scene could have been fired from a universe of weapons that is so large the testimony becomes immaterial and prejudicial.

## II. The Robbery

Next, the State seeks to present to the jury the fact that the defendant was arrested several weeks after the shooting on robbery offenses and a weapon was discovered in the defendant's possessions during that investigation. It is perhaps appropriate to first distinguish this case from those where the other crime was the critical link that led the police to the defendant. As far as the Court can tell from the limited information provided, the Wilmington Police Department had through other witnesses identified the defendant as a suspect even before learning that the weapon had been seized and was in the possession of the Delaware State Police. Second, there is nothing other than the defendant's statement that links these two offenses. Obviously if the ballistic testimony had identified the Colt revolver as the murder weapon, how the police seized that particular weapon and how it related to the defendant would be relevant and admissible. However, without that link, the only possible reason for wanting to introduce the robbery offense is to show that the defendant had access to a gun several weeks after the murder[2] and to provide some degree of corroboration of the statements made by the defendant as to his fear that the police would connect the gun to the murder. While the Court will address the defendant's statements next, it finds that allowing substantive proof of the robbery and the discovery of the weapon without a rational link by ballistics to the murder or an inexplicable intertwined connection between the

A - 00

[1] 698 A.2d 946 (Del. 1977).

[2] An area specifically excluded by the *Farmer* decision.

offenses, would prejudice the rights of the defendant to a fair trial. As such, the State may not introduce, except as set forth below, testimony regarding the robbery or the discovery of the weapon in their case-in-chief. If the defendant takes the stand, then the State is free to request permission to explore these areas on cross-examination based upon the testimony provided by the defendant.

## III. Defendant's Statement

The final area of evidence in which admissibility is sought by the State is the defendant's statement to other witnesses about his fear that because of his subsequent arrest on the robbery offense that the police would connect the seized gun to the murder of Mr. Mercer. The Court has no obligation to protect the defendant from his own stupidity of making statements to friends that implicate him in a crime. Such statements would be admissible under Rule 801(d)(2)(A) as a party as well as Rule 804(b)(3) as a statement against interest. The only issue for the Court is that it has not been provided sufficient information as to the context of the statement so that it can ensure itself that there is a sufficient degree of trustworthiness to allow their admissibility. Therefore before the State is allowed to introduce the statements it must provide to the Court either the prior statements of the witnesses or present, outside of the presence of the jury, evidence as to the nature of those statements. If such statements are anywhere close to those represented in the State's response, they will be admitted with one caveat. That is, the witness may not identify the particular crime for which the defendant was subsequently arrested. In other words, the witness will be allowed to indicate (if this is what was stated) that the defendant told him that he had been arrested several weeks later on an unrelated offense; that a gun was seized from his possessions at that time; and he feared the police would learn that the gun was used in a murder of Mr. Mercer. These admissions by the defendant are direct evidence establishing the defendant's culpability in the murder as well as his intent and knowledge evidenced by his fear of being caught by the police. As such, the Court preliminarily finds the statements of the defendant will be admissible subject to a proffer by the State prior to admitting them to the jury.

A - 88

I believe this covers all of the areas that arc thc subjcct of the defendant's Motion in Limine, and jury selection will begin tomorrow, January 21, 2004. I will meet with counsel at 10:30 a.m. in chambers. Jury selection will begin at approximately 11:00 a.m.

IT IS SO ORDERED.

Sincerely yours,

Judge William C. Carpenter, Jr.

WCCjr:twp

25

1    tried for, not the robberies that you and him may
2    have committed together at some later date.
3        So I am asking you not at any time during
4    the trial indicate at all to the jury that Mr. Hainey
5    participated in any way with you in regards to these
6    robberies. You are not to indicate that he's been
7    charged with the robberies, you're not to indicate
8    he's been arrested on the robberies, you will be
9    asked questions about your charges and your offenses,
10   but you're not to make any reference to Mr. Hainey.
11       Now, sir, this is extremely important. And
12   if you intentionally violate the Court's order, there
13   will be significant consequences to you. So you need
14   to understand this is very important, and it has a
15   bearing on the case, and it's important that you do
16   so as I've asked.
17       Now, if you have any questions at any time,
18   if you have any concerns, you have a question that's
19   been asked of you and you think you cannot answer it
20   without indicating in some fashion that Mr. Hainey
21   was involved with you, just say to me, "Your Honor,
22   I'd like to talk to you about that question." And
23   I'll send the jury out and we'll talk about the

26

1    question, okay. So you have an out if you think, in
2    fairness to you, you can't respond to the question
3    without referencing Mr. Hainey, let me know, and just
4    by saying, "Your Honor, can I talk to you about
5    that," and I'll send the jury out.
6        Do we understand each other, sir?
7        MR. TANN: Yeah.
8        THE COURT: Okay. All right. Let's bring
9    the jury in.
10       (Jury enters the courtroom at 10:57 a.m.)
11       THE COURT: Okay. Ladies and gentlemen,
12   again, thank you for your patience. We're ready to
13   begin. And the State may call their next witness.
14       MS. PETERS: The State calls Monia Tann.
15       THE COURT: Okay. Mr. Tann, would you
16   please stand and place your right hand on the Bible.
17   Would you administer the oath.
18       ... MONIA B. TANN,
19   having been duly sworn according to law, was examined
20   and testified as follows...
21       DIRECT EXAMINATION
22   BY MS. PETERS:
23   Q.   Mr. Tann, will you tell the jury how old you

Tann - Direct

27

1    are.
2    A.   Twenty-four.
3    Q.   And right now you're incarcerated. Where
4    are you being held?
5    A.   At Gander Hill.
6    Q.   Now, sir, you have two criminal convictions
7    on your record, correct?
8    A.   Yes.
9    Q.   And one of those is alluding the police in
10   Virginia?
11   A.   Yes.
12       THE COURT: Mr. Tann, I need you to kind of
13   move toward that mike, if you would, and speak kind
14   of right into it. Thank you.
15   Q.   And one is a receiving stolen goods felony
16   that is in Virginia, as well?
17   A.   Yes.
18   Q.   And also in the state of Delaware you're
19   pending trial on two separate sets of robberies; is
20   that correct?
21   A.   Yes.
22   Q.   Is it fair to say you face a substantial
23   amount of jail time for those robberies?

Tann - Direct

28

1    A.   Yes.
2    Q.   Has the State made any deals with you for
3    your testimony today in consideration for those
4    robberies?
5    A.   No.
6    Q.   Have Ms. Kelsey and I made any deals with
7    you?
8    A.   No.
9    Q.   But in fairness, when you tell this jury as
10   you testify, would you have to say that you're hoping
11   someone will take it into consideration that you
12   testify?
13   A.   Yes.
14   Q.   Sir, can you tell the jury whether or not
15   you know a Jason Hainey?
16   A.   Yes.
17   Q.   And how long have you known him?
18   A.   About three years.
19   Q.   Is he in the courtroom today?
20   A.   Yes.
21   Q.   Can you identify him to the Court by
22   pointing, describing where he is sitting and what he
23   is wearing?

---

21

1    MR. CAPONE: No objection, Your Honor.
2    THE CLERK: State's Exhibit 3, Your Honor.
3    (State's Exhibit No. 3 was admitted into
4    evidence.)
5    THE COURT: Can I have State's Exhibit 1?
6    THE CLERK: Yes, sir.
7    BY MS. KELSEY:
8    Q. Do you want to see them both?
9    Now, with regard to State's Exhibit No. 3,
10   can you explain to the Court what that is, in fact,
11   a photograph of?
12   Do you want to come up by the Elmo? Would
13   that help to be able to point?
14   A. Sure.
15   Do you have a laser?
16   THE COURT: Does it work?
17   THE WITNESS: Yes, it does.
18   A. State's Exhibit No. 3 consists of two
19   photographs. In the top photograph is the Exhibit
20   No. 2 bullet, the evidence bullet that came in, and
21   the Exhibit No. 5 bullet which is State's Exhibit
22   No. 2, on the right side. There is a hairline down
23   the middle. This is a photograph of the two

---

22

1    bullets on the comparison microscope.
2    Again, the second photograph is the same
3    thing, Exhibit No. 2 evidence bullet and Exhibit
4    No. 5 evidence bullet. The Exhibit No. 5 evidence
5    bullet is, again, State's Exhibit No. 2, the
6    mutilated bullet we saw earlier.
7    We're looking at a groove impression here.
8    Now, the lands and grooves within the barrel, as I
9    stated before, impart a spin on the bullet, but
10   within each of those lands and grooves are
11   microscopic imperfections, microscopic
12   irregularities that when a bullet travels down the
13   barrel, will be picked up as a negative of the
14   interior of the barrel.
15   So here you can see microscopic markings
16   that transfer from one bullet to the next as it's
17   been fired through the barrel, and they correspond.
18   These photographs are kind of washed out a little
19   bit, but there are lines that go from the right
20   side of the Exhibit 5 bullet to the left side of
21   the Exhibit 2 bullet that are in correspondence.
22   What we look for are these individual peaks
23   ridges and furrows that are, specifically, the

---

23

1    relative height, depth, width, curvature, spatial
2    relationship of those individual markings within
3    the barrel that transfer to the bullet.
4    And having looked at the bullet, on its
5    whole surface, the whole circumference of the
6    bullet, in an ideal situation, all the lines should
7    match up, but of course, what we have here is a
8    mutilated bullet, and we only have one groove
9    impression that corresponds, that was in
10   correspondence.
11   So based on what we see here, we cannot
12   conclusively identify whether these two bullets
13   were fired from the same firearm to the exclusion
14   of all other firearms, because typically, what I
15   would like to see is each of the land impressions
16   and each of the groove impressions to conclusively
17   say that, yes, in fact, that was fired from the
18   gun.
19   Now, we only have one groove impression, and
20   it's my opinion that that groove impression is not
21   enough to conclusively say to the exclusion of all
22   firearms, that this was fired in the same firearm,
23   but we have evidence that it is possible that they

---

24

1    were.
2    MR. CAPONE: Objection. I would object to
3    that since that's not conclusive.
4    THE COURT: I think the word "possible"
5    is --
6    Is it fair, sir, that you cannot exclude
7    this gun as being the one that has fired it?
8    THE WITNESS: We certainly cannot exclude it
9    based on the markings, but we don't have enough to
10   say that it was, in fact.
11   BY MS. KELSEY:
12   Q. Now, these are two bullets that were sent
13   from the Wilmington Police Department. This is not
14   one of the test-fired bullets?
15   A. That's correct. These are two evidence
16   bullets that were sent in by the Police Department.
17   Q. And the purpose of comparing those two is to
18   see if those two bullets were fired from the same
19   gun?
20   A. Correct.
21   Q. And of the markings that were available,
22   that's the only one that you can compare that is
23   the same?

61

1  particular gun, did you?
2      A. I believe I did. I wrote two reports.
3      Q. I want to see what they did contain.
4      A. As a matter of fact, I did.
5      Q. Could I see that too?
6      A. (The witness complied.)
7          THE COURT: You want a few moments to look
8  at them?
9          I'll give you a few moments.
10         Sir, so I can see if my understanding of
11  your testimony that Mr. Capone asked you is
12  correct, do you have disagreement with either the
13  conclusions -- do you have any disagreement with
14  the conclusions that were reached by Mr. Dandridge
15  concerning his evaluation of the evidence that was
16  submitted, or do you believe it's consistent with
17  what you believe occurred?
18         THE WITNESS: As it was enumerated in his
19  report, I have no problem with his conclusions, and
20  I concur with it.
21         MS. KELSEY: Your Honor, can we take --
22  We haven't been able to see this report.
23  Mr. Dandridge hasn't been able to see the report.

62

1  We haven't been able to see the photographs.
2          THE COURT: We'll take a few minutes.
3          Call me when you're ready.
4          MS. KELSEY: Thank you, Your Honor.
5          THE COURT: No problem.
6          (A recess was taken.)
7          MS. KELSEY: I'd like to introduce into
8  evidence the next State's Exhibit.
9          THE CLERK: State's Exhibit No. 8,
10  Your Honor.
11         MS. KELSEY: Without objection.
12         (State's Exhibit No. 8 was admitted into
13  evidence.)
14         MS. KELSEY: Actually, I'd like to put this
15  up here.
16  BY MS. KELSEY:
17     Q. I'll show you what's been marked as State's
18  Exhibit No. 8.
19         And can you -- Is that a photograph that you
20  took?
21     A. I believe it to be so, yeah.
22     Q. And that's a photograph of a gun that
23  Detective Mullins brought down to your laboratory

63

1  for you to look at --
2      A. On December 18 --
3      Q. -- on December 18?
4      A. -- '03.
5      Q. Okay. And specifically, this right here, do
6  you see this silver part right there?
7      A. Yes.
8      Q. What is that?
9      A. That was the finish removed from the
10  revolver or the frame of this revolver.
11         It actually has the LW, and the serial
12  number indicates it was lightweight or aluminum
13  alloy. And they had removed the oxidized finish
14  and gone down to the aluminum frame.
15     Q. Is that a place where sometimes a serial
16  number is?
17     A. Not on revolvers. Especially a Colt.
18         THE COURT: On some guns?
19  BY MS. KELSEY:
20     Q. On some guns?
21     A. It may be on some guns. They put them in
22  some strange places.
23     Q. And in fact, there is a serial number on

64

1  this gun?
2      A. Absolutely.
3      Q. Okay. And that is inside here, right?
4      A. It's what we call the cylinder window where
5  the crane fastens to the frame, in that area. It
6  pivots just below that when you open it. The
7  serial number is both on the crane and frame part
8  of the window area.
9      Q. And so you didn't specifically take a
10  picture of the serial number?
11     A. I did not.
12     Q. Thank you.
13         Now, you prepared a report on December 22
14  with regard to microscopic comparisons that you
15  did?
16     A. I did, yes.
17     Q. And I don't have in this packet of
18  photographs that you gave me, I don't have any
19  photographs of those microscopic comparisons that
20  you did.
21         Did you take photographs?
22     A. I did.
23     Q. You did take photographs?

---

Tann - Direct

33

1 likely.
2     Q.   Do you know what day of the week it is?
3     A.   I don't remember the exact date. It was
4 about the middle of the week, but I don't remember
5 the exact date.
6     Q.   The time of day, do you know that?
7     A.   It was afternoon.
8     Q.   And did there come a time when the four of
9 you split into groups?
10     A.   Yes.
11     Q.   And what was -- who was within each group
12 and what was each person going to do?
13     A.   Me and Mr. Hainey, we left, and Earl and
14 Phil were still at the house.
15     Q.   Okay. Did you know what Earl and Phil were
16 going to do at the house?
17     A.   Play the game.
18     Q.   Anything else?
19     A.   I don't think so.
20     Q.   When you left the house with Mr. Hainey, did
21 you know where you were going?
22     A.   No.
23     Q.   Okay. Had you been -- had you had any

---

Tann - Direct

34

1 information that you were going, leaving the house
2 for some purpose that you were going to go somewhere
3 specific? Not just the address of where you were
4 going, but did you know what you were doing?
5     A.   I knew we were going to meet somebody.
6     Q.   Okay. And who arranged the meeting with
7 that other person?
8     A.   Mr. Hainey.
9     Q.   How did he arrange the meeting with the
10 other person?
11     A.   He called him.
12     Q.   From what -- or from whose telephone?
13     A.   From my telephone.
14     Q.   And was that a cell phone or a home phone?
15     A.   Home phone.
16     Q.   And after he made this telephone call, did
17 he tell you what you were going over there at the
18 house -- what he had told the person he was coming
19 over to do?
20     A.   He told me he was going to get a CD from the
21 guy, the guy makes CDs.
22     Q.   To get CDs.
23         At that time, did he have any money

---

Tann - Direct

35

1 available to purchase CDs, Mr. Hainey?
2     A.   I don't believe so.
3     Q.   Did you have any money that you could have
4 given Mr. Hainey to purchase any CDs?
5     A.   No.
6     Q.   Did you have a weapon in the house at the
7 time?
8     A.   Yes.
9     Q.   Do you know whether Mr. Hainey -- first of
10 all, let's backtrack. And where did you keep the
11 weapon in your house?
12     A.   In my cabinet.
13     Q.   And your cabinet's within what room of the
14 house?
15     A.   In the kitchen.
16     Q.   And can you describe physically the weapon
17 to the jury?
18     A.   It's a black .38 Special Cobra.
19     Q.   Okay. And is there anything -- at the time
20 on this particular day when you were going over to
21 this person's home, do you know whether or not that
22 gun was loaded?
23     A.   Yes.

---

Tann - Direct

36

1     Q.   And who loaded the gun?
2     A.   I don't know who loaded it. It would have
3 been already loaded, actually.
4     Q.   And who purchased that gun?
5     A.   I did.
6     Q.   And, so, had you used the weapon before?
7     A.   I fired it before.
8     Q.   And what kind of ammunition, if you knew,
9 was loaded into it? Can you describe it physically?
10     A.   They were gold plated bullets.
11     Q.   And did they have a color besides their gold
12 plate?
13     A.   It was just gold, and the tip was silver.
14     Q.   And before you left, did you have any
15 knowledge of whether or not this gun was fully loaded
16 or not?
17     A.   No.
18     Q.   And when you left, was the gun still -- when
19 you left with Mr. Hainey, was the gun still in your
20 house?
21     A.   No.
22     Q.   Where was it?
23     A.   Mr. Hainey had it.

---

Tann - Direct
37

1    Q.   Now, you drove off into -- who drove towards
2  this person's home?
3    A.   I did.
4    Q.   And you only took Mr. Hainey with you?
5    A.   Right.
6    Q.   And did you know physically where you were
7  going or where in the city you were headed?
8    A.   I knew the area.
9    Q.   And, but, did you know the street or the
10 location?
11   A.   No.
12   Q.   In fact, could you make it there -- did you
13 make it all the way there without having to stop?
14   A.   No.
15   Q.   What happened before you could make it
16 there?
17   A.   We had to stop and get more directions.
18   Q.   Who actually got those directions?
19   A.   Mr. Hainey.
20   Q.   And how did he get those directions?
21   A.   He made another phone call.
22   Q.   From a pay phone?
23   A.   Yes.

Tann - Direct
38

1    Q.   And did you eventually find the place that
2  Mr. Hainey was asking you to drive him?
3    A.   Yes.
4    Q.   Do you know which street it's on now?
5    A.   No.
6    Q.   What did you do once you got there?
7    A.   I parked.
8    Q.   Do you know what time of day this is,
9  approximately?
10   A.   It's about four o'clock.
11   Q.   And at about four o'clock, how long had it
12 been since you just left your house?  How long did it
13 take to get there from your house?
14   A.   About ten minutes.
15   Q.   As you parked, what did you and the
16 defendant do next?
17   A.   Mr. Hainey got out, he got out of the car.
18   Q.   Okay.  And did he leave the gun behind?
19   A.   No.
20   Q.   Where did he go?
21   A.   He got out of the car and went into one of
22 the houses.
23   Q.   And did you stay in the car?

Tann - Direct
39

1    A.   Yes.
2    Q.   Were you able to see him get into the house?
3    A.   Yes.
4    Q.   How did he get into the house?
5    A.   He was let in the house.
6    Q.   Did you see whether any person let him in?
7    A.   No.
8    Q.   When he -- I'm going to ask what sounds like
9  an odd question -- did he go into the house with any
10 kind of cover on his face or disguise?
11   A.   No.
12   Q.   How long was he in the house?
13   A.   I'd say about ten minutes.
14   Q.   And when he came -- how did he eventually
15 come back to your car?
16   A.   He just came out and got in the car.
17   Q.   Describe to the jury, was there any
18 difference in the way he was behaving when he left
19 the car from the time he came back into the car?
20   A.   He was a little more hyper, a little more
21 animated.
22   Q.   Did he tell you what had happened in the
23 house?

Tann - Direct
40

1    A.   Yes.
2    Q.   What did he say had happened in the house?
3    A.   He said the guy reached for the gun.
4    Q.   And what gun?
5    A.   The .38.
6    Q.   The one that --
7    A.   The one that he had.
8    Q.   And what did he say after the guy reached
9  for the gun?
10   A.   He said he shot him.
11   Q.   Then what did he say he did next?
12   A.   He left, ran out of the house.
13   Q.   Did he tell you whether or not he took
14 anything from the guy he shot?
15   A.   No.
16   Q.   Did you discuss whether or not there was
17 anything taken?
18   A.   No.
19   Q.   Did he tell you whether or not the person
20 was alive or dead?
21   A.   He didn't say.
22   Q.   Did he tell you whether or not he thought he
23 was dead?

Evans - Direct

41

1  podium so we can hear you. Thank you.
2      Q.   And when were you sentenced on the...
3      A.   December 19th.
4      Q.   Now, you got two years altogether? Or did you
5  get two years...
6      A.   I got two years Level V and two years
7  Level II.
8      Q.   Okay. So you're only doing two years in jail?
9      A.   Yes, ma'am.
10     Q.   And two years on probation?
11     A.   Yes.
12     Q.   Okay. That's what Level II is, probation?
13     A.   Yes.
14     Q.   Okay. Now, when you got arrested, did you
15 tell the police that you knew something about a
16 homicide?
17     A.   Yes, ma'am.
18     Q.   Okay. And do you know the victim of the
19 homicide?
20     A.   No, ma'am.
21     Q.   You didn't know him?
22     A.   No, no, I didn't.
23     Q.   Did you know the person, did you tell the

Evans - Direct

42

1  police who committed the homicide?
2      A.   Yes, I did.
3      Q.   Okay. And who did you tell the police
4  committed the homicide?
5      A.   Jason Hainey.
6      Q.   Is he in the courtroom today?
7      A.   Yes.
8      Q.   Okay. Where is he seated in the courtroom?
9      A.   Over there (indicating).
10     Q.   You have to say where it is, because the court
11 reporter can't take down a point.
12         THE COURT: What's he wearing, sir?
13         THE WITNESS: A gray shirt on, the defendant.
14         THE COURT: The record can reflect he's
15 identified Mr. Hainey.
16 BY MS. KELSEY:
17     Q.   Okay. And how did you know about the
18 homicide?
19     A.   Because he told me.
20     Q.   Okay. Now, do you remember when that homicide
21 took place?
22     A.   I can't put an exact time on it, because it
23 was, like, 2001. It was like, it was hot, I think

Evans - Direct

43

1  around probably like September, somewhere around there,
2  August. I'm not sure what time, really.
3      Q.   If I told you it was August the 21st, would
4  that refresh your recollection?
5      A.   I wouldn't --
6      Q.   You don't know? Does that sound --
7      A.   I knew it was like, you know, school was ready
8  to go back in, and, you know, it was still hot outside,
9  we still was wearing T-shirts.
10     Q.   All right. And where were you living at the
11 time of that homicide?
12     A.   I was living at Abbey Walk, Abbey Walk
13 Apartments.
14     Q.   And did you have a friend who lived in the
15 city at that time?
16     A.   Yes, I have.
17     Q.   And who was that friend?
18     A.   Monia Tann.
19     Q.   And were you also at the time friends with the
20 defendant?
21     A.   Yes.
22     Q.   And how did you know the defendant?
23     A.   How did I know him?

Evans - Direct

44

1      Q.   Mm-hmm.
2      A.   Because we was good friends. I mean, I met
3  him, like, in, like, '98, '99, so.
4      Q.   Okay. And on the particular day of the
5  homicide where were you hanging out?
6      A.   We was on West Side, I think, 2nd Street.
7      Q.   On 2nd Street?
8      A.   2nd.
9      Q.   And who --
10     A.   That was at Monia Tann's house.
11     Q.   At Monia Tann's house?
12     A.   Yeah.
13     Q.   And do you remember the address?
14     A.   I don't really know the address. I know it's
15 on 2nd Street, it's an apartment building. If I hear
16 it, I'll probably know it.
17     Q.   Okay. And who else was at the apartment
18 besides you?
19     A.   Me, Fly, Monia.
20     Q.   Do you know Fly's real name?
21     A.   No, I don't. We just call him "Fly." Monia
22 and Jason.
23     Q.   Monia is Monia Tann?

Evans - Direct

45

1    A.   Yeah.
2    Q.   And Jason is?
3    A.   Jason Hainey.
4    Q.   Jason Hainey.
5         And does Jason have a nickname, a name he
6    uses?
7    A.   What you mean? "Quick."
8    Q.   "Quick"?
9    A.   Yeah.
10   Q.   And at some point in time did anybody leave
11   that apartment?
12   A.   We all did.
13   Q.   Well, but before you -- well, tell us what
14   happened, what were you doing?
15   A.   Well, after we came up from Jersey we picked
16   up Fly, we came back from Jersey. We went, I asked
17   him, you know, we stopped at a house, we stopped at
18   Monia house. And it was like ten to 15 minutes,
19   I wanted to go around the corner to get some weed, you
20   know what I mean.
21   Q.   Some -- when you way "weed"?
22   A.   Weed, drugs.
23   Q.   Marijuana?

Evans - Direct

46

1    A.   Yeah, marijuana. So I asked Monia can I use
2    his car, because he had a rental. And he told me no
3    because he ready to do something. So me and Fly walked
4    around the corner to go get some marijuana. And at
5    that time I guess they left, you know what I mean,
6    because they left after we did.
7    Q.   And how do you know that?
8    A.   Because they wasn't there when we got back.
9    Q.   Okay. And how long were just you and Fly
10   there before they got back?
11   A.   Well... Okay, well, I don't know if you all
12   are familiar, but we rolled a blunt, I rolled a blunt
13   and started smoking it. And that's when they pulled
14   up. So, I mean, we was gone about, like, 10, 15
15   minutes, and they rolled up like ten minutes later.
16   Q.   Okay.
17   A.   Ten, 15 minutes later.
18   Q.   Okay. And when they came back did they come
19   in the apartment?
20   A.   No, no.
21   Q.   What happened when they came back?
22   A.   They rolled up -- they rolled up, they got
23   halfway out the car, Jason got halfway out the car and

Evans - Direct

47

1    said, Yo, we're going back to Jersey, he said, Call
2    Fly. So I called Fly, we jumped in the car and, you
3    know what I mean, we rolled, we rolled off and hit the
4    highway and started going to Jersey.
5    Q.   Okay. And did Fly come, too?
6    A.   Yes, he did.
7    Q.   Okay.
8    A.   All four of us in the car.
9    Q.   All four of you were in the car?
10   A.   Yes.
11   Q.   And when you're in the car on the way to
12   New Jersey, did you have a conversation about what you
13   were doing and why you were going there?
14   A.   Well, he had a little, like, a struck face,
15   you know what I mean, like an unbelievable face like he
16   just did something crazy. But, you know what I mean,
17   he was like, you never know what happened, guess what
18   happened? You know what I mean. Now, we was smoking a
19   blunt, you know what I mean, because like I said, they
20   pulled up --
21   Q.   You're smoking the blunt, which is the
22   marijuana?
23   A.   Yeah, marijuana. And I was like, you know, I

Evans - Direct

48

1    was passing the blunt to Fly, and the next thing you
2    know he was like, Yo, we're hitting the highway now.
3    So we were on the highway, he's like, You never know
4    what happened, you never know what happened, and he's
5    like, Yo, I just shot somebody, I just shot somebody.
6    We're like, What? Yeah, right, yeah, right, you know
7    what I mean, and, yeah, I just hope he die, and I hope,
8    you know, I just shot somebody, you know what I mean.
9    Then he went along and told me -- told us what
10   happened.
11   Q.   Okay. And what did he tell you what happened?
12   A.   That, well, see, he didn't go into all the
13   details. But generally what happened, he said he went
14   into the house, I guess he knocked on the door, or
15   whatever, and he went into the house, and that the
16   dude, he sells CDs, bootleg CDs, tapes, VCR tapes, and
17   stuff like that --
18   Q.   Did he give you the dude's name?
19   A.   Well, I mean, I knew his name, you know what I
20   mean, at the time. His name was Mike Mercer.
21   Q.   How did you know that?
22   A.   Because I used to work with him. And that's
23   the dude that they used to buy CDs, and tapes, and

Evans - Direct

49

1    stuff, from.
2        Q.    So you had heard of the guy before?
3        A.    Yeah. I just never saw him or I never met
4    him. Because, I mean, I used to pick him up from, you
5    know, his job, or whatever, and he used to have bootleg
6    CDs, and stuff, and we used to get it from the dude
7    from work, you know what I mean.
8        Q.    And where was he working?
9        A.    At a bank -- I forgot the name of it.
10       Q.    Okay. You started to tell us what he said
11   happened.
12       A.    Well, he said he went in there, and I guess he
13   asked the dude -- he never said he asked the dude, you
14   know what I mean, I guess the dude went and, you know,
15   he asked for a tape, or something, and when he went to
16   go get a tape he pulled out the gun. And the dude
17   grabbed the gun, or whatever, and was trying to tussle,
18   and it just went off, bam, you know what I mean. And
19   the dude started falling back, or whatever, and he
20   said, I can't leave no witnesses, and he started
21   shooting him again, five more shots.
22       Q.    Did he say how many shots he fired?
23       A.    He said he put six shots in him. He said the

Evans - Direct

50

1    first one, then he put five more. He said so, you know
2    what I mean, because I can't leave no witnesses.
3        Q.    And what did he say?
4        A.    I can't leave no witness. But he also heard a
5    TV upstairs, he thought somebody was in there, you
6    know.
7        Q.    Did he look for that person that was in there?
8        A.    No. He said as soon as he did it, he ran out.
9        Q.    Did he say --
10       A.    Then he jumped in the car and he asked the
11   dude Mo -- this is what he tell me -- that he asked the
12   dude Mo, Monia, did he see anybody, or whatever. Now,
13   Monia was like, he didn't see nobody, but, you know
14   what I mean, said they turned up, took off, came and
15   got us, and we went straight to Jersey.
16       Q.    Now, did he say whether or not he took
17   anything from the guy?
18       A.    No. He said he didn't have a chance to.
19       Q.    And what was the point of now going to
20   New Jersey?
21       A.    Because to get away, just in case somebody
22   saw, you know, saw the car, saw him, you know what I
23   mean, we'd be in Jersey, that's our alibi.

Evans - Direct

51

1        Q.    Okay. And how long did you stay in Jersey?
2        A.    Well, we stayed -- well, he stayed
3    overnight -- we stayed, we stayed up there for a couple
4    hours with him, you know what I mean, because he was,
5    you know what I mean, you know, I guess, you know, I
6    don't know how it feels to shoot somebody, or, you know
7    what I mean, or whatever. So I don't know how, he was
8    feeling kind of crazy, you know what I mean. Like, he
9    didn't have, you know, you know, he didn't, you know
10   what I mean, he didn't -- basically I don't know if he
11   really meant to do it or not, but he didn't, it was
12   like some kind of, you know, kind of vibe that you get
13   where you better stay with him for a little bit, you
14   know what I mean, to see if he all right.
15       Q.    Okay. And then you guys left. Did you talk
16   about it with anybody else besides the people that were
17   in the car?
18       A.    Well, I mean, it's a couple of people that I
19   know. It's a couple of people that I know --
20       Q.    But my question to you is did you see him talk
21   to anybody about it that night in New Jersey, or hear
22   him talk to anybody?
23       A.    In Jersey?

Evans - Direct

52

1        Q.    Yeah.
2        A.    Well, not really, you know what I mean.
3    I mean, he might have been saying so, because, I mean,
4    when we go to Jersey, it's like he can go in the
5    houses, and stuff like that, we stay outside, you know
6    what I mean. So I don't, you know, basically I don't
7    know, you know what I mean, I know a couple people that
8    know about it, and I don't know if he told or, you know
9    what I mean, he told, you know what I mean.
10   I didn't have -- I didn't hear him or see him with my
11   eyes telling people outside like that, you know what I
12   mean.
13       Q.    Now, when you came back -- okay, who was
14   driving when you guys --
15       A.    Monia.
16       Q.    Okay. And when you came back, who drove back?
17       A.    Monia.
18       Q.    And when you came back, did you go back to
19   Monia's house?
20       A.    No. He dropped me off home, because, you know
21   what I mean, because, you know what I mean, I was
22   nervous myself, you know what I mean, because I'm
23   looking at myself like I might be getting an accessory

A-4
2-2-04

Evans - Cross

81

1    A.    Moved out of Abbey Walk, like, I got kicked
2    out of Abbey Walk.
3    Q.    Just tell me when.
4    A.    Probably like two months later.
5    Q.    So that would be September, October, like,
6    November?
7    A.    Around November. Because I was home at my
8    mom's house, I had to go back to my mom's crib, that's
9    why I was mad at him.
10    Q.    So you lived with your mom for how long?
11    A.    I lived with her until she sold her house.
12    Q.    And when was that?
13    A.    I don't know, probably, probably like almost
14    like a year or so. I mean, I don't really recall how
15    long, when she sold her house.
16    Q.    And then where did you go after that?
17    A.    I stayed over at a friend house.
18    Q.    Who and where?
19    A.    A girl named Porsha Dickerson, and at Arbour
20    Place.
21    Q.    And how long did you stay there?
22    A.    Probably like three or four months. Then I
23    went to my sister house -- if that's the next question

Evans - Cross

82

1    you're going to ask me.
2    Q.    All right. You're ahead of me. And how long
3    did you stay at your sister's?
4    A.    Probably like two, two or three months.
5    Q.    What's her name?
6    A.    Brenda, Brenda Wilks. Actually, she just got
7    married, she got married during the time, so her last
8    name Gibbs now.
9    Q.    Gas?
10    A.    Gibbs.
11    Q.    Gibbs.
12          During that time period that we just went
13    through, you spent some time in jail?
14    A.    I spent like two days in jail.
15    Q.    Two days?
16    A.    Yeah. I got stopped by the cops, and I had a
17    fine, I didn't pay a fine.
18    Q.    Okay. Where did you stay, and when?
19    A.    I was at Abbey Walk. That was right after,
20    that was right after the defendant got locked up --
21    Q.    Let's, this was in the fall of 2001?
22    A.    Yeah.
23    Q.    Now, you just, you pled to robbery in the

Evans - Cross

83

1    first degree on October 22nd, 2003. And you were
2    sentenced on December 19th, correct?
3    A.    Yeah.
4    Q.    And you were charged with two counts of
5    robbery first, possession of a deadly weapon during the
6    commission of a felony, conspiracy in the second
7    degree, wearing a disguise during the commission of a
8    felony, and possession of a deadly weapon by a person
9    prohibited. Those were all your charges?
10    A.    Well, I don't think the person prohibited,
11    it's just carrying a firearm during the commission of a
12    felony, it wasn't no prohibited.
13    Q.    Okay. Now, according to my calculations the
14    robbery first carries two to 20, the firearm three to
15    20, and I think the wearing the disguise was three
16    years. So you were looking at?
17    A.    Forty-seven years.
18    Q.    Forty-seven years.
19          And you ended up with two years in jail,
20    followed by two years' probation?
21    A.    Yes. First time offense. I didn't have no
22    background, it's a first time offense.
23    Q.    As part of your deal -- and I have a copy of

Evans - Cross

84

1    your plea agreement -- it says, Defendant agrees to
2    cooperate and testify against Jason Hainey, correct?
3    A.    Yes.
4    Q.    And defendant agrees to postpone sentencing
5    until after the trial of Jason Hainey?
6    A.    Yes. But another thing is, I got sentenced
7    already, and my lawyer told me I didn't even have to
8    testify against Jason Hainey. So that, the agreement
9    that they had was already void once they already
10    sentenced me. Because if the whole deal was that I
11    supposedly got sentenced afterwards, but I got
12    sentenced before, so I didn't have to testify.
13    Q.    So, your lawyer was Eugene Maurer?
14    A.    Yes.
15    Q.    He signed it and you signed it.
16          MR. HEYDEN: May I approach the witness,
17    your Honor?
18          THE COURT: Sure.
19    Q.    Mr. Evans, I'm going to show you the plea
20    agreement. Is that your signature?
21    A.    Yes, it is.
22    Q.    And that's the plea agreement that you
23    reached?

Tann - Direct

41

1    A.   Yes.
2    Q.   What did he say about thinking whether or
3    not he was alive or dead?
4    A.   He thought he had killed him.
5    Q.   Did he tell you whether or not he was able
6    to get anything from the person he thought was dead?
7    A.   I don't remember him saying. I don't think
8    he took anything.
9    Q.   When he gets in the car with you, did you
10   see any blood on his clothes?
11   A.   No.
12   Q.   On his hands?
13   A.   No.
14   Q.   Where did you go after he got in the car?
15   A.   We went back to my house.
16   Q.   And what did you do after you got to the
17   house?
18   A.   We waited at my house for about five
19   minutes, then we went to New Jersey.
20   Q.   I'm sorry. You went in the house for five,
21   ten minutes, and then what?
22   A.   Then we picked up Phil and E, and we went to
23   New Jersey.

Tann - Direct

42

1    Q.   And as you're going to New Jersey, describe
2    to the jury who's sitting where in the car that
3    you're driving?
4    A.   Okay. I'm driving, Mr. Hainey's in the
5    front, and Phil and E are in the back.
6    Q.   And E is Earl Evans?
7    A.   Earl.
8    Q.   Did Mr. Hainey talk within that car ride
9    about what had happened in the house?
10   A.   Yes.
11   Q.   Were people smoking marijuana in the car?
12   A.   Yes.
13   Q.   Where did that marijuana come from, who had
14   it?
15   A.   I had it.
16   Q.   Okay. Now, on this car ride to go to New
17   Jersey?
18   A.   Yes.
19   Q.   How long did you stay in Jersey?
20   A.   For about four or five hours.
21   Q.   And do you come back to Delaware?
22   A.   Yes.
23   Q.   And do you know what time you're traveling

Tann - Direct

43

1    back to Delaware?
2    A.   It was about nine, eight or nine.
3    Q.   In the next morning?
4    A.   That night.
5    Q.   Okay. This gun that you described to the
6    jury, did you ever see it again after that afternoon?
7    A.   Yes.
8    Q.   Did you have a chance to examine it and look
9    at it?
10   A.   I seen it, yes.
11   Q.   Okay. Did you look at -- were you able to
12   determine whether or not it was still loaded?
13   A.   No.
14       THE COURT:  Mr. Tann, can you put it in a
15   time frame for us? Are we talking about seeing it
16   right after the incident, or...? Did you see it soon
17   after the incident?
18       THE WITNESS:  Yes.
19       THE COURT:  That same afternoon?
20       THE WITNESS:  Not the same afternoon.
21       THE COURT:  Okay. Can you tell us kind of
22   when, when would you have seen the gun next?
23       THE WITNESS:  It would have been later on

Tann - Direct

44

1    that night or the next day.
2        THE COURT:  Thank you.
3    BY MS. PETERS:
4    Q.   To your knowledge, had it been used in
5    between the time Jason Hainey said I shot him and the
6    time you looked at it?
7    A.   No.
8    Q.   What was -- what was, as you looked at it,
9    was it still fully loaded?
10   A.   No.
11   Q.   Do you have any -- are you able to recall
12   how many bullets might have still been in it or not?
13   A.   I don't remember exactly how many.
14   Q.   Okay. What did you eventually do with that
15   weapon, that gun?
16   A.   It was put back in the cabinet.
17   Q.   Okay. Now, when you came back from New
18   Jersey, did the defendant come with you?
19   A.   Yes.
20   Q.   And did he stay at your home the next --
21   that night? Or where did he stay?
22   A.   He went back to where he was staying.
23   Q.   And was he staying with any one of the

Tann - Direct

53

1    THE COURT: All right.
2    MS. PETERS: Sorry.
3    THE COURT: That's okay. I just thought we
4    should hear it before. How much further do you think
5    you have?
6    MS. PETERS: This is the last question
7    before I do the entry of the weapon.
8    THE COURT: Okay. Why don't we, since
9    they're out, why don't we take our morning break at
10   this juncture.
11   (Recess taken, 11:26 to 11:45 a.m.)
12   MS. KELSEY: Your Honor, could we have one
13   minute? (Pause.)
14   THE COURT: Okay. Bring the jury in.
15   (Jury enters the courtroom at 11:46 a.m.)
16   THE COURT: Ms. Peters, you may continue.
17   MS. PETERS: Thank you.
18   BY MS. PETERS:
19   Q.   Mr. Tann, when we just broke I had asked you
20   the question, and you told us that you had seen Earl
21   Evans in the hallway this week downstairs in lockup?
22   A.   Yes.
23   Q.   And you started to tell the jury, can you

Tann - Direct

54

1    tell the jury completely what he and you said to one
2    another in that hallway?
3    A.   He asked me how I was. I said I was all
4    right. I asked him where did they have him locked
5    up, because I didn't know he was locked up. He told
6    me he was locked up in Smyrna. He said, "You know
7    what they want us to do, right?" I said, "Yeah."
8    And he asked me what I was going to do. And I said I
9    didn't know, I said I needed to sleep on it.
10   Q.   And was that the end of your conversation?
11   A.   Yes.
12   Q.   Okay. On the night of 2001 when you drove
13   Jason Hainey to what you now know was Michael
14   Mercer's house, as you waited for Mr. Hainey, did you
15   hear any gunshots?
16   A.   I heard two distinctive noises that I
17   didn't, I didn't recognize them as gunshots, but I
18   did hear two noises.
19   Q.   And when Mr. Hainey came out of the house --
20   you told us that the guy reached for his gun -- did
21   Mr. Hainey explain to you why he pulled the gun out?
22   MR. TANN: Can I speak to you?
23   THE COURT: In regards to the incident on

Tann - Direct

55

1    that particular day, did he tell you why he had gone
2    there?
3    MR. TANN: Yes.
4    THE COURT: Can you tell us what that was?
5    MR. TANN: He was going to rob.
6    BY MS. PETERS:
7    Q.   Rob who, Mr. Mercer?
8    A.   Yes.
9    Q.   Now, this gun that you said was yours that
10   you -- the defendant had, did you load that gun
11   sometime before this day?
12   A.   Yes.
13   Q.   Fully loaded?
14   A.   Yes.
15   Q.   And did you have bullets that were -- did
16   you have extra bullets other than the ones that you
17   put in the gun?
18   A.   Yes.
19   Q.   And those were in -- were those also in your
20   house in your cabinet?
21   A.   Yes.
22   Q.   And were they similar in physical
23   description to the ones that you put into the gun?

Tann - Direct

56

1    A.   Yes. They were all the same.
2    Q.   And when you looked at that gun that day
3    after you got it back from the defendant, you're
4    telling us it was not fully loaded?
5    A.   Right.
6    Q.   Did you reload it again?
7    A.   I don't think so.
8    Q.   But you put it back in the cabinet?
9    A.   He put it back in the cabinet.
10   Q.   Okay. And so the next time -- as far as you
11   knew, you still had possession of the gun in your
12   house?
13   A.   Yes.
14   Q.   And the next time you saw the defendant was
15   when after the shooting of Mike Mercer?
16   A.   The next day.
17   Q.   And when was the last time you were aware
18   you still had possession of the gun?
19   A.   It was later on after -- actually, it was
20   the day before the cops came and took me to the
21   station.
22   Q.   So after you spoke to the cops, did you go
23   looking for the gun?

Tann - Cross

73

1    A.   Yes.
2    Q.   And they want you to come in here and lay a
3  load on Mr. Hainey, don't they?
4    A.   They want me to tell what happened.
5    Q.   All right. I'm going to switch gears a
6  little bit here. You testified that on the 21st of
7  August you were with Mr. Hainey, you were with Earl,
8  and you were with a guy named Phil, right?
9    A.   Yes.
10   Q.   Phil's got a nickname, doesn't he?
11   A.   Yes.
12   Q.   And that nickname is "Free," isn't it?
13   A.   Yes.
14   Q.   That nickname is not "Fly," is it?
15   A.   No.
16   Q.   And, in fact, you know a guy named Fly,
17 don't you?
18   A.   No.
19   Q.   You don't know a guy named Fly?
20   A.   I don't think so.
21   Q.   You've never met a guy named Fly?
22   A.   I don't think so.
23   Q.   But you can tell me this: You know that

Tann - Cross

74

1  Phil is not Fly?
2    A.   Yes.
3    Q.   So on the date of August 21st you weren't
4  with a guy named Fly?
5    A.   I don't think so.
6    Q.   And you didn't drive up to New Jersey with a
7  guy named Fly, did you?
8    A.   No.
9    Q.   And the guy sitting in the back seat of your
10 car that you drove up to New Jersey wasn't the guy
11 named Fly, was it?
12   A.   No.
13   Q.   What time did you go to New Jersey on that
14 day?
15   A.   Right after the incident we went right to my
16 apartment, and ten minutes after that we left.
17   Q.   Had you been to New Jersey earlier that day?
18   A.   Not that day.
19   Q.   Okay. So on that day, it's not like you
20 went to New Jersey, picked up some people, came back,
21 had an incident, you went back to New Jersey again,
22 is it? That didn't happen, did it?
23   A.   No.

Tann - Cross

75

1    Q.   All right. You're going to have to forgive
2  me, I'm doing a little bit of jumping around here.
3  I don't mean to confuse you, and certainly not the
4  jury.
5        I want to go back to where you were living,
6  all right. You said that after you got out of jail
7  on that capias you went to Maryland?
8    A.   Yes.
9    Q.   And you lived in Maryland. Where did you
10 live in Maryland?
11   A.   In Elkton.
12   Q.   With whom did you live?
13   A.   A friend's sister.
14   Q.   Would that happen to be Earl's sister?
15   A.   No.
16   Q.   Whose sister?
17   A.   A friend of mine named Rob.
18   Q.   And would you mind giving me Rob's name?
19   A.   Robert Young.
20   Q.   Okay. And you lived with Rob's sister in
21 Maryland for how long?
22   A.   Until August 2002.
23   Q.   And then where did you go?

Tann - Cross

76

1    A.   I moved back to Delaware.
2    Q.   And where did you live once you got back in
3  Delaware?
4    A.   In Lancaster Court.
5    Q.   Okay. And who did you live with there?
6    A.   My sister.
7    Q.   And how long were you there?
8    A.   Until February.
9    Q.   Of?
10   A.   2003.
11   Q.   And then where did you go?
12   A.   I went to Virginia. Well, actually I went
13 to Carolina.
14   Q.   You went to Carolina?
15   A.   Yes.
16   Q.   And how long were you there?
17   A.   A couple weeks.
18   Q.   Where did you go in Carolina?
19   A.   Ridge Square.
20   Q.   To Ridge Square?
21   A.   Rich Square.
22   Q.   Rich Square. And why did you move to
23 Carolina?

A-10

A-10

Tann - Cross

69

1    Q.   How long were you there?
2    A.   Until after I got out of jail on a capias,
3    about three days after that I moved to Maryland.
4    Q.   Okay. Now, you got -- you went to jail on a
5    capias. And let me just take a wild guess, would
6    that have been in September of '01?
7    A.   Yes.
8    Q.   Okay. You got picked up on a capias. And
9    let me take another wild guess. When you got picked
10   up on the capias, you were in a car with Earl Evans.
11   Isn't that true?
12   A.   Yes.
13   Q.   And that would have been about a month after
14   this incident, right? This incident occurred in
15   August of 2001, right?
16   A.   Right.
17   Q.   A month later you were in a car with Earl
18   Evans, you get stopped, you get picked up on
19   capiases, you both went to jail, didn't you, on the
20   capiases?
21   A.   Yeah.
22   Q.   Now, in direct testimony you told the
23   prosecutor that after August 21st, 2001, you were

Tann - Cross

70

1    only with Earl Evans one other time. Are you going
2    to tell me that was the only other time that you were
3    with him?
4    A.   After 2000 -- could you repeat the question?
5    Q.   Okay. Let's go back to the question that
6    she asked you. And she asked you this question, she
7    said after August 21st, 2001, did you ever see Earl
8    Evans again? And you said, Just one other time. All
9    right. Are you trying to tell me that that one other
10   time was the time that you and he just happened to
11   get picked up in a car together on a capias?
12   A.   Well, I think I misunderstood her question.
13   Q.   Okay.
14   A.   I thought she meant after I moved to
15   Maryland.
16   Q.   Well, then, let's try to clarify all of
17   this, okay. After August 21st, 2001, how many times
18   did you see Earl Evans?
19   A.   I'd say I saw him almost pretty regularly
20   that I had seen him before that.
21   Q.   And that was like almost every day?
22   A.   Almost.
23   Q.   All right. So let's just make sure I

Tann - Cross

71

1    understand this, then. When did you move to
2    Maryland?
3    A.   Near the end of September. Well, three days
4    after I made bail.
5    Q.   Three days after you made bail. So from the
6    time -- and when did you get picked up on the capias?
7    A.   In September.
8    Q.   In September. From August 21st to
9    September, whenever you got picked up on that capias,
10   you saw him almost every day?
11   A.   Almost.
12   Q.   Almost. You know what, if I tell you, could
13   we agree it was five days a week instead of seven,
14   that's fine with me, all right.
15   A.   Not even that much. I'd say about three.
16   Q.   Three days.
17        And where would you see him at?
18   A.   At my apartment.
19   Q.   At your apartment. And he would come over?
20   A.   Yeah.
21   Q.   He would come over without Jason?
22   A.   Well, Mr. Hainey was locked up.
23   Q.   Okay. Did I ask you that? Did I ask you

Tann - Cross

72

1    where Mr. Hainey was? Did I -- was that the question
2    I asked, where was Mr. Hainey? I asked you this
3    question: Did he come over without Mr. Hainey or by
4    himself?
5    A.   By himself.
6    Q.   Okay. Now, why would you want to throw that
7    in? Why would you want to tell me that Mr. Hainey
8    was in jail?
9         MS. PETERS: Objection. Sidebar.
10        MR. CAPONE: I'll withdraw the question,
11   your Honor.
12        THE COURT: Okay.
13   BY MR. CAPONE:
14   Q.   Let's go back to this question -- let's go
15   back to your direct testimony this morning. You said
16   that you met Mr. Evans downstairs and you had a
17   conversation with him. And that conversation went
18   something like this: "You know what they want us to
19   do, right?"
20        Okay. Now, who's "they"? Us?
21   A.   I would say he meant the prosecutors.
22   Q.   Them, you know what they want us to do,
23   right?

A-10

Tann - Cross

85

A.  Right.
2    Q.  Is it in the middle of the block or towards
3  one end of the block or the other?
4    A.  It was towards the end of the block.
5    Q.  Towards this end of the block down here?
6    A.  No.
7    Q.  Towards the closer end of the block?
8    A.  Yes.
9    Q.  Okay.  And where did you park?
10    A.  On the left side.
11    Q.  The same side as the house?
12    A.  Yes.
13    Q.  Okay.  And where in relation to the house?
14    A.  A little up further from the house.
15    Q.  Further down this way?
16    A.  Yes.
17    Q.  Were there a lot of cars on the street?
18    A.  Yes.
19    Q.  Okay.  Why did you pick that particular,
20  whatever spot you picked, why did you pick it?
21    A.  It was available.
22    Q.  It was available.
23        Were there people on the street?

Tann - Cross

87

1    A.  Yes.
2    Q.  How did you know it was loaded when you
3  handed it to Mr. Hainey?
4    A.  I didn't hand it to Mr. Hainey.
5    Q.  You didn't hand it to Mr. Hainey?
6    A.  No.
7    Q.  How did he get it?
8    A.  He knew where it was, he just went and got
9  it.
10    Q.  He just went and got it.  Did you see him go
11  and get it?
12    A.  No.
13    Q.  No.  When did you know that he had it?
14    A.  In the car.
15    Q.  In the car.  Did you turn around and go
16  back?
17    A.  No.
18    Q.  Now, you described the bullets today as
19  being what color?
20    A.  Gold.
21    Q.  Gold?
22    A.  Gold plated.
23    Q.  Gold plated.  With what else?

Tann - Cross

86

1    A.  No.
2    Q.  Nobody was on the street?
3    A.  I didn't see anybody.
4        MR. CAPONE:  Could I have the lights back,
5  please.
6    Q.  Now, during one of the statements that you
7  made to the police, did you tell the police that you
8  loaded the gun before Jason Hainey got it?
9    A.  Yes.
10    Q.  But you didn't tell us that today, did you?
11    A.  I did say that today.
12    Q.  You did say it today?
13    A.  Yes.
14    Q.  Okay.  When did you load the gun?
15    A.  I don't remember when.
16    Q.  Well, was it in the car?  Was it while you
17  were in the car?
18    A.  No.
19    Q.  Was it back at your house?
20    A.  It would have been in my house, yes.
21    Q.  Would it have been that day?
22    A.  No.
23    Q.  But you loaded it?

Tann - Cross

88

1    A.  With like a silver tip, kind of like a dull
2  gray.
3    Q.  Okay.  Did you ever describe it any
4  differently to the police?
5    A.  I believe that's about how I described it,
6  somewhere similar to that.
7    Q.  Did you collect the gun after the incident
8  on August 21st?
9    A.  Mr. -- when we got back to the house
10  Mr. Hainey, he put it back.
11    Q.  He put it back?
12    A.  Yes.  Actually, he put it on the counter
13  top.
14    Q.  He put it on the counter.  And you got it,
15  you reloaded it and you put it back in the cabinet,
16  right?
17    A.  Yeah.
18    Q.  Did you ever tell the police you reloaded
19  the gun after the incident?
20    A.  I don't think so.
21    Q.  You don't think you did?
22    A.  No.
23    Q.  Okay.  So the first statement you made to

Tann - Cross

89

the police, you tell the police that you made a phone
2  call to Mr. Mercer's house, you wanted to buy some
3  CDs from him. Did you also tell them that, you
4  know -- let's go into the detail that you had
5  provided to the police during that first statement.
6  And this is on the fly, right? I mean, the cops come
7  to your house, you're surprised to see them there,
8  right?
9      A.  Right.
10     Q.  And according to what you told us, you just
11  knew that a call had been made from your house to his
12  house. Did you tell them that, well, you met Mike in
13  July on Market Street, did you tell him that?
14     A.  I don't remember.
15     Q.  Okay. Did you tell him that you knew he,
16  like, did bootleg CDs?
17     A.  Yes.
18     Q.  Did you tell him that you knew he sold a
19  Jada Kiss CD?
20     A.  I might have.
21     Q.  You might have. Would that have been true
22  or just something you was making up for the cops?
23     A.  Something I was making up for the cops.

Tann - Cross

90

1      Q.  And you told the cops that you got the
2  Jada Kiss CD two or three weeks before that from him,
3  from Mike, did you tell him that?
4      A.  I don't remember.
5      Q.  But if you did, that was just something that
6  you were just making up then, right?
7      A.  Yes.
8      Q.  Did you tell the police that he would sell
9  the CDs on the Market Street Mall?
10     A.  I don't remember.
11     Q.  You don't remember?
12     A.  No.
13     Q.  Did you tell the police the last time you
14  spoke with him was on the phone that day?
15     A.  Yes.
16     Q.  And what time did you say you made the call?
17     A.  I didn't say.
18     Q.  Well, did you tell the police it was about
19  four o'clock?
20     A.  I don't remember saying that.
21     Q.  And if you did, were you just making that
22  up?
23     A.  Oh, I knew a call was placed at four

Tann - Cross

91

1  o'clock, but I don't remember if I had told that to
2  the police.
3      Q.  Did you tell the police that Mike sells CDs
4  for $5 or $10 less than they go for in the store?
5      A.  I don't remember.
6      Q.  If you did, that would have been totally
7  baloney, right, just making it up?
8      A.  People sell them on the street for about
9  $5, $10.
10     Q.  But according to you, you had no information
11  to think that Mike was selling them like that, did
12  you?
13     A.  Right.
14     Q.  Didn't you tell the police that somebody had
15  broken into your house? Was that the truth, or was
16  it you just snowballing, giving a snow job on that,
17  too? Do you remember that part?
18     A.  I don't remember telling somebody broke into
19  my house.
20     Q.  Your neighbor came into your house, do you
21  remember that part of the story?
22     A.  I don't remember telling it to the police.
23     Q.  Okay. Was that true?

Tann - Cross

92

1      A.  Yes.
2      Q.  Well, would we agree, then, that the way
3  you've presented this to the police is a work in
4  progress over a couple of years?
5      A.  Yes.
6      Q.  All right. Now, let's talk about -- again,
7  I'm shifting gears a little bit -- let's talk about
8  the night of August 21st. You say you went up to
9  New Jersey, right?
10     A.  Right.
11     Q.  And where did you go in New Jersey?
12     A.  I believe the town was called Clayton.
13     Q.  Clayton, New Jersey?
14     A.  By Glassboro.
15     Q.  And according to what I've understood so
16  far, the people in the car were Jason, Earl, and
17  Phil?
18     A.  Right.
19     Q.  And when you got there where did you go?
20     A.  Mr. Hainey directed us to, I think we went
21  to Phil's house, but I'm not sure.
22     Q.  You went to Phil's house.
23     And how long were you there?

Tann - Cross

101

1    Q.  Five years. You didn't take that plea?
2    You're looking at over 250 years in jail, you didn't
3    take the five?
4    A.  No.
5    Q.  Okay. Why not?
6    A.  Because my lawyer said it might be, there
7    might be a chance that the next plea might be better.
8    Q.  And what do you think would make that next
9    plea better? Your performance today, right?
10    A.  No.
11    Q.  Okay. Fair enough.
12        What else would make that plea better? What
13    else would you do to make that plea better? Give me
14    one reason.
15    A.  Actually, at that time it was nothing to do
16    with any of my performance, I was hoping the
17    prosecutor would offer me another deal.
18        MR. CAPONE: Could I have a moment,
19    your Honor?
20        (Defense counsel confer.)
21        MR. CAPONE: No further questions,
22    your Honor.
23        MS. PETERS: Your Honor, may we go to

102

1    sidebar, please?
2        THE COURT: Sure.
3        (The following took place at sidebar:)
4        MS. PETERS: Defense counsel has crossed in
5    the area that the State feels has opened the door.
6    Defense counsel was provided with a factual
7    recitation of why Earl Evans and Monia Tann were in a
8    car together after the murder, and that they were
9    trying to collect money to help Jason and Monia get
10    home. Now, that was provided factually to defense as
11    part of the motion for reargument. And when
12    questioned and asked what are you doing hanging out
13    with Earl Evans, I would like to rehabilitate him by
14    allowing him to say that I'm not out there conspiring
15    with Earl to get Jason in worse trouble, I'm out
16    there trying to get him bailed out on some other
17    charges, I'm still his friend at that time.
18        MR. CAPONE: Could I confer with counsel for
19    a minute?
20        (Defense counsel confer.)
21        MR. CAPONE: Well, I understand.
22        MR. HEYDEN: If you can do that, if you can
23    get into the --

103

1        MR. CAPONE: If the Court -- all right.
2    I take the position that I didn't open the door.
3        THE COURT: I'm sorry?
4        MR. CAPONE: I'm going to argue that they
5    didn't open the door -- that I didn't open the door.
6        MS. PETERS: And there's one other point to
7    be made.
8        THE COURT: That you did open the door?
9        MR. CAPONE: Did not.
10        MS. PETERS: There's one other point to be
11    made about the fact that he's resultantly ends up in
12    prison as a result of his capias, that is, that time
13    that he speaks to Mr. Hainey because they meet each
14    other in lockup in Gander Hill and then discuss that
15    gun.
16        MR. CAPONE: I didn't get into that at all
17    that he met Hainey in jail. And as far as the fact
18    that he got arrested on a capias trying to collect
19    bail, I was trying to contradict what, I was
20    cross-examining him on the --
21        THE COURT: Wait a minute.
22        MR. CAPONE: On the credibility, on the
23    credibility issue. Because he said on direct I only

104

1    saw him one time after August --
2        THE COURT: What's Mr. Hainey in jail for at
3    this juncture?
4        MS. PETERS: Abbey Walk. And he makes bail
5    on Abbey Walk. And the thing is --
6        MS. KELSEY: No, he didn't make bail.
7        MS. PETERS: He doesn't make bail, oh, I'm
8    sorry. But, in any event, they are at that time --
9    and this is part of the credibility that defense, the
10    State argues is trying to suggest that --
11        THE COURT: Well, you certainly asked him
12    whether or not during this period of time after this
13    incident and when he's seeing Mr. Evans whether or
14    not he continues to be a friend with Mr. Hainey, and
15    whether or not he is concerned about the welfare of
16    Mr. Hainey. But then to say that he's, I saw
17    Mr. Hainey in jail and I'm trying to get him out on
18    bail is, there's no probative value to that. There's
19    nothing of value to the fact that they're trying to
20    get him out of jail, other than to establish that now
21    Mr. Hainey's in jail.
22        I mean, I can't understand the probative --
23    you certainly can establish he's still friends with

Spillan, Jr. - Direct

13

1  the Court's Exhibit No. 1. What is that, sir?
2      A. It's a Delaware State Police Consent to
3  Search Form.
4      Q. For what residence?
5      A. For 39 Abbey Lane, Building 60, Apartment
6  7C, Charles, Newark, Delaware.
7      Q. And is that the residence which you were
8  searching and looking for the gun from that robbery
9  incident?
10     A. That is correct.
11     Q. Who signed the consent to search form?
12     A. I had both Mr. Hall and Mr. Evans sign the
13  form.
14     Q. Okay. Now, did they remain present as you
15  searched, in fact searched the residence?
16     A. That is correct.
17     Q. Did you eventually find and locate the gun
18  that you were looking for?
19     A. Yes.
20     Q. Describe to the Court where it was found.
21     A. Within the living room area of the
22  apartment, in a corner it was amongst some bags, it
23  was specifically in a red bag in the property, or in

Spillan, Jr. - Direct

14

1  the corner of this living room.
2      Q. And was there anything else besides the
3  weapon in the red bag?
4      A. There was additional rounds in the bag.
5      Q. And was there anything else, like personal
6  possessions or belongings in the bag?
7      A. None that I had noted, that I recall.
8          MR. CAPONE: Your Honor, could I object and
9  ask for some voir dire? I'm not sure that he
10  actually did find these things. And I'm not sure
11  whether we're getting this through hearsay with this
12  witness.
13         THE COURT: Well, why don't you see if you
14  could clarify that point.
15  BY THE COURT:
16     Q. Did you actually do the search?
17     A. Yes.
18     Q. You actually were the one that found it?
19     A. Yes.
20  BY MS. PETERS:
21     Q. Was there anyone else with you doing the
22  search?
23     A. Detective Erne and Corporal Witmarsh.

Spillan, Jr. - Direct

15

1      Q. So were they also present for your recovery
2  and retrieval of the weapon?
3      A. Yes.
4          MS. PETERS: I think, your Honor, that might
5  be where the confusion of the defense is laid. Is
6  that correct?
7  BY MS. PETERS:
8      Q. Getting back to the question as to personal
9  effects, you don't recall if there were any personal
10  effects in that particular bag?
11     A. No, I don't.
12         MS. PETERS: Just one moment, your Honor,
13  please. (Pause.)
14     Q. Okay. Now, did you learn whether or not the
15  defendant, Jason Hainey, lived in this home or this
16  residence?
17     A. He would visit. He wasn't a, what I was
18  told by Mr. Evans and Mr. Hall he did not reside
19  there.
20     Q. Okay. And, however, did you learn whether
21  or not he was staying there?
22     A. Yes.
23     Q. And from whom?

Spillan, Jr. - Direct

16

1      A. From Mr. Evans and Mr. Hall.
2      Q. And when you removed the gun from that
3  personal bag did you learn to whom, if anyone, it
4  belonged to, the bag?
5      A. That was indicated that that property and
6  everything belonged to Mr. Hainey.
7      Q. Who told you that?
8      A. That was Mr. Evans.
9      Q. Okay. Now, Detective, just to be clear,
10  when you approached the property wherein you found
11  the weapon, did you learn before or after you removed
12  the gun that that particular -- those particular
13  belongings were Mr. Hainey's?
14         MR. CAPONE: What particular belongings?
15  I thought you said there was no personal effects in
16  the bag.
17         MS. PETERS: I'll rephrase it.
18  BY MS. PETERS:
19     Q. Before or after you went into the bag, did
20  you learn -- when did you learn who the bag belonged
21  to, before or after you removed the gun from the bag?
22     A. When we indicated to the owners of the
23  apartment we found the gun.

## Spillan, Jr. - Direct

17

1    Q.   Okay.  Now, were they actually able to see
2  you retrieve the gun?
3    A.   Yes.
4    Q.   Did you actually show them the gun?
5    A.   I didn't get up to them and hand it to them,
6  or anything, but they were across -- the living room,
7  there's a couch along the wall of the door entrance
8  of the apartment, the property that they indicated
9  was Mr. Hainey's across the room, unobstructed
10  view, in the corner with all the belongings.  When we
11  pulled the gun up out of the bag, that's when they
12  had indicated that property belonged to Mr. Hainey.
13    Q.   Okay.  Now, were there actually bedrooms
14  separate from this living room?
15    A.   Yes.
16    Q.   Within the residence?
17    A.   Yes.
18    Q.   Okay.
19          MS. PETERS:  Let me see the gun.
20          Your Honor, the record should reflect that I
21  just handed to defense counsel the weapon for their
22  review.
23          (Defense counsel confer.)

## Spillan, Jr. - Direct

18

1          MS. PETERS:  Your Honor, I'd like to have
2  this item marked as a Court's exhibit at this time.
3          MR. CAPONE:  That's fine with us,
4  your Honor.
5          MS. PETERS:  Would your Honor like the box
6  marked instead of the evidence itself?
7          THE COURT:  There was no evidence envelope.
8  Was it put in an evidence envelope?  We could
9  probably put a tag on the bottom of...
10          All right.  That's fine.
11          THE CLERK:  Marked as Court Exhibit No. 2.
12          THE COURT:  Thank you.
13          MS. PETERS:  As your Honor cautioned me
14  yesterday, once it gets turned on it can't be turned
15  off.  Could I approach the witness while we're doing
16  that?
17          THE COURT:  Go ahead.
18  BY MS. PETERS:
19    Q.   This is, Detective Spillan, Court's Exhibit
20  No. 2.  Do you recognize that?
21    A.   Yes.
22    Q.   As what?
23    A.   That's the weapon we recovered from the

## Spillan, Jr. - Direct

19

1  apartment.
2    Q.   Now, when you recovered this weapon, the
3  defendant, Mr. Hainey, was subsequently charged,
4  correct?
5    A.   Correct.
6    Q.   And you chose to charge him with an
7  obliterated serial number, right?
8    A.   Correct.
9    Q.   Why?
10    A.   Because where the, where I looked for a
11  serial number on a weapon such as this, there was no
12  serial number.  And up top, along the top portion of
13  the frame of the weapon appeared to have been a filed
14  down, what I believed the serial number to be
15  removed, where the spot where I would look for a
16  serial number on the weapon.
17  BY THE COURT:
18    Q.   Detective, I'm assuming -- we'll get to this
19  in a moment -- but I'm assuming that other than what
20  these two individuals told you, that this was
21  Mr. Hainey's property, there was nothing that you
22  recovered or nothing that you found that would
23  independently confirm that this was his property,

## Spillan, Jr. - Direct

20

1  that it had to be, based upon what they told you?
2    A.   Correct.
3          THE COURT:  Okay.
4  BY MS. PETERS:
5    Q.   As we're looking at Court's Exhibit No. 2,
6  which you've identified as the weapon you recovered,
7  along the top of that there's a silver portion of the
8  gun removed.  Is that where you felt that the serial
9  number was?
10    A.   That's correct.
11    Q.   And is there another place within the weapon
12  to look for a serial number?
13    A.   Also on -- I'm not an expert, or anything --
14  but on the bottom of the handle of that revolver
15  you'll see a flat portion of metal on the bottom
16  side.
17    Q.   This (indicating)?
18    A.   Rotate it the other way.  There you go.
19  Right there at the bottom of that handle there's a
20  flat portion, there's a flat piece of metal.  And
21  typically the serial number would be etched in there,
22  also.
23    Q.   Did you find one when you opened the weapon?

Spillan, Jr. - Direct

21

1    A.   I did not find anything that to me that
2  indicated it was a serial number, no.
3    Q.   So Court Exhibit 2 is the weapon that you
4  recovered that particular night?
5    A.   Yes.
6    Q.   Okay.  Now, along with the victim's
7  description of the particular weapon that was used in
8  the incident against him, did he make a description
9  of the person who was holding it, the weapon against
10 him?
11   A.   Yes.
12   Q.   And did he eventually identify the person
13 against whom -- or who had used the weapon against
14 him?
15   A.   He gave me -- as far as to be honest with
16 you, I don't know if we did a -- I'd have to refer to
17 my report.  I don't know if we did a show-up or if we
18 did a photo lineup, or any way, for that.
19   Q.   Let me ask you, how did you --
20      MS. PETERS:  Since we're in a hearing,
21 your Honor, if you'll give the State a little
22 leeway.
23   Q.   -- how did you figure out that Jason Hainey

Spillan, Jr. - Direct

22

1  was the person holding the gun against him?
2    A.   (Pause.)
3    Q.   Is it that you just can't remember?
4    A.   Yeah.  I know it's in my report.  The victim
5  gave me a description of, I typically ask for a
6  description of everything they could possibly
7  remember about an assailant.  So it would be in my
8  report on a description.
9      MS. PETERS:  Your Honor, the record should
10 reflect that we have provided defense counsel with
11 the redacted crime report.  If they want to see the
12 original before, I'd ask of the Court the opportunity
13 to refresh the recollection of the witness, if they
14 can do that?
15      THE COURT:  Sure.
16 BY MS. PETERS:
17   Q.   Detective, I'm going to hand you the reports
18 and ask you to look through them and see if they
19 refresh your recollection as to how you connected
20 Court's Exhibit 2 to the defendant on that night?
21   A.   (Pause.)  All right.  He basically provided
22 me with a physical description of both suspects.
23 From what I have here in my notes that the victim

Spillan, Jr. - Direct

23

1  gives me, he has the, it appears to be -- do you want
2  me to give a physical description?
3    Q.   Well, aside from the physical description,
4  was the victim able to identify him in any other way?
5    A.   Oh, I'm sorry.  (Pause.)  He had indicated
6  that one of the suspects he was familiar with, he had
7  had a cigarette with on Tuesday night.  And that was
8  -- he has that listed, he indicates to me that's
9  suspect No. 1.  So for my report purposes that would
10 have been Maurice Wright who he had the cigarette
11 with prior to this incident.
12   Q.   Now, did he describe to you that Maurice
13 Wright was holding the weapon when it was used?
14   A.   Yeah.  He had indicated to me that he was
15 holding the revolver in his right hand during that
16 incident, during the robbery.
17   Q.   I'm sorry.  What was that?
18   A.   That description going along with suspect
19 No. 1, he describes that that person was holding a
20 revolver in his right hand during the robbery and
21 described the weapon.  He also said that suspect
22 No. 2, who I've listed for report purposes is Jason
23 Hainey, he was also holding the weapon that was

Spillan, Jr. - Direct

24

1  similar to the one being used by the first suspect.
2    Q.   And I hate to be dense, but when he says
3  that suspect No. 2 was also holding a weapon, did he
4  personally know suspect No. 2 to identify him?  Or
5  did he have to give you a physical description which
6  you matched up with --
7    A.   He described him to us.  He knows No. 1,
8  who is Mr. Wright.  And then when he described the
9  second suspect, who is Mr. Hainey in the apartment,
10 one particular thing that he gave to me was wild
11 hair, and basically his hair was just kind of
12 standing up.
13   Q.   And did he also describe the clothes that he
14 was wearing that night?
15   A.   Yeah.  He had on, he was wearing dark jeans,
16 either blue or black, a light-colored T-shirt, and
17 possibly wearing boots.
18   Q.   And did he tell you to where the two
19 suspects went after they committed the offense
20 against him?
21   A.   Yeah.  They had fled to the described
22 apartment.
23   Q.   Okay.  And how soon after this information

---

Spillan, Jr. - Direct

25

1  you got from the victim did you arrive at that
2  apartment?
3      A.  I don't know my arrival time to the scene.
4  But typically what happens on this one here, just to
5  clarify, in the beginning it was a general dispatch
6  for the complaint. Our agency and New Castle County
7  police responded. They helped, they assisted in
8  directing us to where the apartment was and where the
9  suspects fled to based on the victim's information.
10  And then I verified that with the victim prior to
11  going to this apartment. So that's how we got to the
12  apartment, and that's how we know where they fled.
13      Q.  And when you got to the apartment, did you
14  encounter someone matching the description?
15      A.  Yes.
16      Q.  And that was on the same night?
17      A.  Yes.
18      Q.  Within how much period of time from
19  the actual incident were you able to tell had
20  passed?
21      A.  Incident's recorded at 2200. I know I was
22  working nights. I was probably there within 40
23  minutes of the incident.

---

Spillan, Jr. - Direct

26

1      Q.  So it would be 40 minutes you encountered
2  the person matching the description?
3      A.  Yes.
4      Q.  Was Maurice Wright also in that residence?
5      A.  Yes.
6          MS. PETERS: Just a moment, your Honor.
7          (Pause.)
8      Q.  Now, sir, in the actual description of the
9  incident to you by the victim and through the New
10  Castle County police, was there one or two weapons
11  used in this particular attempted robbery?
12      A.  (Pause.) According to the victim, what he
13  has told me, and what I'm recalling here from my
14  notes, he was describing both suspects as having
15  weapons.
16      Q.  Did you locate two weapons?
17      A.  No.
18      Q.  And did you search any other areas besides
19  the interior of the home?
20      A.  We done a canvass of the bush line that
21  separates the area where the suspects had fled up
22  from, and nothing was recovered there, either.
23          MS. PETERS: Nothing further, your Honor.

---

Spillan, Jr. - Cross

27

1          CROSS-EXAMINATION
2  BY MR. CAPONE:
3      Q.  Detective Spillan, one of the things I heard
4  you say this afternoon is that you're not an expert
5  in ballistics; is that right?
6      A.  No.
7      Q.  You would agree with me on that --
8      A.  Oh, yeah.
9      Q.  -- correct?
10          And you decided -- well, who made the
11  decision to charge Mr. Hainey with possession of a
12  weapon with the removed, obliterated or altered
13  serial number, who made that decision?
14      A.  That would have been myself.
15      Q.  Okay. And, in fact, there it is on the
16  indictment, it's Count No. IV, right?
17      A.  Yes.
18      Q.  And when did you go in front of the grand
19  jury and ask them to vote on this indictment?
20      A.  Where did I go?
21      Q.  When did you go? If you --
22      A.  I don't believe -- I believe Sergeant
23  Ferrera's our court liaison officer, so he does

---

Spillan, Jr. - Cross

28

1  presentation for grand juries.
2      Q.  So in between the time, do you know when
3  that occurred?
4      A.  The grand jury on it?
5      Q.  Yeah.
6      A.  No.
7      Q.  In between the time that you arrested my
8  client and the time you went to the grand jury, do
9  you know if anyone who might be more familiar with
10  ballistics than you had a chance to look at this gun
11  to determine whether or not there was in fact an
12  obliterated serial number on that gun?
13      A.  Not to my knowledge.
14      Q.  Not to your knowledge.
15          And the fact of the matter is, and it's
16  completely undisputed, that this particular gun which
17  forms the basis of this indictment did not have an
18  obliterated serial number, did it?
19      A.  As I'm being told. I mean, if that's the
20  serial -- if there's numbers on it that are indicated
21  to me they're the serial number, I'll accept it.
22      Q.  Well, do you think that maybe that's not the
23  gun?

---

Spillan, Jr. - Cross
29

1   A.   No, that's the gun.
2   Q.   And the gun, how do you know it's the gun?
3   A.   That's the gun I recovered out of the bag,
4   sir.
5   Q.   But how do you know that? The gun that you
6   say you recovered you say had an obliterated serial
7   number?
8   A.   Correct.
9   Q.   This one has a serial number.
10  A.   If that's the serial number.
11  Q.   Okay. Are you disputing that what I'm
12  showed what's on that gun is a serial number?
13  A.   Sir, I'm saying if it's the serial number,
14  I'll accept it.
15  Q.   Okay. Now, there were -- the victim in this
16  case said that there were two suspects, right?
17  A.   Correct.
18  Q.   And Suspect 1 was holding this gun that is
19  the Court exhibit in this case, right, to your mind?
20  A.   He was holding a, he described a revolver,
21  yes.
22  Q.   A revolver. And in your mind, that's the
23  gun that's in evidence now in this case, the Court

Spillan, Jr. - Cross
30

1   exhibit, right?
2   A.   Well, they described both suspects possibly
3   holding revolvers. So I have his description, if he
4   has two, one of those guns which is that gun is in
5   evidence now.
6   Q.   Are you telling me that they described them
7   both as revolvers?
8   A.   I said in the description that was given by
9   the first guy, he was holding a revolver. The victim
10  said the second suspect was holding a similar type
11  gun.
12  Q.   All right. Here at the bottom of the page
13  it says, Suspect No. 2, the victim encountered the
14  suspect -- this is your report, right?
15  A.   Correct.
16  Q.   The victim encountered this suspect as he
17  was walking away from suspect No. 1, dark-skinned
18  black male, five-nine to six-foot, 200 pounds with a
19  slim build and wild hair. That's the one you think
20  is Hainey, right?
21  A.   Correct.
22  Q.   Wearing dark jeans, either black or blue,
23  and a white-colored T-shirt, possibly wearing boots.

Spillan, Jr. - Cross
31

1   This suspect held a gun in his right hand which
2   appeared to be similar to the one used by the first
3   suspect. Victim 1 was unable to describe the gun
4   being held by the suspect.
5        That's what you're saying, right?
6   A.   Okay.
7   Q.   I read that to say unable to describe the
8   gun being held by the suspect, right?
9   A.   Well, he's calling it -- he's calling it
10  similar to the one being used by the first suspect.
11  Q.   And then you finished -- he apparently
12  finished it off and said: I'm unable to describe the
13  gun being held by this suspect.
14       That's your language, that's not my
15  language.
16  A.   Okay.
17  Q.   Right?
18  A.   Correct.
19  Q.   Now, let's look at what this person
20  apparently told you about the other gun. He said:
21  The suspect was holding a revolver in the right hand,
22  the gun had a brown handle and the frame was black in
23  color and appeared to be a .38 caliber-sized weapon.

Spillan, Jr. - Cross
32

1   Right?
2   A.   Correct.
3   Q.   So it's pretty -- would I be wrong in saying
4   that he gave you a much better description of the gun
5   that Maurice Wright was holding than the gun that
6   Mr. Hainey was holding, right?
7   A.   Yes.
8   Q.   The gun that we have here is the gun that
9   Mr. Wright was holding, right?
10  A.   Well, if you want to go solely on the --
11  yes, okay. But it's also a similar description, he's
12  saying the --
13  Q.   You know what, I'm just asking you, I'm
14  going to take a wild leap here, in your own mind, the
15  gun that we have here in court today is the gun
16  Mr. Wright was holding, right, in your mind?
17  A.   According to the victim's description.
18  Q.   Yes, I'm right, correct?
19  A.   Correct.
20  Q.   Okay. Now, let's talk about finding the
21  gun, all right. Mr. Hainey, at the time the gun was
22  located where was Mr. Hainey?
23  A.   I believe I said earlier he probably was

Spillan, Jr. - Cross

33

1  transported back to Troop 6.
2       Q.  He was transported back to 6.
3           But when he was found in the apartment,
4  where was he in the apartment?
5       A.  Mr. Hainey wasn't present when we found the
6  gun.
7       Q.  But when he was found in the apartment,
8  where was he?
9       A.  Oh, where was he? I'm sorry. In the back
10  bedroom.
11      Q.  He was in the back bedroom. And this gun
12  apparently was found in a front room?
13      A.  In the living room area, yes.
14      Q.  In the living room area.
15          Okay. Now, did you write a report about
16  this, about finding the gun?
17      A.  Yes.
18      Q.  You did. Did you say you found the gun?
19      A.  Yes.
20      Q.  Okay. Well, I got, this is Witmarsh's
21  report. Do you see it?
22      A.  (Pause.)
23      Q.  I think you can even pull it up on the

Spillan, Jr. - Cross

34

1  screen. If you turned your screen on, it would be
2  right there in front of you.
3       A.  Okay. Let me see if I have that here.
4           THE COURT:  Let's turn it on. It's on mine,
5  just turn his on. It's on mine.
6       Q.  It says "Witmarsh" at the bottom of the
7  page, right?
8       A.  Yes.
9       Q.  And it says the supervisor is John Tack?
10      A.  Correct.
11      Q.  So you didn't approve this report?
12      A.  No.
13      Q.  All right. And according to Witmarsh, he
14  says, the last three lines: During this search I
15  located a small black revolver and a plastic bag in
16  the rear left of the living room. I immediately
17  notified Detective Spillan -- Detective Spillan, who
18  took custody of same. I then cleared the scene.
19          How do you figure that?
20      A.  (Pause.) Because, as I said, he was there
21  with us when we were doing the search. I had
22  Detective Erne and Corporal Witmarsh both inside of
23  the apartment when we were searching.

Spillan, Jr. - Cross

35

1       Q.  I know you said that. He's saying that he
2  found it and gave it to you.
3       A.  (Pause.)
4       Q.  Is there another way to read that?
5       A.  I mean, I see his wording, sir, but I don't
6  think he handed that weapon to me.
7       Q.  Okay. So you're disputing the way he's
8  worded that, then?
9       A.  He's saying he located. "Locate" could
10  mean, hey, it's over here, I found it. And that's
11  what I believe occurred that evening.
12      Q.  Okay. Fair enough.
13          And, as I recall your testimony, there were
14  no other personal effects inside that plastic bag?
15      A.  I don't recall anything else being in that
16  bag, no.
17      Q.  Now, Mr. Hall, Wayne Hall, told you that
18  Jason Hainey did not live at that apartment, didn't
19  he?
20      A.  Correct.
21      Q.  And it was Evans who told you that the gun
22  belonged to Mr. Hainey, didn't he?
23      A.  Correct.

Spillan, Jr. - Redirect

36

1           MR. CAPONE:  Could I have a moment,
2  your Honor?
3           THE COURT:  Mm-hmm.
4           MR. CAPONE:  No further questions,
5  your Honor.
6           REDIRECT EXAMINATION
7  BY MS. PETERS:
8       Q.  Detective, you just told Mr. Capone that if
9  you go by the victim's description, the gun that's
10  just been presented to you could be the gun Maurice
11  Wright was holding at the time of this offense,
12  correct?
13      A.  Correct.
14      Q.  Who was with Maurice Wright, according to
15  the victim, at the time this gun was used?
16      A.  Mr. Hainey.
17      Q.  Was Earl Evans with Mr. Wright, according to
18  any victim's statement, during the robbery?
19      A.  During the robbery itself, no, there was no
20  indication of a third person.
21      Q.  Was Mr. Hall -- was Mr. Wright, according to
22  any victim statements?
23      A.  No.

Spillan, Jr. - Redirect

37

1    Q.    When you went to the house in the residence
2    to search for the gun or guns that were used in the
3    robbery, and it was located, did either Wayne Hall or
4    Earl Evans tell you that that was Maurice's gun,
5    Maurice Wright's gun?
6    A.    They indicated that that property, where it
7    was found, that that weapon was recovered, belonged
8    to Maurice Wright -- or, excuse me -- Mr. Hainey.
9    Q.    Did they ever say that Maurice Wright was
10   staying or visiting at that residence for periods of
11   time?
12   A.    They would visit. They believed that he
13   had -- I just refreshed my mind here on what they had
14   said -- they believed that he had a girlfriend in the
15   complex and he wouldn't stay there at the apartment
16   long.
17   Q.    Who, Maurice, or Mr. Hainey?
18   A.    Mr. Hainey.
19   Q.    So where, according to your police report,
20   did Mr. Wright live?
21   A.    I have an address of 307 Clemons Building,
22   Newark, Delaware.
23   Q.    Is that Abbey Walk Apartments?

Spillan, Jr. - Redirect

39

1    other bags. Which it took up the corner of the room,
2    as you come in the door, and it sat right near the
3    corner, just some other personal property.
4    Q.    Like what?
5    A.    I did not note what the property was, just
6    other bags. I mean, there was a few bags there, that
7    I can recall.
8    Q.    Was there an effort to try to inventory what
9    was there? I mean, how do I know -- I mean, to be
10   candid with you, Officer, you got a gun that you just
11   found, it's allegedly in the personal properties of
12   Mr. Hainey, and the only way you know that at the
13   moment is because somebody told you that. Logic
14   would say to me I would try to look through the
15   personal property that's there to see whether or not
16   I could verify that all this pile of stuff that's in
17   one corner has anything to do with Mr. Hainey.
18   A.    Right.
19   Q.    Was there an effort to do that? Or was
20   it -- was there clothing that was noted? Was there
21   anyone's jeans? Was there personal effects? Or was
22   it -- I'm not quite sure what to make here to help me
23   make that determination.

Spillan, Jr. - Redirect

38

1    A.    Not to my knowledge, no.
2    Q.    And did Mr. Wright have a girlfriend that
3    lived at or near Abbey Walk Apartments, as far as
4    your information told you?
5    A.    I mean, that was what was told to us.
6    Q.    Maurice or Jason?
7    A.    (Pause.)
8    Q.    Who had the girlfriend that stayed at Abbey
9    Walk Apartments?
10   A.    Mr. Wright had the girlfriend.
11   Q.    And Mr. Hainey -- between Mr. Hainey and
12   Mr. Wright, who did they tell you stayed at Earl and
13   Wayne's home?
14   A.    They would both visit. I mean, neither one
15   of them would actually stay -- were living or paying
16   rent there.
17   Q.    Did they indicate to you as you searched
18   that there were any possessions of Mr. Wright's in
19   their home?
20   A.    No, not that I recall.
21   BY THE COURT:
22   Q.    Officer, what else was around this bag?
23   A.    It was a bunch of other personal property,

Spillan, Jr. - Redirect

40

1    A.    Well, the only thing I can tell you, sir, is
2    mainly clothing that was there. As far as telling
3    you did I see an ID or look for an ID, I don't recall
4    if we ever did that, or if we ever found an ID out of
5    that pile.
6    Q.    Like, was there lots of clothing, like?
7    A.    It was a considerable sized pile. Probably
8    about, came out about three feet, maybe two feet out,
9    took up that little portion of the wall there, like
10   that (indicating).
11   Q.    Was it just a pile of clothes there?
12   A.    If I recall correctly, sir, yes.
13   BY MS. PETERS:
14   Q.    Now, Detective, this gun that was located,
15   whether held by the first or the second suspect,
16   matched the description of the weapon used in the
17   offense?
18   A.    Correct.
19   Q.    And neither Mr. Evans nor Mr. Hall were
20   implicated in the offense?
21   A.    Correct.
22   Q.    And they were the actual owners of the
23   residence?

Spillan, Jr. - Redirect

41

1    A.   Correct.
2    Q.   And also true, I don't have the indictment
3    in front of me, was Mr. Hainey charged with
4    conspiracy in the commission of this offense?
5    A.   Correct.
6        MS. PETERS: Just one minute, your Honor.
7    Q.   Now, when you retrieved the gun, it's your
8    recollection that you actually did the retrieval of
9    the gun from its original position?
10   A.   Correct.
11   Q.   Its condition at the time, was it loaded or
12   unloaded?
13   A.   Let me refer here for a second. (Pause.)
14       It was noted with six rounds of ammunition.
15       MS. PETERS: Just one minute.
16   Q.   And other than the actual weapon and the
17   ammunition that was loaded into the weapon, was there
18   anything else that you took from those possessions?
19   A.   There was four additional rounds of
20   ammunition also recovered.
21   Q.   And what did you do with those items that
22   you recovered?
23   A.   They were then taken down to Troop 2 and

Spillan, Jr. - Redirect

42

1    logged into evidence.
2    Q.   And how did they eventually end up in the
3    possession of the Wilmington police department?
4    A.   One of our detectives had made an arrest for
5    another robbery investigation. Mr. Hainey was the
6    person who was arrested. During an interview it had
7    come up that that weapon was used in a homicide.
8    Q.   And at that time was it turned over to the
9    Wilmington police department?
10   A.   Yes, it was.
11       MS. PETERS: And, your Honor, just a moment.
12   Q.   Before -- how long -- what time -- you
13   recovered it in 2001, what year did the Wilmington
14   police department ask for it?
15   A.   2003.
16   Q.   And where had the Delaware state police put
17   the gun by this time? Was it still being used as
18   having evidentiary value for this robbery case?
19   A.   No.
20   Q.   And had it been marked for destruction?
21   A.   Yes.
22       MS. PETERS: I'm sorry, your Honor. (Pause.)
23   Q.   Now, when an item is actually marked for

43

1    destruction, before it's actually destroyed, does it
2    maintain the same -- do you preserve the evidence in
3    the same way before it's destroyed? Do you keep the
4    same case number, and do you keep it secured?
5    A.   Yes.
6        MS. PETERS: No more questions, your Honor.
7    BY THE COURT:
8    Q.   Officer, I'm assuming that, if I'm reading
9    your testimony correct, you located Mr. Hainey and
10   believed he was one of the people who were involved
11   in the robbery or attempted robbery, took him into
12   custody?
13   A.   Correct.
14   Q.   Somebody took him back to the troop?
15   A.   Correct.
16   Q.   You find the gun, Mr. Hainey's now back at
17   the troop. I'm assuming, since you didn't tell me,
18   that either, A, you didn't interview him, or, B, you
19   asked to interview him and he told you to go pound
20   sand, one of the two. Did you talk to him?
21   A.   He was interviewed, yes.
22   Q.   He was interviewed?
23   A.   Yes.

44

1    Q.   Did you show him the gun?
2    A.   No.
3    Q.   So you had a gun that somebody told you was
4    his and you didn't show it to him and say, "Is This
5    your gun?"
6    A.   No, I did not.
7    Q.   What did he tell you?
8    A.   (Pause.) He basically, he doesn't -- when
9    the incident occurs he describes it as a fight, the
10   initial report for the whole incident he describes as
11   a fight. He never says that there was ever a weapon
12   used in the fight. The only reason that the weapon
13   even came up -- then he just -- then he invoked, he
14   wouldn't go any further during the interview. But at
15   the apartment he had made an indication to me with
16   Detective Erne present that I think I can help you,
17   and I know what you're looking for.
18   Q.   Right, I got that. And he said it was in
19   the bushes. And I'm assuming, knowing that you're a
20   good detective, somebody at least would have been
21   told to go out and look at the bushes?
22   A.   Yes. We did canvass that area.
23   Q.   And nothing was found?

Spillan, Jr. - Recross

45

1    A.   Right.
2    Q.   But I'm assuming that you never, either you
3  never got to that point in the interview because he
4  invoked his privileges?  Or...
5    A.   Once he invokes, sir, I stop everything,
6  and I won't even approach him with a piece of
7  evidence.
8    Q.   I understand that.  So you never got into a
9  discussion at that point in time about the weapon or
10  the fact that you had found a weapon because he
11  invoked?
12    A.   Correct.
13    THE COURT:  All right.
14    MR. CAPONE:  Just a couple more, your Honor.
15            RECROSS-EXAMINATION
16  BY MR. CAPONE:
17    Q.   Well, let's talk about whether Jason Hainey
18  was living there or staying there.  The information
19  that you got regarding his frequency of his visits to
20  that apartment came from Mr. Evans and Mr. Hall,
21  right?
22    A.   Correct.
23    Q.   Okay.  Now, Mr. Evans, you would agree, fits

Spillan, Jr. - Recross

46

1  the description of one of the suspects -- five-nine,
2  200 pounds, black male?
3    A.   I don't have the description of Mr. Evans
4  before me, so I can't...
5    Q.   Okay.  Well, this is my redacted copy of the
6  police report.  The statement of witness 001 -- I
7  know it's redacted, but I was able to figure out that
8  it's Wayne Hall -- it's page 7 of your police report.
9    A.   Okay.
10    Q.   Okay.  Was I right?  Was I able -- did I
11  figure it was Wayne Hall?  Did I guess the right guy?
12  Is that who it is?
13    A.   You did well.
14    Q.   Thank you.
15    All right.  Let's see what Wayne Hall says.
16  Let's go to the third paragraph, next to last
17  sentence.  Now, he's PC-1, you're referring to him as
18  PC-1 there, right?
19    A.   Correct.
20    Q.   PC-1 added, Neither suspect is on the lease,
21  nor do they pay rent or spend the night, right?
22    A.   Correct.
23    Q.   And when he's talking about either suspect,

Spillan, Jr. - Recross

47

1  he's talking about Jason Hainey and Maurice, right?
2    A.   Correct.
3    MR. CAPONE:  No further questions.
4    MS. PETERS:  No more questions from the
5  State, your Honor.
6    THE COURT:  Okay.  You can step down, sir.
7  Thank you.
8    (Pause.) Okay.
9    MS. PETERS:  I wasn't sure if the Court
10  wanted to hear some sort of an argument at this
11  point, or wanted to make a decision.
12    THE COURT:  Well, I'm sure you all would
13  like to argue it to me.  So whoever wants to argue it
14  to me.
15    I guess my -- I had expected -- and perhaps
16  I was reading too much into it -- that there would
17  be -- that the discovery of the weapon would have
18  been in some way be identified to Mr. Hainey in some
19  fashion, other than Mr. Evans saying that that's
20  Hainey's gun.  But I'm willing to listen to -- I kind
21  of expected, there is a piece of clothing, there was
22  clothing, or something like that, that was similar to
23  what Mr. Hainey was wearing, or there was

48

1  identification there, there was something that would
2  reflect -- or even if Hainey had said that's my
3  stuff.
4    It appears to me what you have is a bag
5  that's found, and it's some clothing that somebody
6  says that's Mr. Hainey's possessions.
7    MS. PETERS:  Yes, your Honor.  And I think
8  what Mr. Capone has very adeptly demonstrated is
9  that, the fact that this, the link is strong
10  circumstantially and not by some piece of physical
11  evidence, i.e., an identification card or piece of
12  clothing, is that there's a large expanse of area to
13  cross-examine the detective as to the fact that it
14  could have belonged to more than one person in that
15  room.
16    The State offers to the Court the
17  circumstances that it would like to submit to the
18  jury is the fact that there was an investigation of
19  another crime, a weapon was described to be involved
20  of a certain physical description.
21    Now, whether that weapon was held by
22  defendant or his co-defendant in that particular
23  offense, it does not diminish the issue of the

49

1    State's purpose of, look, he's the guy that's still
2    using the gun two weeks later, he's the guy who has
3    it within his possession and control. Whether or not
4    it was handed to Mr. Wright or not, again, is an area
5    as to cross-examination, evidentiary, but not
6    admissability.
7         The State knows the position it's in as far
8    as how many holes there are to present to the jury,
9    but it argues that that doesn't preclude the
10   admission of the evidence. What we'd ask to admit is
11   the detective's description that I was investigating
12   another crime, I was given a certain physical
13   description of a weapon, I went into a home where the
14   defendant was known to be staying, I located that
15   item, an item that matched the description, this is
16   the item that I located.
17        True, Mr. Evans is going to be the person
18   upon whom he relied to say that this belonged to
19   suspect No. 2 versus suspect No. 1 in that incident.
20   And what the jury would hear in this particular
21   instance was Mr. -- it was indicated to me that it
22   belonged to Mr. Hainey.
23        The relevance as to this particular instance

50

1    is, is that two weeks after this offense it's
2    Mr. Hainey who's in the apartment with a weapon that
3    the State can identify was used on the night of the
4    murder. And the person obviously missing from that
5    apartment is Monia Tann. So when we cycle backwards
6    to the date of the offense that we're prosecuting, we
7    have Mr. Tann and Mr. Hainey heading towards a crime
8    scene and Mr. Tann able to identify the weapon. But
9    who do we have two weeks later holding what the State
10   can have identified and authenticated as the weapon
11   used that night is the defendant.
12        Yes, that's proven circumstantially. Yes,
13   there is great area for defense to attack it, but its
14   probative value is great in that it identifies, it
15   steps up Mr. Hainey as the identifiable murderer. It
16   can also be identified and authenticated to be more
17   likely than not the murder weapon. And the fact that
18   it's found as a result of the investigation of
19   another crime, and it was said to be Mr. Hainey's by
20   Mr. Evans, well, Mr. Evans was present. And already
21   in opening defense has made the point of you got to
22   touch and consider his credibility. But that doesn't
23   prevent its admissibility of the fact that it was

51

1    found in the circumstances, again, with Mr. Hainey.
2         And for those reasons, we're asking the
3    Court to permit its admission, and permit the
4    admission of the testimonial evidence of Detective
5    Spillan as to its recovery, obviously sanitized in
6    the investigation of another offense. And, yes, he
7    has to get up there and admit my only way of knowing
8    it was Mr. Hainey's was the word of that guy Earl
9    Evans. And the State knows what the defense is going
10   to say about the reliability of that guy Earl Evans.
11   We have to deal with that, but after the admission of
12   that information.
13        MR. CAPONE: Could I have a moment to
14   confer, your Honor?
15        THE COURT: Yes.
16        MR. CAPONE: Your Honor, I think we headed
17   down this course because the State said we're going
18   to be able to show you that a gun was found and we
19   can link it to Jason Hainey. And after having gone
20   through all of that, I think the only linkage they
21   have is that Earl Evans says that that gun is Jason
22   Hainey's, and that's all they have. And I don't
23   think they say how he knows that it was Jason

52

1    Hainey's gun, or if he ever saw him with the gun
2    before.
3         All we know is we have the police go into
4    Earl Evans' apartment, and he's investigating a
5    robbery, a gun is found in that apartment, he says it
6    belongs to Jason Hainey, and he doesn't live here.
7    And his roommate says that he never even spends the
8    night here. It can't be linked to any other physical
9    property in there. According to this cop, this
10   officer, the gun that's found, in his opinion, is
11   Maurice Wright's gun.
12        So I think that this has really no -- the
13   unfair prejudices of having this gun come in and
14   being identified as Jason Hainey's gun is, cannot be
15   supported by the authentication the State needs to
16   prove at this point in the case. So we would argue
17   that it should not come in.
18        THE COURT: (Pause.) Well, I -- it is
19   surprising to me the extent of the connection, since
20   the -- and maybe I was just reading too much into
21   it -- the representation I thought was going to be
22   much stronger as to the State's ability to connect
23   the gun to Mr. Hainey. And some, some additional

53

1    effort by the law enforcement agencies to connect him
2    would have been helpful, but that's not what we have
3    here.
4        X        And when I boil it down, what we have is at
5    least some indication from those who are the owners
6    or renters of the apartment that Mr. Hainey frequents
7    the apartment, although not staying over, is not a
8    stranger to the apartment.  And in the police report
9    that was shown on the large screen there was some
10   indication that he comes and, I guess, sees Mr. Evans
11   and plays video games with him.
12       The circumstances surrounding the discovery
13   of the weapon and the fact that it may be
14   Mr. Hainey's, although is not strong, I think is
15   sufficient to allow it to be admitted.  And whatever
16   -- the tenuous of the connection would go to the
17   weight of the evidence that the jury should give to
18   it and not its admissability.
19       Just so that we're all on the same page,
20   what this officer testified to, it is not even close
21   to what he would be allowed to testify to during
22   trial.  And I want the officer to -- that time be
23   spent with this officer, because I'm concerned that

54

1    if we don't spend time with him, he will just stand
2    up and read and think things.  And I know you will,
3    but I'm just making sure that we're all on the same
4    page.
5        The only thing that can happen here is the
6    officer can say that while investigating an unrelated
7    incident, during the investigation of that unrelated
8    incident he had the occasion to search this
9    apartment.  And in the conducting of the search for
10   that apartment in which he was looking for a gun, in
11   the search for that apartment he found, he or another
12   officer found this gun, and Mr. Evans told him that
13   the gun belonged to Mr. Hainey.
14       And that opens up the defense to
15   cross-examine him in regards to that.  He should not
16   -- he should really be alerted -- and this is
17   probably the most -- that if he feels that -- and
18   particularly in regards to cross-examination -- he
19   has to explain it in some way, he is not to go down a
20   road that's not, that I haven't approved.  He can ask
21   for time to talk with you, he can ask -- or talk to
22   the Court about his concern, but I don't want him to
23   try to justify his actions based upon the fact that

55

1    he was conducting a robbery investigation, and during
2    the robbery investigation Mr. Hainey was allegedly
3    had a gun in his hand and utilized it.
4        Now, I think that is credible information
5    for the Court to consider in deciding whether or not
6    there is a sufficient link to Mr. Hainey to the
7    weapon, but it is not evidence that the jury will be
8    allowed to hear.  So to a large extent the jury's
9    going to hear they found the gun in the apartment,
10   which Mr. Hainey visits periodically, and the link to
11   Mr. Hainey is what Mr., I guess it's Mr. Evans or
12   Mr. Wright told them.  So I'll allow it to that
13   extent.
14       MR. CAPONE:  I'm not asking to reargue at
15   all, your Honor.  The issue is going to be for me to
16   effectively cross-examine this police officer, for me
17   to be able to get in the fact that in his mind this
18   gun belonged to someone else, until he heard it from
19   Earl Evans.  I think that goes to Evans' credibility.
20   And I can work with the prosecutors to try to figure
21   out a way to get that done, but ultimately I think I
22   should be allowed to ask that without opening the
23   door to this robbery business.

56

1        MS. PETERS:  And, your Honor, I think we can
2    accomplish that, as long as Mr. Capone acknowledges
3    that -- I don't know, we'll work it out -- but that
4    there's two guns of similar description that they
5    were looking for, if that's what he crosses on.
6        THE COURT:  Well, see, I'm not comfortable
7    there.  I mean, I think it's fair for Mr. Capone to
8    say -- and the officer would agree -- that at the
9    time that he recovered the gun, based upon the
10   descriptions that had been given to him by the victim
11   he believed perhaps this gun had been utilized by
12   someone else.
13       X   Now, you have the part that Evans says it's
14   Mr. Hainey's gun, he's got the part that perhaps at
15   the time of the crime it was being utilized by
16   someone else.  It doesn't mean it's not Mr. Hainey's,
17   or it's not in Mr. Hainey's possession, it just means
18   at the time of the crime perhaps it was being
19   utilized by someone else.
20       If I allow you to go down the road of he's
21   got a gun, then we're opening up the fact that two
22   weeks later he's got this arrest, which is
23   problematic.  So you all can see if you can work it

57

1    out, but I think you have some leeway. As long as --
2    and I think the way to do it is try to alert the
3    officer that he shouldn't try to be cute about that
4    response, and he just should fess-up like he did here
5    and say at the time, yes, that's what I believed, and
6    leave it at that.
7           MS. PETERS: And... I guess, I'll talk to
8    defense counsel about my next question, if there's
9    any kind of questioning for the Court. But, yes, the
10   detective has already been warned that if he was
11   allowed to testify, this would come, he knows. He
12   called this practice.
13          THE COURT: Okay. Well, I think it will
14   take some time to be with him. He's not -- I'm not
15   criticizing him, but he appears to be not a person
16   that you should just put on the stand and hopefully
17   he's going to follow your directions. You need to
18   sit down with him and make sure that he understands
19   why things are being done and how it's done. And I
20   know you will, but just, he's going to get mad, and
21   he's going to say something that's going to make us
22   all do this again, which none of us want to do.
23          Okay. All right. Where do we stand now

58

1    with... we're going to bring in the next witness, the
2    witness we had left off with?
3           MS. KELSEY: Yes. I think I was going to
4    begin cross-examination of Mr. Evans.
5           THE COURT: Redirect.
6           MS. KELSEY: Or redirect. I'm sorry.
7           THE COURT: She would like to cross-examine
8    Mr. Evans.
9           MS. KELSEY: I'm guessing from the Court's
10   ruling, but I don't want to presume, that I can now
11   ask Earl about this incident at Abbey Walk? Well, I
12   can ask him about the police coming there to recover
13   a gun?
14          THE COURT: Yeah. And my suggestion to
15   you -- and I'm sure the defense won't object -- is
16   that you lead him through that. There was at least
17   four or five times yesterday that he came extremely
18   close to blowing us out of the water, none which I
19   think early in the case has an effect on the Court's
20   ruling, or a reflection of the fact that perhaps
21   Mr. Hainey was involved in more than what we have
22   here, but this is a real delicate issue. And I think
23   it would be best that to the extent that we can get

59

1    him to say yes and no to questions, we would all be
2    better served.
3           MS. KELSEY: Well, your Honor, we have to
4    ask him open-ended questions. And although I was
5    trying to limit him as much as I could, the defense
6    counsel doesn't -- and I believe they're the ones who
7    provoked a lot of the questions with regard to --
8           THE COURT: Well, you can ask this as closed
9    yes/no questions as you'd like, as long as defense
10   doesn't object, that's the, yes, the rules say that
11   you can't lead the witness, but the rule also says
12   unless the defense starts objecting that it's
13   happened.
14          What I'm suggesting to you is that you
15   progress down this area having to lead him and see if
16   the defense objects. And then if they object in
17   their opening up the situation. But I think it would
18   be better if you were to lead him to say, now, a
19   month later was there a search done at an apartment
20   that you were at? And he would say yes. And during
21   that search -- who lived at the apartment that was
22   searched? Did Mr. Hainey ever visit? That kind of
23   thing. So he would be able to answer relatively

60

1    precise -- because I observed him yesterday. And
2    what's helpful for the Court to know is whether or
3    not this is the one you thought you had control over,
4    or is Mr. Evans really better?
5           MS. KELSEY: No. He is definitely the one I
6    do not have control over.
7           THE COURT: Okay. I was hopeful that was
8    the answer, as well.
9           MS. KELSEY: I think it's pretty clear what
10   the problem is, your Honor.
11          THE COURT: But I think you would be better
12   off just trying to lead him through that process.
13   And I don't think there will be an objection.
14          MS. KELSEY: Can I show him the gun?
15          THE COURT: Yes, you may.
16          MS. KELSEY: Should we get -- I'd like to
17   get it back from the Court and then show it to --
18          THE COURT: Have you showed it to him yet?
19          MS. KELSEY: Yes.
20          THE COURT: And I'm assuming he said that's
21   the gun, that he says that's the gun that I gave him?
22   Or is that...
23          MS. KELSEY: No. He's the one who was at

61

1   the apartment. That's the gun they got from the
2   apartment.
3        THE COURT: So he's merely confirming that
4   the gun that he's seeing is similar to the gun that
5   was seized from the apartment, from his observation?
6        MS. KELSEY: Right.
7        THE COURT: Now, the next witness is the one
8   that's going to testify he's the one who gave him the
9   gun?
10       MS. KELSEY: Yes.
11       THE COURT: Because, I'm sorry, I don't have
12  a good handle on names of circumstances yet.
13       MS. KELSEY: Yes.
14       THE COURT: Okay. Let's take five minutes
15  for the court reporter to recover, and then we'll
16  bring the jury in.
17       MS. KELSEY: But I can take this gun back
18  and give it back to Detective Hall?
19       THE COURT: Yes.
20       (Recess taken, 3:28 to 3:34 p.m.)
21       THE COURT: Where's our witness?
22       (Pause.) (Corrections escorts Earl Evans to
23  witness stand.)

62

1        THE COURT: Mr. Evans, we're going to
2   continue with your questioning. I think we'll
3   probably finish today. I believe the State is going
4   to question you concerning events that occurred a
5   month or so after that in which, in which this
6   robbery occurred and which a search of your apartment
7   occurred. Are you familiar with that?
8        MR. EVANS: (Nods head.)
9        THE COURT: Yes?
10       MR. EVANS: Yes.
11       THE COURT: It's important that you listen
12  carefully to the State's question and only respond to
13  what they're asking. Because I've limited their
14  questioning to the fact that there was a search
15  conducted, and have limited what the jury is able to
16  know concerning the events that ended up, and perhaps
17  you and Mr. Hainey being arrested that day, or
18  Mr. Wright and Mr. Hainey being arrested, whatever,
19  in that time frame.
20       So it's important that you listen very
21  carefully. Don't try to explain anything beyond what
22  you think you need to so that they can comply with
23  the Court's order. Okay. I know it's difficult.

63

1   And if you have any questions, any concerns at any
2   time that you think you may go over the line one way
3   or the other, just say can I talk to you, judge, and
4   we'll stop and then you can explain.
5        Okay?
6        MR. EVANS: Okay.
7        THE COURT: All right. Bring the jury in.
8        (Jury enters the courtroom at 3:39 p.m.)
9        THE COURT: Okay. Ladies and gentlemen, I
10  apologize for the delay, but we're ready to proceed.
11       Ms. Kelsey, you may redirect Mr. Evans.
12       MS. KELSEY: Thank you, your Honor.
13             REDIRECT EXAMINATION
14  BY MS. KELSEY:
15       Q.  All right. Mr. Evans, in September, after
16  the incident that you told us about yesterday of the
17  year 2001, where did you live?
18       A.  Abbey Walk Apartments.
19       Q.  And who did you live there with?
20       A.  My roommate, Wayne Hall.
21       Q.  And did anyone else stay there?
22       A.  Jason Hainey.
23       Q.  When you say he was staying there, what do

Evans - Redirect

64

1   you mean?
2        A.  Well, he just got kicked out of his house,
3   and he stayed with us. He brought his clothes over
4   there, but he was in between Monia house and my
5   house.
6        Q.  Okay. So was he sleeping there at night?
7        A.  Yes.
8        Q.  And you said he had his clothes there?
9        A.  Yes.
10       Q.  Okay. And where did he keep his clothes?
11       A.  Right in the, like, a front room right here,
12  there's a dining room where they didn't have no table
13  at, his clothes right there (indicating).
14       Q.  And how many bedrooms were in that Abbey
15  Walk apartment?
16       A.  Two.
17       Q.  And who had the bedrooms?
18       A.  Me and Wayne Hall.
19       Q.  And did you have separate bedrooms?
20       A.  Yes, we did.
21       Q.  Where did you keep your clothes, and stuff?
22       A.  In my room.
23       Q.  And where did Mr. Hall keep his clothes, and

## Evans - Redirect

73

1    Q.   Okay. And then you met with them and your
2    lawyer?
3    A.   Yes.
4    Q.   Okay. And you got a deal then?
5    A.   Yes. When I got my lawyer, yes.
6    Q.   Okay. And that was the third time that you
7    talked to him?
8    A.   Actually the third time, the third time they
9    didn't make a deal with me. It's the fourth time
10   they talked to me we made the deal.
11   Q.   Okay. All right. But each of the times you
12   talked to him you told him what you knew about what
13   happened?
14   A.   Yes. They kept asking me.
15   Q.   Okay. Now... Okay. What does it mean to
16   you when you use the term, "The gun has a body on
17   it"?
18   A.   Well, when the cop says it took place, he
19   was saying that the gun will come back with a body on
20   it, the one they found.
21   Q.   Okay. That means that gun was used to kill
22   somebody?
23   A.   Yes.

## Evans - Redirect/Recross

74

1    Q.   Okay. And that's what you thought the
2    defendant meant when he said the gun's going to come
3    back with a body on it?
4    A.   Well, I knew what he meant.
5    Q.   Okay. All right. One more question about
6    Abbey Walk. Was Monia Tann staying at Abbey Walk?
7    A.   No, he wasn't.
8    Q.   And the day that the police came to Abbey
9    Walk and found the gun, was Monia Tann there?
10   A.   No, he wasn't.
11   Q.   And...
12        MS. KELSEY: Thank you. I have no further
13   questions.
14        RECROSS-EXAMINATION
15   BY MR. HEYDEN:
16   Q.   Good afternoon, Mr. Evans.
17   A.   Good afternoon.
18   Q.   Now, in September of 2001 the police come to
19   your house, correct, come to your apartment?
20   A.   Yes.
21   Q.   And you gave them the consent to search your
22   house, correct?
23   A.   Yes.

## Evans - Recross

75

1    Q.   And you said Jason was -- or, excuse me --
2    Jason kept his clothing in the dining room. That's
3    what you said?
4    A.   Yes.
5    Q.   And then the police searched?
6    A.   Yes.
7    Q.   And you and Mr. Hall were outside?
8    A.   Well, we was in the hallway.
9    Q.   So you weren't in the apartment?
10   A.   No, we wasn't.
11   Q.   And so you didn't see them search the
12   apartment because you're in the hallway?
13   A.   Well, actually, they only searched for like
14   three minutes, and they found the gun.
15   Q.   When they were searching, you were out in
16   the hallway, were there police officers there with
17   you?
18   A.   Yes.
19   Q.   Okay. And, so you didn't see the officers
20   inside as they searched your apartment, correct?
21   A.   No, no, I didn't.
22   Q.   So you didn't physically see where they
23   found the gun, correct?

## Evans - Recross

76

1    A.   No, I didn't.
2    Q.   But an officer came to you out in the
3    hallway and showed you a gun, right?
4    A.   Well, actually when he brought us back in --
5    Q.   Well, can you answer my question? He came
6    out to the hallway and he showed you a gun, correct?
7    A.   No, he didn't. He didn't come in the
8    hallway.
9    Q.   All right. So it was your testimony that
10   you were outside and then they came out and showed
11   you a gun. So were you outside the building at that
12   point?
13   A.   No. I was in the hallway. And at the time
14   when they found the gun they brought us back in the
15   apartment, that's when they showed the gun.
16   Q.   Okay. Now, they showed you the gun. And
17   you told them that it was Jason's gun?
18   A.   I never told them who gun it was.
19   Q.   Okay. So you didn't say whose gun it was?
20   A.   No, I didn't.
21   Q.   Now, when this conversation occurred between
22   you and the officers, Jason was not in the apartment,
23   correct?

A-12

A-22

2

1

February 11, 2004
2                        10:15 a.m.

3      PRESENT:

4             As noted.

5                        - - - - -

6             MS. KELSEY:  Good morning, Your Honor.

7             THE COURT:  I'm handing you a copy of the

8      note that I received about a half hour ago from the

9      jury.  Approximately 9:15, I'm sorry.

10            So I'm all ears as to what you would like me

11     to do.

12            MR. CAPONE:  Your Honor, I kind of imagined

13     that this would be like this, but there are some

14     important things that I need to discuss with

15     Mr. Hainey in private before we take a position

16     with the Court.

17            Can I ask for 5 or 10 minutes to take him

18     into the back there.

19            THE COURT:  Sure.  I can tell you, just so

20     you can have the benefit of my thinking, I have

21     had -- When you get notes that don't tell you the

22     vote, it is easier to give an Allen charge

23     concerning the matter, because you can perhaps

A - 22

2-11-04

```
 1      think that there is a person or two who perhaps is
 2      just not following the others, and giving it is
 3      something that is perhaps helpful.
 4          When this happened in the Guy/Hassan-El case
 5      where they gave me the vote, it becomes more
 6      difficult, difficult only in the sense of how --
 7      what effect it will have.
 8          Does it have any meaning in the sense would
 9      it really move anything of significance?  Even if
10      you moved a couple people, you still have an eight
11      to four vote.  So it is a little bit problematic.
12      But why don't you talk to your client about what
13      you want to do.
14          (A brief recess was taken.)
15          MR. CAPONE:  Well, Your Honor, we're not
16      going to ask the Court to give an Allen charge.
17          MS. PETERS:  We are going to ask the Court
18      to give an Allen charge.
19          THE COURT:  You're going to have to try to
20      rationalize it for me.
21          MS. PETERS:  Well --
22          THE COURT:  I don't disagree that normally,
23      I would give it.  The problem, and this happened
```

4

2-11-04

| | |
|---|---|
| 1 | with Guy/Hassen-El, once I know the vote, it |
| 2 | becomes problematic because you give an Allen |
| 3 | charge when you hope that perhaps it is a situation |
| 4 | where you have a couple people who are just not |
| 5 | following everyone else.  But when I have half of |
| 6 | them going one way and half of them going the |
| 7 | other, trying to convince half of them to go the |
| 8 | other way is a problem.  One, it seems to be almost |
| 9 | a futile effort, and problematic, but I'll listen. |
| 10 | MS. PETERS:  I can't dispute anything the |
| 11 | Court said.  I certainly can follow your reasoning |
| 12 | and understand why you feel that way.  The only |
| 13 | reason that we would be asking for it is because we |
| 14 | spent this much time picking the jury, we spent |
| 15 | this much time trying the case, we've had the |
| 16 | witnesses come in and testify, and you know, all |
| 17 | the things that it says in the Allen charge about |
| 18 | we've invested this much time and effort and it |
| 19 | seems like you have to try, is sort of the way I |
| 20 | feel, having put this much effort into it, to just |
| 21 | give that one last effort. |
| 22 | Maybe the Court could give an Allen charge, |
| 23 | ask them to let you know right away if that is |

2-11-04

| | |
|---|---|
| 1 | going to shake the tree at all, and if it doesn't, |
| 2 | then we'll take a verdict.  But I can't argue with |
| 3 | what the Court just said because I agree with you. |
| 4 | Our position just is that you have to try. |
| 5 | THE COURT:  Okay. |
| 6 | MR. CAPONE:  And Your Honor, in anticipation |
| 7 | that the State might ask for an Allen charge, I |
| 8 | would refer the Court to a 2000 decision out of the |
| 9 | Third Circuit in U.S. versus Podlaseck.  It's a |
| 10 | case, I don't have the cite.  I pulled this off the |
| 11 | internet last night, but it's Case No. 99-5489. |
| 12 | And in that case -- |
| 13 | THE COURT:  Spell the last name. |
| 14 | MR. CAPONE:  The first defendant is Eastern |
| 15 | Medical Billing, Inc., and then there are two, |
| 16 | Joseph and David, and their last name is Podlaseck, |
| 17 | P-o-d-l-a-s-e-c-k. |
| 18 | And in that case, the Third Circuit said, |
| 19 | We're never approving an Allen charge again. |
| 20 | Henceforth, we are going to strike down Allen |
| 21 | charges.  They just put too much pressure on the |
| 22 | jury. |
| 23 | So we're taking the position -- And I will |

2-11-04

1     say that I don't think that our Supreme Court has

2     gone as far as the Third Circuit has, but I would

3     point out to you that if this case were to result

4     in a conviction, eventually, this is going to get

5     to the Third Circuit.  So we are opposed to the

6     Allen charge being given in this case.

7              THE COURT:  Well, let me ask this.  I'm

8     inclined, as I indicated to everyone at the

9     beginning, not to give an Allen charge because I do

10    know the vote and I do know how extreme it is.

11             The question is, do you want me to do

12    anything short of that, in the sense that I think

13    we need to at least inquire of them as to whether

14    or not they believe that, one, I should tell them

15    that there is no time limit on them; two, that they

16    can continue to talk as long as they feel it is

17    productive; and while I understand their note, do

18    they believe that continuing to discuss it

19    throughout the day would be of any difficulty?

20             That's not forcing their hand, but I want

21    them to at least know that I think that is at least

22    the minimum that I would have to do.

23             MR. CAPONE:  We would not oppose an inquiry

2-11-04

1       like that, Your Honor.

2               THE COURT:  All right.  Let's bring the jury

3       in.

4               (Jury enters courtroom at 10:30 a.m.)

5               THE COURT:  Good morning, ladies and

6       gentlemen.  I have your note.  And let me make a

7       couple comments, and then I'm going to go to go

8       back and tell you my response to this.

9               First of all, there is -- And I think some

10      of what I'm going to say is probably obvious to

11      you, but perhaps let me say it so that you can at

12      least think about it.

13              There is no magical time frame for you to

14      decide the case.  There is no time limit on you.

15      There is no time pressure on you to resolve the

16      case and resolve it as you feel appropriate.  You

17      are free to continue to discuss the case as long as

18      you think it is fruitful and helpful and beneficial

19      to do so.

20              So even though you've been out for a couple

21      days now, I don't want you to feel any pressure in

22      regards to, Gee, we haven't been able to resolve

23      the matter in two days.  Then we need to stop

2-11-04

| | |
|---|---|
| 1 | because the Court expects something in that amount |
| 2 | of time.  That's not the case. |
| 3 | We appreciate the seriousness of it, we |
| 4 | appreciate the significance of it, and the time |
| 5 | frame in which you decide the matter is totally up |
| 6 | to you.  And if you think continuing to talk about |
| 7 | it today is helpful, you should continue to talk |
| 8 | about it.  If you think continuing to talk about |
| 9 | it, you've made progress, and you're not resolved |
| 10 | today, and you want to continue tomorrow, that's |
| 11 | okay too. |
| 12 | On the other hand, if you have talked about |
| 13 | and talked about and talked about and talked about |
| 14 | it and you have gotten to the point where you just |
| 15 | believe you will not be able to reach a decision, |
| 16 | that you will not be able to resolve the matter, |
| 17 | that's okay too, and you are free to tell me that's |
| 18 | where you are and that's where you truly believe |
| 19 | you are and that it really won't matter if you |
| 20 | spend another week talking about it, it's really |
| 21 | not going to change.  And you need to tell us that. |
| 22 | By that, you will have told us something |
| 23 | about the case too.  It's not like you have not |

2-11-04

1      performed your function.  You will have.  But I

2      need to at least have you -- and to some degree,

3      you have -- but I need you to at least, having

4      heard that from me and heard that there is no

5      restraint on you and there is no time limit on you,

6      and you can continue to do this as long as you feel

7      it is productive to do it, the Court will

8      accommodate whatever it needs to be accommodated

9      during that period of time, and then we will

10     continue on with the deliberation process.

11          If you believe, however, you have done what

12     you can do and it's just not going to resolve, then

13     I need to know that.  And so I would ask you to go

14     back, think about my comments, and if I don't hear

15     from you, I'm assuming you want to continue to

16     talk.  If I hear that it's over with, then you tell

17     me it's over with.

18          So that's what I'm asking you to do.  Okay?

19          (Jury leaves courtroom at 10:35 a.m.)

20          (Court's Exhibit 4 was marked for

21     identification.)

22          THE COURT:  That leaves you with a few

23     minutes to talk to see if you can resolve the case.

$A-22$

1

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE,          )
                            )
v.                          )    ID No. 0306015699
                            )
JASON HAINEY,               )
          Defendant.        )

THURSDAY, FEBRUARY 12, 2004

BEFORE:  JEROME O. HERLIHY, J,
         and a Jury

APPEARANCES:

          DEPARTMENT OF JUSTICE
          BY:  CYNTHIA KELSEY, ESQ., AND
               ALLISON PETERS, ESQ.
               Deputy Attorneys General
               for State of Delaware

          JEROME CAPONE, ESQ., and
          MICHAEL C. HEYDEN, ESQ.
               for Defendant

          TRANSCRIPT OF VERDICT

- - - - - - - - - - - - - - - - - - - - - - - - -
          LYNNE BELL COALE, RMR
          SUPERIOR COURT REPORTERS
500 N. KING STREET   WILMINGTON, DELAWARE 19801
               (302) 255-0562

COPY

2-12-04

| 1 | (Courtroom 6D, 3:30 A.M.) |

2                    - - -

3         THE COURT:  Prothonotary have a verdict sheet?

4         THE CLERK:  Yes, your Honor.

5         THE COURT:  Bring in the jury, please.

6         Can we move that podium out of the way, please.

7         (Jury enters courtroom at 3:32 P.M.)

8         THE COURT:  Good afternoon, ladies and gentlemen.

9 My name is Judge Herlihy, and at the request of Judge

10 Carpenter, I am taking this verdict.  He is the chairman of the

11 Delaware Sentencing Accountability Commission called SENTAC,

12 and had to attend a hearing in Dover before the Legislative

13 Joint Finance Committee this afternoon.  He just finished that

14 hearing, but he's far enough away where he has asked me to take

15 this verdict in his place.  So, please excuse his absence, but

16 he was required to appear before a very important legislative

17 committee this afternoon in his other official capacity.

18         I understand that you have a verdict, so I would

19 ask the Prothonotary now to take it.

20         THE CLERK:  Yes, your Honor.

21         Mr. Foreman, please rise.  Has the jury agreed upon

22 their verdicts?

23         JURY FOREPERSON:  Yes we have.

2-12-04

1      THE CLERK:  How does the jury find the defendant at

2   the bar as to Count 1, murder in the first degree, guilty or

3   not guilty?

4      JURY FOREPERSON:  Guilty.

5      THE CLERK:  As to Count 2, murder in the first

6   degree, guilty or not guilty?

7      JURY FOREPERSON:  Guilty.

8      THE CLERK:  As to Count 3, possession of a firearm

9   during commission of a felony, guilty or not guilty?

10     JURY FOREPERSON:  Guilty.

11     THE CLERK:  As to Count 4, attempted robbery first

12  degree, guilty or not guilty?

13     JURY FOREPERSON:  Guilty.

14     THE CLERK:  As to Count 5, possession of a firearm

15  during commission of a felony, guilty or not guilty?

16     JURY FOREPERSON:  Guilty.

17     THE CLERK:  Thank you.  Please be seated.

18     Members of the jury, harken to the verdict as the

19  Court has recorded it.  Your foreperson says that you find the

20  defendant at the bar, as to Count 1, murder in the first

21  degree, guilty; as to Count 2, murder in the first degree,

22  guilty; as to Count 3, possession of a firearm during

23  commission of a felony, guilty; as to Count 4, attempted

2-12-04

```
 1  robbery first degree, guilty; and as to Count 5, possession of

 2  a firearm during commission of a felony, also guilty.  So say

 3  you all?

 4              JURORS:  Yes.

 5              THE COURT:  Thank you.

 6              THE CLERK:  Your Honor.

 7              THE COURT:  Are there any applications?

 8              MR. CAPONE:  I ask that the jury be polled, your

 9  Honor.

10              THE COURT:  Yes, please poll the jury.

11              THE CLERK:  Your Honor, do you want me to read each

12  count to each juror?

13              THE COURT:  No.  What you do is just read the

14  verdict and ask for each one -- go through the five, and then

15  ask each juror, "Is that your verdict?" --

16              THE CLERK:  Okay.

17              THE COURT  -- as to all those counts.

18              THE CLERK:  Sure.  Ladies and gentlemen of the

19  jury, your foreperson states that the jury finds the defendant

20  at the bar as to Count 1, murder in the first degree, guilty;

21  as to Count 2, murder in the first degree, guilty; as to

22  Count 3, possession of a firearm during commission of a felony,

23  guilty; as to Count 4, attempted robbery first degree, guilty;
```

2-12-04

```
 1 │ as to Count 5, possession of a firearm during commission of a
 2 │ felony, also guilty.
 3 │            Mr. Foreperson, is that your verdict?
 4 │            JURY FOREPERSON:  Yes, it is.
 5 │            THE CLERK:  Juror No. 2, is that your verdict?
 6 │            JUROR NO. 2:  Yes.
 7 │            THE CLERK:  Juror No. 3, is that your verdict?
 8 │            JUROR NO. 3:  Yes.
 9 │            THE CLERK:  Juror No. 4, is that your verdict?
10 │            JUROR NO. 4:  Yes.
11 │            THE CLERK:  Juror No. 5, is that your verdict?
12 │            JUROR NO. 5:  Yes.
13 │            THE CLERK:  Juror No. 6, is that your verdict?
14 │            JUROR NO. 6:  Yes.
15 │            THE CLERK:  Juror No. 7, is that your verdict?
16 │            JUROR NO. 7:  Yes.
17 │            THE CLERK:  Juror No. 8, is that your verdict?
18 │            JUROR NO. 8:  Yes.
19 │            THE CLERK:  Juror No. 9, is that your verdict?
20 │            Juror NO. 9:  Yes.
21 │            THE CLERK:  Juror No. 10, is that your verdict?
22 │            JUROR NO. 10:  Yes.
23 │            THE CLERK:  Juror No. 11, is that your verdict?
```

2-12-04

```
 1            JUROR NO. 11:  Yes.

 2            THE CLERK:  Juror No. 12, is that your verdict?

 3            JUROR NO. 12:  Yes.

 4            THE CLERK:  Thank you.  Your Honor.

 5            THE COURT:  The verdicts being unanimous and the

 6   jury being polled, ladies and gentlemen, those verdicts will be

 7   entered.  I'm going to ask you to remain here for just a moment

 8   while I go over a scheduling matter over here with counsel at

 9   bar, please.

10            (The following sidebar conference was held.)

11            THE COURT:  Two things.  You all have to give an

12   exchange of correspondence.  Secondly, Judge Carpenter has

13   indicated to me that he would like -- I don't know if he's had

14   much chance, if any, to talk about scheduling with you at all.

15   He's told me he'll be starting Tuesday at 9:30 and going at

16   1:00 o'clock because he has something after 1:00 o'clock he has

17   to attend.  And he needs to finish up next week.

18            MS. KELSEY:  He's told us that lots of times.

19            THE COURT:  Well, how long will the penalty phase

20   last?

21            MS. KELSEY:  We should be able to finish by Friday.

22            MR. CAPONE:  By when?

23            MS. KELSEY:  Friday.
```

Mullins - Direct

25

1    A.   It's at 11:10 a.m., 11:21 a.m., and
2    11:35 p.m.
3    Q.   Did any -- did Mr. Mercer receive any phone
4    calls from Jacob Lipton anytime after noon on August
5    21st, 2001?
6    A.   He didn't have any on his phone.
7    Q.   Okay. And there were none in his phone
8    records?
9    A.   Correct.
10   Q.   Okay. Now, did you also, Detective, interview
11   a Mr. Earl Evans in December 2003?
12   A.   Yes.
13   Q.   In that interview of Mr. Evans did you make
14   any deal with him in exchange for his testimony about
15   the events of August 21st, 2001?
16   A.   No.
17   Q.   Can you say in honesty, did Mr. Evans -- was
18   Mr. Evans looking for a deal, though?
19   A.   Yes.
20   Q.   But did you make him one?
21   A.   No.
22        MS. PETERS: Thank you, Detective. I have no
23   further questions at this time.

Mullins - Cross

26

1         CROSS-EXAMINATION
2    BY MR. CAPONE:
3    Q.   Detective Mullins, I do have some questions
4    for you. All right?
5    A.   Okay.
6    Q.   Let's start off with that last part. Of
7    course you didn't make him a deal, you don't have legal
8    authority to make him a deal?
9    A.   No.
10   Q.   But you can tell him, you know what, if you
11   play ball with me, I'll go to bat for you, right?
12   A.   Mm-hmm.
13   Q.   And you said that to him, didn't you?
14   A.   No.
15   Q.   You didn't say I'll go to the attorney
16   general's office, I'll do what I can, I'll tell them
17   what you did and how your cooperation went?
18   A.   I didn't tell him.
19   Q.   Okay. But maybe someone else told him that?
20   A.   I didn't.
21   Q.   You didn't. Did somebody else imply that to
22   him or say that to him?
23   A.   Not to my knowledge.

Mullins - Cross

27

1    Q.   Okay. Well, let's continue on that
2    conversation on December 10th. Did you show Earl Evans
3    any pictures on that, during that meeting?
4    A.   I believe I did, yes.
5    Q.   Okay. And you showed him a picture of a guy
6    named Phil Kizee, also known as Free?
7    A.   Correct.
8    Q.   All right. And did you question -- so you
9    said, "That's Free," you pointed to the picture at Phil
10   Kizee and said, "That's Free," right?
11   A.   Yes.
12   Q.   Did you show him a picture of a guy named Fly?
13   A.   Who?
14   Q.   Fly, F-l-y, Fly?
15   A.   No.
16   Q.   Do you know who Fly is?
17   A.   No.
18   Q.   Isn't Fly the guy that Earl said he was with
19   while this shooting occurred?
20   A.   He used that nickname, yes.
21   Q.   But you have no idea who Fly is, do you?
22   A.   No.
23   Q.   You never located a Fly, have you?

Mullins - Cross

28

1    A.   Correct.
2    Q.   During the course of your investigation, did
3    you get to talk to Phil Kizee, also known as Free?
4    A.   Yes.
5    Q.   Let's talk about Mr. Tann for a minute. You
6    actually went to Mr. Tann's house and talked to him?
7    A.   Yes.
8    Q.   Did you call him up and tell him you were
9    coming?
10   A.   No.
11   Q.   You surprised him?
12   A.   Yes.
13   Q.   And that's what you wanted to do?
14   A.   Mm-hmm.
15   Q.   Why?
16   A.   It gives me the advantage.
17   Q.   It gives you the advantage?
18   A.   Mm-hmm.
19   Q.   All right. To catch him off guard?
20   A.   Sometimes, if necessary.
21   Q.   Sometimes it does.
22        You go out to see this guy Tann. Do you go
23   into his house?

Mr Capone & Mr Heyden                                    7/05

              Hello this is Jason Harvey and
I'm writing in reference to the information I've
repeatedly asked for. I've written letters requesting
statements from Earl Evans, Phil Kizee & Wayne
Nall I also requested a police supplement report
& a copy of my indictment. My direct appeal
has just been denied & I am now my own
counsel so I feel it is imperative that
I have these items. Thank you in advance
for your time & effort.

                                        Jason Harvey
                                        383162
                                        Jason Harvey


                                        Brian D Engrem
                                        7-8-05 Notary

## SUPREME COURT OF DELAWARE

#46

CATHY L. HOWARD
*Clerk*

AUDREY F. BACINO
*Assistant Clerk*
DEBORAH L. WEBB
*Chief Deputy Clerk*
LISA A. SEMANS
*Senior Court Clerk*
DEBRA J. ZATLOKOVICZ
*Senior Court Clerk*

July 12, 2005

SUPREME COURT BUILDING
55 THE GREEN
DOVER, DE 19901

P.O. BOX 476
DOVER, DE 19903

(302) 739-4155
(302) 739-4156
(302) 739-8091

Jerome M. Capone, Esquire
1823 W. 16ᵗʰ Street
Wilmington, DE 19806

Michael C. Heyden, Esquire
1201 King Street
Wilmington, DE 19801

RE:    *Jason A. Hainey v. State*, No. 252, 2004

Dear Counselors:

Enclosed is a copy of a letter dated July 11, 2005 received from Jason A. Hainey, in the above-captioned matter. The Court has directed me to provide you with a copy of Mr. Hainey's letter for appropriate disposition. Please contact Mr. Hainey about his concerns and advise him that all future correspondence to the Court on his behalf should be through you as his attorney until the Court reviews the decision on remand.

By copy of this letter, I am informing John R. Williams, Esquire, of the Department of Justice, of the Court's action regarding Mr. Hainey's letter. I am providing Ms. Williams with a copy of Mr. Hainey's letter for informational purposes only. The Court will take no further action regarding Mr. Hainey's letter.

Very truly yours,

Lisa Semans

Enclosures

/eas

cc:    Mr. Jason A. Hainey
        (with copy of docket sheet)
        John R. Williams, Esquire
        (with copy of Mr. Hainey's letter)

A - 24

SUPERIOR COURT
OF THE
STATE OF DELAWARE

WILLIAM C. CARPENTER, JR.
JUDGE

NEW CASTLE COUNTY COURTHOUSE
500 NORTH KING STREET, SUITE 10400
WILMINGTON, DELAWARE 19801-3733
TELEPHONE (302) 255-0670

August 17, 2005

Jason Hainey
Delaware Correctional Center
Smyrna, DE

> RE:   State v. Jason Hainey
>       ID No. 0306015699

Dear Mr. Hainey:

The Court is in receipt of your letter of July 15, 2005 requesting information concerning your case so that you can proceed pro se with a postconviction matter. I have reviewed the case file in this matter, and the Court does not have the police reports which you are referencing. As such, I do not have the ability to simply copy and provide them to you. I do have a copy of the indictment which I am enclosing with this letter.

I am also declining to order Mr. Capone and Mr. Heyden to provide any particular information to you at this time. I do not see why the police report or the statements of these witnesses would have any bearing upon your Rule 61 petition alleging ineffective assistance of counsel. As such, to the extent you were requesting action forcing this material to be provided to you, your request is denied.

Sincerely yours,

Judge William C. Carpenter, Jr.

WCCjr:twp
cc:   Jerome Capone, Esquire
      Michael Heyden, Esquire
      Allison Texter, Esquire
      Prothonotary

A-24

SUPERIOR COURT
OF THE
STATE OF DELAWARE

WILLIAM C. CARPENTER, JR.
JUDGE

NEW CASTLE COUNTY COURTHOUSE
500 NORTH KING STREET, SUITE 10400
WILMINGTON, DELAWARE 19801-3733
TELEPHONE (302) 255-0670

August 26, 2005

Jason Hainey
Delaware Correctional Center
Smyrna, DE

> RE:   State v. Jason Hainey
>        ID No. 0306015699

Dear Mr. Hainey:

The Court is in receipt of your letter of August 22, 2005 in which you are requesting a copy of the police statement of Phil Kizee. The simple answer to your question is the Court does not have the document and therefore cannot provide it to you. I have forwarded a copy of your letter to Mr. Capone and Mr. Heyden in the event they are willing to honor your request.

Sincerely yours,

Judge William C. Carpenter, Jr.

WCCjr:twp

cc:   Jerome Capone, Esquire
       Michael Heyden, Esquire
       Prothonotary

"A-26"

**WILMINGTON DEPARTMENT OF POLICE**
**DET. M/CPL. BARRY J. MULLINS**
**CASE # 30-01-83505**

**INVESTIGATIVE PROCEDURES CONTINUED:**
**20 MAY 2003**

1. On this date at 1200 hours, this officer and Det. Matthew Hall interviewed Monia Tann at the ▓▓▓▓▓▓▓▓▓▓ ail, Emporia, Virginia, in reference to this criminal investigation. Said interview was audiotaped and for further detail, see said audiotape and/or transcript.

**29 MAY 2003**

1. On this date at 1700 hours, this officer and Det. Matthew Hall along with Det.▓▓▓▓Williams of the ▓▓▓▓▓▓Police Department, Glassboro, New Jersey and Det.▓▓▓▓▓Hemphill of the ▓▓▓▓▓▓ County Prosecutors Office, County of Gloucester, New Jersey located ▓▓▓▓▓▓▓at ▓▓▓▓▓▓▓▓, Glassboro, New Jersey.

2. On this date at 1715 hours, this officer and Det. Matthew Hall interviewed▓▓▓▓▓▓▓▓e at the ▓▓▓▓▓▓Police station,▓▓▓▓▓▓▓▓▓Glassboro, New Jersey in reference to this criminal investigation. This interview was audiotaped and for further details, see said audiotape and/or transcript.

**04 JUNE 2003**

1. On this date at 1130 hours, this officer arrived at Abbey Walk Apartments, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. This officer contacted ▓▓▓▓▓▓▓who is the manager of said location at which time she indicated that from 02-01-01 to 11-16-01, ▓▓▓▓▓▓ ▓▓and ▓▓▓▓▓were the only (2) subjects listed on the lease of Building▓▓▓▓▓▓▓, Newark, Delaware.

**05 JUNE 2003**

1. On this date at 1035 hours, this officer and Det. Matthew Hall along with Det▓▓▓▓Williams of the▓▓▓▓▓▓Police Department, Glassboro, New Jersey, located▓▓▓▓▓▓▓at ▓▓▓▓▓▓▓▓, Glassboro, New Jersey.

2. On this date at 1045 hours, this officer and Det. Matthew Hall interviewed▓▓▓▓▓▓▓▓at the▓▓▓▓▓Police station, ▓▓▓▓▓▓▓▓▓Glassboro, New Jersey, in reference to this criminal investigation. This interview was audio taped and for further details, see said audio tape or transcript.

**06 JUNE 2003**

1. On this date at 1500 hours, this officer received via Federal Express the above described items that had been shipped to the Bureau of Alcohol, Tobacco and Firearms Forensic Laboratory on Tuesday 8 April 2003. Said items were tagged as evidence by this officer and submitted to the Support Services Division.

**PAGE 15 OF 16**

"A-26"

2-11-04

                                      11:35 a.m.
                                    The same day

 1

 2      PRESENT:

 3
              As before noted.
 4

 5           THE COURT:  This is the note that we have

 6      received from the jury now.  "Is it possible for us

 7      to review portions of testimony via transcript?"

 8           Prior to the modern age of technology, the

 9      answer would have been easy and the answer would

10      have been no, but at the moment, I can tell counsel

11      that I do have sitting on this computer a rough

12      draft of the testimony of any witness who has

13      appeared.  Now, it's not perfect, and it has some

14      words that don't make perhaps 100 percent sense,

15      and so that is concerning, but technologically, we

16      can instantly give them a copy of any transcript of

17      any witness that they want.

18           MR. CAPONE:  Our position, Your Honor, is

19      this:  We've been doing this for years, and we have

20      been operating under the assumption that the Court

21      policy has always been not to give transcripts.

22      And I can say that I believe certain decisions that

23      we even made during this trial were based upon the

2-11-04

| | |
|---|---|
| 1 | fact that they weren't going to get transcripts. |
| 2 | We considered, should we order transcripts? Then |
| 3 | they might get the idea that they can have all |
| 4 | transcripts. |
| 5 | So we've taken positions based upon the |
| 6 | Court's prior practice of not providing |
| 7 | transcripts, and therefore, we would not be in |
| 8 | favor of giving transcripts at this point. |
| 9 | MS. KELSEY:  The State would agree with the |
| 10 | defense.  We haven't taken a position based on not |
| 11 | being able to get transcripts, but the concern is |
| 12 | it's a rough draft that you have, we wouldn't have |
| 13 | an opportunity to review that, we wouldn't know if |
| 14 | something important had been omitted, and because |
| 15 | of the technological difficulties, there isn't any |
| 16 | case law on it.  And I'm just not sure that we want |
| 17 | to venture into new legal ground in this particular |
| 18 | case. |
| 19 | THE COURT:  It's always fun to venture into |
| 20 | new ground.  There's some Star Trek words that I'm |
| 21 | looking for, but I can't quite remember what they |
| 22 | are.  I tend to agree with counsel, although I'm a |
| 23 | junkie to this stuff, so I kind of have some |

2-11-04

1          comfort with it.

2                    The only thing I guess beyond this that I

3          need to know from you is whether or not -- Well,

4          let me put it this way.  It would be unfortunate if

5          there is simply something, a single issue that is

6          hanging them up in regards to a particular

7          individual's testimony that they could tell us and

8          that we could provide them that portion of the

9          testimony that related to that.

10                   Now, there's a danger there, I agree, but

11         we've spent a lot of time at it, and we don't know

12         whether or not there is something in particular

13         that they're looking for, or they'd just like to

14         read the transcripts again.  So I need to know

15         whether or not you want me to ask whether or not

16         they could be more precise so that we would

17         consider it.

18                   MR. CAPONE:  The answer to that question,

19         Your Honor, we would still oppose it.  Even if they

20         could precisely narrow down one witness or one

21         portion of a witness' testimony, we would still not

22         be in favor of any of it.

23                   When we take depositions in cases, we always

2-11-04

| 1 | have the opportunity to review the transcripts to |
| 2 | ask for corrections that we think that were needed, |
| 3 | and that would be one issue in this case.  Also, |
| 4 | you know, they may take something out of context, |
| 5 | and we may feel that they need to get more than |
| 6 | just a single slice of evidence.  So I don't think |
| 7 | that it would be appropriate to provide them with |
| 8 | any transcripts. |
| 9 | MS. PETERS:  The State doesn't want to do it |
| 10 | either. |
| 11 | THE COURT:  Perhaps one day, when the case |
| 12 | doesn't have as much at stake, it would be worth |
| 13 | trying and having some Supreme Court decisions on |
| 14 | it, because I do believe that the technology is |
| 15 | clearly providing us an opportunity to pretty much |
| 16 | provide them anything they want and provide counsel |
| 17 | quickly a copy of it to see whether or not there is |
| 18 | any errors that you recall. |
| 19 | And in addition to that, having the court |
| 20 | reporter's notes on top of it probably could solve |
| 21 | any issue relatively quickly if there are any |
| 22 | disparities in the transcript.  But I can't |
| 23 | disagree with counsel that perhaps this is not that |

2-11-04

1    case, as much as is at stake.

2        So I'll simly simply write, unless you want

3    me to bring them in to tell them "No," my

4    suggestion is I just would write down "No."

5        MR. CAPONE:  We don't have a problem with

6    the Court advising them by note of your decision.

7        THE COURT:  Because the Supreme Court

8    doesn't say, I think, if both sides don't object to

9    that, it would be hard-pressed to make that clear

10   error.

11       MS. PETERS:  The State doesn't object to

12   that either.

13       MR. CAPONE:  The last thing I would ask,

14   Your Honor, can we find out whether they're going

15   to order lunch or not?

16       THE COURT:  Yes.

17       Do you want me to say anything beyond "No"?

18   Do you want me to say, "Your collective

19   recollection must control"?

20       MR. CAPONE:  I would just say, "No, it's not

21   the Court's written policy."

22       THE COURT:  I just have written "No" and

23   left it at that.

2 - 11 - 04

1          Give them the note and then give them a few

2     minutes.  That may be the end of the process, so I

3     don't want to press the issue with them.

4          Okay.  I'll be back.

5          (Court adjourned at 11:45 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

19

$2 - 11 - 04$

STATE OF DELAWARE:

NEW CASTLE COUNTY:


          I, Jeanne Cahill, Official Court Reporter of
the Superior Court, State of Delaware, do hereby
certify that the foregoing is an accurate
transcript of the proceedings had, as reported by
me in the Superior Court of the State of Delaware,
in and for New Castle County, in the case therein
stated, as the same remains of record in the Office
of the Prothonotary at Wilmington, Delaware, and
that I am neither counsel nor kin to any party or
participant in said action nor interested in the
outcome thereof.

          WITNESS my hand this 6th day of December,
2004.


          Jeanne Cahill, RMR, CRR
          Delaware CSR # 160-PS

A-29

SUPERIOR COURT CRIMINAL DOCKET                     Page    13
( as of   09/25/2007 )

State of Delaware v.  JASON A HAINEY                          DOB: 02/12/1979
State's Atty: ALLISON L TEXTER , Esq.        AKA:
Defense Atty: JEROME M CAPONE , Esq.


       Event
No.   Date             Event                              Judge
----------------------------------------------------------------------------
       * APPROVED BY JUDGE CARPENTER.
87   01/31/2007
       LETTER FROM LOREN MEYERS, DAG  TO JUDGE CARPENTER.RE: PROSECUTORS HAVE
       TODAY FILED WITH THE PROTHONOTARY THE STATE'S ANSWER TO THE MOTION
       FOR POSTCONVICTION RELIEF. FOR THE COURT'S CONVENIENCE, I ENCLOSED A
       COPY OF THE STATE'S ANSWER.
88   01/31/2007
       STATE'S ANSWER TO MOTION FOR POSTCONVICTION RELIEF FILED.
       FILED BY LOREN MEYERS, DAG
       REFERRED TO JUDGE CARPENTER.
89   02/21/2007
       LETTER FROM JASON HAINEY    TO JUDGE CARPENTER. RE: RULE 61
       RE: REQUESTING EXTENTION TO FILE RESPONSE TO THE PROSECUTIONS REPLY
       TO RULE 61.
       REFERRED TO JUDGE CARPENTER.
90   03/05/2007                                  CARPENTER WILLIAM C. JR.
       LETTER FROM JUDGE CARPENTER    TO JASON HAINEY. THE COURT IS IN
       RECEIPT OF YOUR LETTER OF FEBRUARY 20, 2007 REGARDING THE RULE 61
       POSTCONVICTION MOTION YOU FILED. YOU REQUESTED EXTENSION OF TIME TO
       REPLY TO THE STATE'S RESPONSE AND THAT REQUEST IS GRANTED. UNDER YOUR
       PRESENT CONDITIONS OF INCARCERATION, I WILL GRANT A 90 DAY EXTENSION.
91   05/11/2007
       MOTION TO AMEND  FILED. PRO SE
       REFERRED TO JUDGE CARPENTER.
92   06/07/2007
       DEFENDANT'S REPLY BRIEF FILED. RE: RULE 61
       REFERRED TO JUDGE CARPENTER
93   09/24/2007                                  CARPENTER WILLIAM C. JR.
       ORDER: ON DEFENDANT'S PRO SE MOTION FOR POSTCONVICTION RELIEF.DENIED
       IT IS SO ORDERED

              *** END OF DOCKET LISTING AS OF  09/25/2007 ***
                  PRINTED BY: CSCKWAL

```
            SUPERIOR COURT CRIMINAL DOCKET                Page   10
                 ( as of   09/25/2007 )

State of Delaware v.  JASON A HAINEY                    DOB: 02/12/1979
State's Atty: ALLISON L TEXTER , Esq.       AKA:
Defense Atty: JEROME M CAPONE , Esq.


       Event
No.    Date           Event                              Judge
-----------------------------------------------------------------------
63   11/15/2004
         TRANSCRIPT FILED.
         JURY TRIAL PROCEEDINGS- FEBRUARY 5,2004
         BEFORE JUDGE CARPENTER AND A JURY
64   11/15/2004
         TRANSCRIPT FILED.
         PRAYER CONFERENCE PROCEEDINGS- FEBRUARY 6,2004
         BEFORE JUDGE CARPENTER AND A JURY
65   11/16/2004
         TRANSCRIPT FILED.
         JURY TRIAL PROCEEDINGS- FEBRUARY 2,2004
         BEFORE JUDGE CARPENTER AND A JURY
66   11/19/2004
         LETTER FROM LINDA JABLONSKI, CASE MANAGER TO SUPREME COURT
         RE: ENCLOSED IS ADDITIONAL DOCUMENTS AND TRANSCRIPTS THAT WERE
         RECEIVED IN THE PROTHONOTARY AFTER THE RECORD WAS SENT TO SUPREME
         COURT.
         252, 2004
67   11/22/2004
         LETTER FROM SUPREME COURT TO SHARON AGNEW, PROTHONOTARY
         RE: THE TRANSCRIPT AND RECORD ARE DUE TO BE FILED
         IN SUPREME COURT NOVEMBER 29, 2004.
         (RECORD & TRANSCRIPT SENT 11/19/04).
68   12/08/2004
         TRANSCRIPT FILED.
         JURY NOTES - FEBRUARY 11, 2004
         BEFORE JUDGE CARPENTER
69   12/09/2004
         LETTER FROM FROM LINDA JABLONSKI, CASE MANAGER TO SUPREME COURT
         RE: ENCLOSED IS AN ADDITIONAL TRANSCRIPT THAT WAS RECEIVED
         IN THE PROTHONOTARY AFTER THE RECORD WAS SENT TO SUPREME COURT.
         252, 2004
70   12/29/2004
         TRANSCRIPT FILED.
         PRETRIAL HEARING- JANUARY 9,2004
         BEFORE JUDGE WILLIAM CARPENTER
71   03/16/2005
         DEFENDANT'S LETTER FILED.
         TO: JEROME CAPONE
         REGARDING DIRECT APPEAL
72   06/08/2005
         DEFENDANT'S LETTER FILED.
```

```
                      SUPERIOR COURT CRIMINAL DOCKET                 Page    11
                          ( as of   09/25/2007 )

State of Delaware v.  JASON A HAINEY                          DOB: 02/12/1979
State's Atty: ALLISON L TEXTER , Esq.        AKA:
Defense Atty: JEROME M CAPONE , Esq.


      Event
No.   Date         Event                                  Judge
--------------------------------------------------------------------------------
      TO: MR. HEYDEN
      (COPY) OF REQUEST FOR SUPPLEMENT POLICE REPORT
73    07/20/2005
      DEFENDANT'S LETTER FILED.
      TO: JUDGE CARPENTER
      LETTER REGARDING LACK OF COMMUNICATION WITH HIS ATTORNEYS.
74    07/28/2005
      MANDATE FILED FROM SUPREME COURT:  SUPERIOR COURT JUDGMENT AFFIRMED.
      SUPREME COURT CASE NO: 252, 2005
      SUBMITTED: JUNE 8, 2005
      DECIDED: JULY 5, 2005
      BEFORE STEELE, CHIEF JUSTICE, BERGER AND JACODS, JUSTICES.
75    08/17/2005                                       CARPENTER WILLIAM C. JR.
      LETTER FROM JUDGE CARPENTER       TO JASON HAINEY. THE COURT IS IN
      RECEIPT OF OUR LETTER OF JULY 15, 2005 REQUESTING INFORMATION
      CONCERNING YOUR CASE SO THAT YOU CAN PROCEED PRO SE WITH A POST-
      CONVICTION MATTER. I HAVE REVIEWED THE CASE FILE IN THIS MATTER, AND
      THE COURT DOES NOT HAVE THE POLICE REPORTS WHICH YOU ARE REFERENCING.
      AS SUCH, I DO NOT THE ABILITY TO SIMPLY COPY AND PROVIDE THEM TO YOU.
      I DO HAVE A COPY OF THE INDICTMENT WHICH I AM ENCLOSING WITH THIS
      LETTER. I AM ALSO DECLINING TO ORDER MR. CAPONE AND MR. HEYDEN TO
      PROVIDE ANY PARTICULAR INFORMATION TO YOU AT THIS TIME. I DO NOT SEE
      WHY THE POLICE REPORT OR THE STATEMENTS OF THESE WITNESSES WOULD HAVE
      ANY BEARING UPON YOUR RULE 61 PETITION ALLEGING INEFFECTIVE ASSISTANCE
      OF COUNSEL. AS SUCH TO THE EXTENT YOU WERE REQUESTING ACTION FORCING T
      HIS MATERIAL TO BE PROVIDED TO YOU, YOUR REQUEST IS DENIED.
76    08/24/2005
      DEFENDANT'S LETTER FILED. RE: COURT'S LETTER OF AUGUST 17, 2005.
      REFERRED TO JUDGE CARPENTER
77    08/29/2005                                       CARPENTER WILLIAM C. JR.
      LETTER FROM  JUDGE CARPENTER       TO JASON HAINEY. RE: THE COURT IS IN
      RECEIPT OF YOUR LETTER OF AUGUST 22, 05 IN WHICH YOU ARE REQUESTING A
      COPY OF THE POLICE STATEMENT. THE SIMPLE ANSWER TO YOUR QUESTION IS
      THE COURT DOES NOT HAVE THE DOCUMENT AND THEREFORE CANNOT PROVIDE IT
      TO YOU. I HAVE FORWARDED A COPY OF YOUR LETTER TO MR.CAPONE AND MR.
      HEYDEN IN THE EVENT THEY ARE WILLING TO HONOR YOUR REQUEST.
78    06/15/2006
      MOTION FOR POSTCONVICTION RELIEF FILED. PRO SE
      REFERRED TO JUDGE CARPENTER.
79    06/15/2006
      LETTER FROM A. HAIRSTON, PROTHONOTARY OFFICE  TO ALLISON TEXTER, DAG
      RE: NOTICE OF FILING OF PRO SE MOTION FOR POSTCONVICTION RELIEF.
```

A-31

In The Superior Court Of The State Of Delaware

In And For New Castle County

State Of Delaware

v.

Jason A. Hainey
Name of Movant on Indictment

Correct Full Name of Movant

No. _____
(To be supplied by Prothonotary)

Honorable W. C. Carpenter JR.

Motion To Amend

Notice:

Please Take Notice that the Attached motion to Amend Defendant's Rule 61 motion for Post Conviction Relief Is Hereby Submitted to the court for consideration.

Dated: _____

Jason A. Hainey

Jason A. Hainey

SBI # 383182  Unit: 23-B-L-8

D.C.C

1181 Paddock Rd.

Smyrna, DE 19977

1.

In The Superior Court of the State of Delaware
In And for New Castle County

State of Delaware              I.D.** 0306015699
                    v.
Jason A. Hainey
                Defendant.          Motion To Amend

Comes Now, Jason A. Hainey, Pro Se, (Hereafter refered to
as the "movant" or the "Defendant") Pursuant To Super. Ct. Crim. Rule
61 (B) (6), Submits this " Motion to Amend".
Movants motion for post conviction Relief Previously filed 6/15/06
In support the movant offers the following:

Facts

1. On 6-15-06 the Defendant, Pro Se filed a motion for P.C.R
under rule 61.
2. The Defendant is unskilled in the area of law and is Pro Se.
Pro Se pleadings are to be liberally construed/Interpeted.
3. This Court pursuant to Del. Super. Ct. Crim. Rule 61.(B)(6),
And Del. Super Ct. Civil Rule. 15, clearly directs the liberal
granting of amendments, even after a response has been
filed, ...."By leave of court, which shall be freely given
when justice so requires."
4. After Recieving defense counsel's affidavit of 8/23/06 + state's
reply breif of 1/31/07 The defendant has cause to Amend his
P.C.R. 61 in this matter. In further support the defendant
offers;

## 2.

A.) The motion to Amend is not brought in bad faith And includes the defendants final efforts to cure any deficiencies in the Motion for P.C.R and Cel Before the court.

B.) Defendant asserts there is no prejudice to the partys' involved.

C.) That as a direct result of ineffective assistance of counsel the defendant suffered a miscarriage of justice that undermined the legality, reliability, integrity + fairness of the proceedings leading to the defendants judgment of conviction.

D.) Defendant is actually Innocent, legally Innocent, of the charged offenses.

E.) That Prejudice amounting to manifest injustice Exist, and these claims, and facts must be evaluated by the court And written reasons given in Evaluation of these claims. See: <u>Semick V. State, Del. Supr., 451 A.2d 1155</u> (1982) <u>Allen V. State, Del. Supr., 509 A.2d 87, 88</u> (1986) <u>Albury V. State, Del. Supr., 551 A.2d 53, 58</u> (1988)

## <u>Claims / Grounds in Support</u>

1. Appellate Counsel (Jerome Capone) was ineffective as he failed to present the facts, nor argue based upon the facts reflected in the record; appellate counsel also failed to present the arguments outlined in this motion; this miscarriage of justice undermined the legality, reliability, integrity + fairness of the proceedings leading to the defendants judgment of conviction.

This claim is not procedurally barred, as this is a colorable claim that there was a miscarriage of justice that undermined the fundemental legality, reliability, integrity or fairness of the proceedings leading to the judgment of conviction in accordance with Super. Ct. Crim. R. 61 (i) (5)

3.

The due process clause of the 14th amendment guarentees a criminal defendant the effective assistance of counsel on his first appeal as a matter of right. See: Evitts v. Lucey, 469 U.S. 387 (1985) See also: Erb v. State, 332 A.2d 137 (Del. 1974) [ Holding defense counsel's ineffective prosecution of appeal required the court to deny the states motion to dismiss appeal where defense counsel failed to be diligent in prosecuting defendants appeal; The state is not permitted to benefit from defense counsel's ineffective representation.)

Appellate counsel failed to Argue, or even present all of the facts, Appellate counsel also failed to raise several other state + federal constitutional issues that were likely to suceed, Despite repeated efforts by the defendant to meet with counsel concerning direct appeal that were ignored. (See: A-29 date 3/16/05 - 6/8/05 - 7/20/05 docket sheet showing letters written to counsel & court concerning counsel's neglect involving direct appeal.)

Second: Appellate counsel failed to present the fact or argue that the prosecution used perjured testimony to convict the defendant violating the defendants 5th, 6th, + 14 amendments, right to due process, Effective assistance of counsel + a fair trial.

Third: Appellate counsel failed to argue or present the fact that it was prosecutorial misconduct when the state misrepresented evidence that in turn resulted in the defendants conviction violating the defendants 5th, 6th + 14th amendment right to due process, Effective assistance of counsel + a fair trial.

Fourth: Appellate counsel failed to Argue or present the fact that it was an abuse of discretion by the trial judge for suppressing ballistics experts testimony while still allowing a gun that has no established nexus to the crime in as evidence,

4.

violating the defendants 5th, 6th + 14th ~~and~~ amendments, right to due process, effective assistance of counsel + a fair trial. Appellate counsel's failure to raise these issues fell below an objective standard of reasonableness + caused actual prejudice to the defendant. Appellate counsel should have known that, even under a plain error standard, some of these issues had a reasonable likelihood of success before the Del. Supreme Court, as the trial courts actions violated the defendants federal + state constitutional rights. Appellate counsel's performance in this case fell below an objective standard of reasonableness + was not sound strategy. When evaluated from counsel's perspective at the time + in light of the totality of the circumstances. See: Lockhart v. Fretwell, 50x U.S. 364 (1993); Kimmelman v. Morrison, 477 U.S. 365 (1986); Strickland v. Washington, 466 U.S. 668 (1984) "a system of appeal as of right is established precisely to assure that only those who are validly convicted have their freedom drastically curtailed. a State may not extinguish has been violated." See: Evitts v. Lucey, 469 U.S. at 399-400 (1985)


II. and III. Appellate counsel failed to present the fact or argue that the prosecution used perjured testimony + misrepresented evidence that resulted in the defendants conviction, violating the defendants 5th, 6th + 14th amendments, Right to due process, effective assistance of counsel + a fair trial.

These claims are not procedurally barred as this is a colorable claim that there was a miscarriage of justice that undermines the fundamental legality, reliability, integrity ~~and~~ fairness of the proceedings leading to the judgment of conviction in accordance with Super. Ct. Crime. R. 61 (i) (5)

5.

On the date of 2/3/04 Detective Spillan testified during a balancing analysis to determine relevancy of evidence that he found a gun during the search of State witness Earl Evans Apt. in response to an attempted Robbery that occured on 9/12/01. (The alleged attempted robbery is a seperate incident) Detective Spillan further testified that upon retrieving the gun from Evans apt. Evans told him that the gun belonged to the defendant.

Because of this testimony the trial judge allowed the gun in question to be admitted as evidence during the defendants murder trial, (although trial judge stated that he expected the link to be stronger in terms of connecting the defendant to the gun in question.) After the gun was admitted & the trial continued it was established that detective Spillan's balancing analysis testimony was false/perjured. First, it was an officer whitmaesh who found the gun in question **Not** detective Spillan. See: _A-0 whitmaesh report 9/30/01_ Second, **a**fter detective Spillan's balancing analysis testimony got the gun in question admitted under the premise that State witness Evans could link the defendant to the gun, Evans testified that when the gun was recovered by the police he never told them who the gun belonged to. See: _A-12 2/3/04 T.S pgs. 75-76_;

See also: _A-11 2/3/04 T.S. pgs. 16-63_ for detective Spillan's false/perjured balancing analysis testimony. And See: _A-11 2/3/04 T.S. pgs. 47-57_ for trial judges ruling based solely on detective Spillan's testimony that State witness E. Evans supposedly linked the defendant to the gun in question.

The defendant contends that once state witness Earl Evans testified that he never said who the gun in question belonged to upon its retrieval, defense counsel should have objected to the offering

6.

of the gun as evidence because the sole link for which the gun had been admitted had been destroyed. Had it not been for detective Spillan's false/perjured testimony during the balancing analysis to determine relevancy of evidence, there would have been absolutely no reason to believe state witness Evans would link the defendant to the gun & if there is no reason to believe Evans would link the defendant to the gun then there are no grounds in which to make the gun admissible, so had the gun in question remained inadmissable there is a reasonable probability that the jury may have rendered a different verdict. Especially in light of the case being so close. ( The jury sent a note stating that they were deadlocked 6-6 for the majority of 2 days see: A-22 2/11/04 T.S. pgs. 2-9 ) "a verdict or conclusion only weakly supported by the record is more likely to have been effected by errors than one with overwhelming record support." Id at 696, 104 S.Ct.

The defendant argues that by counsel not contesting the false/perjured testimony of detective Spillan that in turn allowed a gun that had no established nexus to be admitted as evidence, & by allowing the prosecutors misconduct to go uncontested was a deficient performance that prejudiced the defendant. It cannot be said with absolute certainty that had counsel objected to these descreepancies the outcome of the trial would have been the same.

"a new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury." See: Id at 154, 92 S.ct. 766

7.

False testimony cases involve not only "Prosecutorial misconduct" but also "a corruption of the truth-seeking function of the trial process." See: U.S. v. Agurs Supr. 427 U.S. at 104, 96 S.Ct. at 2397 In Napue v. Illinois, 1959, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217, the Supreme Court made clear in no uncertain terms that due process is violated when the prosecutor obtains a conviction with the aid of false evidence which it knows to be false and allows to go uncorrected. It is immaterial whether or not the prosecution consciously solicited the false evidence. It is also immaterial whether the false testimony directly concerns an essential element of the Governments proof or whether it bears only upon the credibility of the witness. As the court explained in <u>Napue</u>, "the jury's estimate of the truthfulness & reliability of a given witness may well be determinative of guilt or innocence, & it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." <u>360 U.S. at 269, 79 S.Ct. at 1177.</u>

Defendant contends that the state had to know perjured/false testimony was given once state witness Evans denied ever telling the police who the gun in question belonged to. Evans directly contradicted detective Spillan's testimony & directly contradicted the basis for which the gun was introduced, yet the state never moved to correct or remedy this discrepancy & defense counsel never objected to this blatant prejudiced nor argued on direct appeal this miscarriage of justice violating the defendants right to effective assistance of counsel, due process & to a fair trial.

8.

The court is not the body which, under the constitution, is given the responsibility of deciding guilt or innocence. The jury is that body, + again under the constitution, the defendant is entitled to a jury that is not laboring under a state sanctioned false impression of material evidence when it decides the question of guilt or Innocence with all of its ramifications. In this case, in which credibility weighed so heavily in the balance, it cannot be concluded that had the unlinkable gun remained inadmissable the jury would have still found that the states case + the defendant's guilt had been established beyond a reasonable doubt. Therefore the defendant respectfully requests that his conviction be reversed + remanded for a new trial.

IV. Appellate counsel failed to argue or present the fact that it was an abuse of discretion by trial judge for supressing ballistics experts testmony while still allowing a gun that had no established nexus violating the defendants 5th, 6th, + 14 Amendments. Due process, effective assistance of counsel + a fair trial. This claim is not procedurally barred, as this is a colorable claim that there was a miscarriage of justice leading to the judgment of conviction in accordance with Super. Ct. Criminal. R. 61 (i) (5)

On the date of 1/9/04 defense counsel Jerome Capone argued motion in limine to exclude reference to a gun seized from state witness Earl Evans Apt. in a seperate incident from which the defendant is on trial. (attempted robbery 9/13/01) Both, state ballistics expert Walter Dandridge And Defense ballistics expert William Welch conceded that they could not conclusively match the bullets

9.

found at the crime scene to the gun in question. See: ballistics testimony A-1 date 1/9/04 T.S pgs. 1-133 Accordingly on 1/20/04 the court granted the defendants motion to exclude ballistics experts testimony. Stating in part, "Simply put, there is no way to indentify the seized firearm as the murder weapon by ballistic testing."

On the date of 2/3/04 Due to the false/perjured testimony of detective Spillan during an balancing analysis to determine relevancy of evidence, the trial court ruled that the gun in question would be allowed to be offered as evidence. See: A-11 2/3/04 T.S. pgs. 47-57 for judges ruling

At this point the defendant contends that counsel should have argued that the ballistics experts testimony should have become admissable because once the gun became admissable evidence then any + all information pertaining to the gun became relevant.

As Stated in, BARBEE. V. WARDEN, MARYLAND PENITENTIARY 331 F.2d 842 "In our view, all of the evidence tending to exculpate the petitioner became highly relevant the instant his revolver was produced in open court, formally marked for identification + witnesses interrogated about it. Presenting the gun, without explanation or qualification could not fail to suggest an inference that this was the weapon used to commit the offense for which Barbee was on trial. If this was not meant to be suggested, there was no reason, indeed no justification, whatever for its formal production at trial. Once produced, it became not only appropriate but imperative that any additional evidence concerning the gun be made available either to substantiate or to refute the suggested

10.

inference. If the pistol was pertinent for any purpose, so also was the opinion of the ballistics expert that it was not the weapon used in the Fisher shooting. We cannot say that the trier of fact would have given no weight to the ballistics report or the experts testimony."

The defendant contends that his situation in this particular instance was similar to Barbee's + defense counsel should have argued it accordingly. Especially in light of the case being so close. In fact with the case being so close it cannot be said that had ballistics experts testified the jury would have come to the same conclusion of guilt. There would have been the defense And the states ballistics experts coming to the same conclusion that it could not be said as a fact that the gun introduced as evidence was the gun used in the crime. Defendant argues that once the unlinkable gun was introduced as evidence the speculation + inference that this was the weapon used had already begun, so arguing for And having the ballistics experts testify would have entailed no significant cost to the defense. The damage had already been done the moment the jury was allowed to speculate about the significance of the gun introduced. With this prejudice + miscarriage of justice in mind the defendant humbly requests that his conviction be reversed + remanded for a new trial.

In The Superior Court Of The State Of Delaware
In And For New Castle County

A-31

Jason Hainey,
  Defendant-Below,
  Movant,

    V.

State Of Delaware,
  Respondent.

Cr. A. No. _____

Memorandum Of Law in Support Of
Rule 61 motion For Post-Conviction Relief

    The defendant, Jason Hainey, Pro-Se, moves this Honorable Court pursuant to Superior court Criminal Rule 61, to reverse his conviction on the charges of: 1st Degree murder, 1st Degree murder during commission of a felony, Possession of a firearm during the commission of a felony, Attempted Robbery 1st degree, Possession of a Firearm during the commission of a felony

Based on the errors of law and constitutional violations as stated in the attached motion for post-conviction relief. This is the defendant's memorandum of law in support of his request for relief.

A-31

JASON HAINEY ID. No. 0306015499 V. State of DE. Appendix

Table of contents for Rule 61

| Dates of Transcripts used | | Appendix pgs. |
|---|---|---|
| 9/12/2001 | Reporting officer Detective Spillian | "A-00" |
| 9/30/2001 | Reporting officer TCF Whitmarsh | "A-0" |
| 1/9/2004 | Motion in limine hearing T.S. pgs. 1-133 | "A-1" |
| 2/3/2004 | T.S. pgs. 97-113 | "A-01" |
| 2/3/2004 | Detective Spillian - Direct T.S. pgs. 3-12 | "A-2" |
| 2/4/2004 | T.S. pgs. 3-32 | "A-3" |
| 2/4/2004 | Tann-Direct T.S. pgs. 33-40 | "A-4" |
| 5/20/2003 | Tann - Statement Pg. 8 | "A-5" |
| 2/2/2004 | Evans - Direct T.S. pgs. 41-52 | "A-6" |
| 2/2/2004 | Evans- Cross T.S. pgs. 81-84 | "A-6" |
| 2/4/2004 | Tann- Direct T.S. pgs. 41-44; Also 53-56 | "A-7" |
| 9/13/01 | Reporting officer Detective Spillian | "A-8" |
| 3/28/2002 | Reporting officer Detective Spillian | "A-9" |
| 2/4/2004 | Tann-Cross Ts. pgs. 69-76; Also 85-92; Also 101-104 | "A-10" |
| 2/3/2004 | T.S. pgs. 13-63 | "A-11" |
| 2/3/2004 | Evans T.S. pgs. 75-76 | "A-12" |
| 2/3/2004 | T.S. pgs. 86-88 | "A-13" |
| 2/3/2004 | Spillian 89-96 | "A-14" |
| 2/4/2004 | T.S. pgs. 2-11 | "A-15" |
| 2/4/2004 | Hall - T.S. pgs. 217-228 | "A-17" |
| 2/9/2004 | T.S. pgs. 89-112 | "A-19" |
| 2/9/2004 | T.S pgs. 13-20 | "A-20" |
| 3/13/2003 | Evans - Statement | "A-21" |
| 2/11/2004 | T.S. pgs. 2-9 | "A-22" |
| 2/12/2004 | T.S. pgs. 1-6 | "A-22" |
| 2/5/2004 | Mullins-Direct 25-28 | "A-23" |
| 7/2005 /8/2005 | letters to counsel + court | "A-24" |
| 7/5/2005 | Direct Appeal decision | "A-25" |
| 6/5/2003 | Proof of Kizee Statement | "A-26" |
| 3/05 - 5/05 - 6/05 | letters to counsel + court | "A-27" |

## NATURE AND STAGE OF THE PROCEEDINGS

The Defendant was charged with Murder 1st degree and several related charges.  The case was tried as a capital case.  After a lengthy jury selection process, the trial started on February 2, 2002.  The case went to the jury on February 9, 2004.  On February 11, 2004 they sent out a note that they were deadlocked at 6-6.  The trial judge told them that they could keep deliberating or advise the Court that they were unable to reach a verdict.  27 hours later, on the afternoon of February 12, 2004, the jury returned with a guilty verdict.

The case went to a penalty phase, and in that part of the case the jury recommended a life sentence (mitigators outweighed aggravators) by a 7-5 vote.  The Defendant was sentenced on May 14, 2004 and was given a life sentence. He filed his appeal in a timely manner.  This is his Opening Brief.

## STATEMENT OF THE FACTS

During the early morning hours of March 12, 2003, Earl Evans sat in an interrogation room at the Delaware State Police Troop 2.   A few hours earlier, he had been arrested for robbing a liquor store in the Newark area, and his police interrogators made sure to let him know just how many, many years he would spend in jail for having committed the robbery.

The interrogation was recorded on videotape.   Watching the videotape, you can see Evans squirm, you can see hear his voice shift between bravado and fear, you can almost smell him sweat.   It was obvious that Earl Evans did not want to spend a lot of time in jail.

In an effort to avoid jail, Evans told the police that he could solve a murder for them, if they would do something for him on the robbery charges.   Evans told police that the murder he could solve occurred in the City of Wilmington.   The police asked him if Jason Hainey (his accomplice in the liquor store robbery) committed the murder, which he denied.     The State police then contacted the Wilmington police who went to Troop 2 and picked up the questioning.

Evans eventually told the police that Jason Hainey committed the murder back in August, 2001 on Wilmington's east side; that Hainey was driven to the crime scene by a man named Monia Tann; and that the police already had the murder weapon, having seized a gun from Evans apartment while conducting another investigation - an robbery at the Abbey Walk Apartments in New Castle County which occurred on September 12, 2001. He told them facts about the murder that only someone associated with crime would know, such as the number of shots fired, the position of the body and that the murder occurred in a house in Wilmington's Southbridge section. ▇▇▇-▇▇.

The Police then located Monia Tann serving a jail sentence in Virginia. He was interrogated and told them the same basic story, blaming the shooting on Hainey. Tann had the most to fear about being blamed for Mercer's murder. He had been questioned about a week after the murder during a surprise visit from the police. ▇▇▇-▇. The police had traced a phone call from Tann's phone to Mercer's cell phone shortly before the murder. During that 2001 interrogation, Tann had admitted knowing Mercer, and he told police that he was aware that Mercer sold bootleg CD's. He told police he called Mercer to discuss a time when he could buy some CD's from Mercer. ▇▇▇-▇.

Since the murder occurred during the daytime, and Tann's car was parked on the street near Mercer's house, Tann had to be concerned that someone could identify his car as being near the scene of the crime. And Tann knew that it was his gun that was used to kill Mercer. Tann, who was facing unrelated robbery charges back in Delaware, also had reasons to blame Hainey for the murder - a) to throw the blame off himself and b) to strike a deal with the prosecutors to reduce his sentence on the robbery charges.

The State's case was based almost entirely on the stories of these two characters, Tann and Evans, neither of whom could be called a credible witness. Yet the State claimed that their stories were believable for three reasons: 1) the stories were consistent; and 2) some of what they said was corroborated by other evidence; and 3) Evans and Tann did not have the opportunity to get together and create a story.

At the conclusion of the State's case, the evidence showed only that Tann and Evans had consistent stories only to the extent that they described the murder the same way. In regards to the facts leading up to the murder and what occurred after the murder, their stories were dramatically different.

Insofar as the State sought to present evidence that corroborated their story, they were only able to corroborate the facts relating to the actual murder – i.e, the victim was shot six times. The defense took the position that Evan's was probably that person who shot Mercer, that he was assisted by Tann, and Evans and Tann knew the facts relating to the actual shooting because they were there and committed the offense, and that they had plenty of opportunities to create a story blaming the shooting on Hainey, should the need ever arise.

By the time the evidence concluded, the jury had learned that Tann and Evans had good reason to throw the blame off themselves and onto Jason Hainey and had plenty of opportunities to concoct a story. The jury also heard that once Evans and Tann were asked to recount facts leading up to the shooting, as well as what happened after the shooting, their stories were substantially different. Moreover, none of the State's other witnesses provided any substantial support for the credibility of Tann and Evans.

After nearly three days of deliberations, the jury sent out a note indicating that they were deadlocked at 6-6. Twenty seven hours later, they announced they had reached a verdict, and the defendant was convicted of all counts.

The jury returned for the penalty phase.  After
hearing the evidence, a majority of the jury voted that the
mitigating factors outweighed the aggravating factors by a
vote of 7-5.[1]  The Defendant was sentenced by the court on
May 14, 2004 and received a life sentence.

---

[1] After the verdict of guilt was delivered, one of the jurors was excused from participating in the penalty
phase deliberations, and an alternate was placed on the jury. (A149)

| Page: | Report Date: 09/12/2001 | Agency: Tr? ? State Police | | Complaint: 06-01-087153 |
|---|---|---|---|---|

| Reported Date and Time WED 09/12/2001 2200 | | Initial Crime Report | Occurred WED 09/12/2001 2155 thru WED 09/12/2001 2200 |
|---|---|---|---|

**Location:**
2707  CAPITOL TRL      NEWARK, DE 19702

**M.O. and Incident Overview:**
The suspects approached the Victim displaying a handgun and demanding his money.  The Victim did not comply and attempted to flee at which time the beat the Victim.  The suspectsm fled without property.

| Grid | Sector | County | Domestic Related | 4-F-14 Sent? | Gen Broadcast Sent? | |
|---|---|---|---|---|---|---|
| 074-350 | 27 | New Castle | ☐Yes ☒No | ☐Yes ☒No | ☐Yes ☒No | |

## Victim Information

| Victim Number 001 | Name ~~LANE~~ |
|---|---|

| Type Individual | Sex Male | Race White | | Ethnic Origin Non-Hispanic | Age 22 | D.O.B. |
|---|---|---|---|---|---|---|

| Address  Newark, DE 19702 | Resident Status Full Time | Home Telephone | Employer/School | Work Telephone |
|---|---|---|---|---|

| Reporting Person? ☐Yes ☒No | Victim Injured? ☒Yes ☐No | Victim Deceased? ☐Yes ☒No | | |
|---|---|---|---|---|

| Injuries Apparent Broken Bones | Description of Injuries POSSIBLE BROKEN NOSE, LACERATION TO RIGHT KNEE, BRUISED LEFT HIP |
|---|---|

## Suspect/Defendant Information

| Sequence 001 | Type Defendant | SBI Number | Name WRIGHT, MAURICE L | | | Nick Name | |
|---|---|---|---|---|---|---|---|

| Sex Male | Race Black | Ethnic Origin Non-Hispanic | Age 24 | D.O.B. | Height 6' 03" | Weight 140 | Skin Tone Dark | Eye Color Black |
|---|---|---|---|---|---|---|---|---|

| Hair Color Black | Hair Length Short | Hair Style | Facial Hair | Voice Speech | Teeth | Build Thin | Glasses |
|---|---|---|---|---|---|---|---|

| Disguise | Disguise Color(s) | Resident Status Full Time | Unusual Characteristics | Armed With Handgun | |
|---|---|---|---|---|---|

| Address NEWARK, DE 19702 | Home Telephone 0 - | Employer/School | Work Telephone |
|---|---|---|---|

| Arrest Number 089382 | Arrest Type Warrant |
|---|---|

| Sequence 002 | Type Defendant | SBI Number | Name HAINEY, JASON A | | | Nick Name | |
|---|---|---|---|---|---|---|---|

| Sex Male | Race Black | Ethnic Origin Non-Hispanic | Age 22 | D.O.B. | Height 6' 04" | Weight 185 | Skin Tone Dark | Eye Color Black |
|---|---|---|---|---|---|---|---|---|

| Hair Color Black | Hair Length Short | Hair Style | Facial Hair | Voice Speech | Teeth | Build Thin | Glasses |
|---|---|---|---|---|---|---|---|

| Disguise | Disguise Color(s) | Resident Status Full Time | Unusual Characteristics | Armed With Handgun | |
|---|---|---|---|---|---|

| Address 5589 MILLTOWN RD APARTMENT 3B Wilmington, DE 19808 | Home Telephone (302) 994-7727 | Employer/School | Work Telephone |
|---|---|---|---|

| Arrest Number 089383 | Arrest Type Warrant |
|---|---|

## Crimes and Associated Information

| Victim Number 001 | Crime Seq 001 | Statute DE:11:0832:00A2:F:B | Crime Description Robbery First Degree Displays What Appears to be a Deadly Weapon |
|---|---|---|---|

| Location Type Parking Lot/Garage | Status Adult Arrest 09/13/2001 | Involvement ☐Alcohol ☐Drugs ☐Computer | General Offense ATPT - Attempt to Commit |
|---|---|---|---|

| Suspected Hate/Bias ☐Yes ☒No - N/A | Crime Code 12213A - Robbery/Gun Street/Alley/Highway |
|---|---|

| Victim Number 001 | Crime Seq 002 | Statute DE:11:1447:A00A:F:B | Crime Description Possession of A Firearm During the Commission of A Felony |
|---|---|---|---|

| Location Type Parking Lot/Garage | Status Adult Arrest 09/13/2001 | Involvement ☐Alcohol ☐Drugs ☐Computer | General Offense |
|---|---|---|---|

| Suspected Hate/Bias ☐Yes ☒No - N/A | Crime Code 5212 - Possession of Weapon |
|---|---|

| Victim Number 001 | Crime Seq 003 | Statute DE:11:0512:0001:F:G | Crime Description Conspiracy Second Degree-Agreement to Engage in Felony Criminal Conduct |
|---|---|---|---|

| Location Type Parking Lot/Garage | Status Adult Arrest 09/13/2001 | Involvement ☐Alcohol ☐Drugs ☐Computer | General Offense |
|---|---|---|---|

A - 00''

| Reporting Officer DET SPILLAN   - 46491 | Pending Supervisory Review: |
|---|---|

| Page: 2 | Report Date: 09/12/2001 | Agency: Tr⁻ ¹ State Police | | Complaint: 06-01-087153 |
|---|---|---|---|---|

## Crimes and Associated Information

| Suspected Hate/Bias ☐Yes ☒No - N/A | Crime Code 7399 - Public Order Crimes/Includes Official Misconduct | | | |
|---|---|---|---|---|

| Victim Number Crime Seq 001    004 | Statute DE:11:1459:0000:F:D | | Crime Description Possession of a Weapon with a Removed, Obliterated or Altered Serial Number | |
|---|---|---|---|---|
| Location Type Parking Lot/Garage | | Status Adult Arrest 09/13/2001 | Involvement ☐Alcohol ☐Drugs ☐Computer | General Offense |

| Suspected Hate/Bias ☐Yes ☒No - N/A | Crime Code 5201 - Altering the Identification of a Firearm |
|---|---|

## Victim - Suspect/Defendant Relationships

| Victim - 001 | Suspect/Defendant - 001 WRIGHT, MAURICE L | Victim Offender Relationship Stranger |
|---|---|---|
| Victim - 001 | Suspect/Defendant - 002 HAINEY, JASON A | Victim Offender Relationship Stranger |

## Investigative Narrative

******Supplement to follow with the investigative narrative.

$^{\backprime}A$-$00^{\prime\prime}$

| Reporting Officer DET SPILLAN  - 46491 | | Pending Supervisory Review: | | | |
|---|---|---|---|---|---|
| Detective Notified | | Referred To | | | |
| Solvability Factors | ☐Witness ☒Suspect Located | ☐M. O. ☐Suspect Described | ☐Trace Stolen Property ☒Suspect Identified | ☒Suspect Named ☐Suspect Vehicle Identified | Status Has Follow l |

Memorandum of law P.C.R 61 in Support of Ground 1 and 2

Ground 1: Abuse of discretion when trial judge allowed a gun to be introduced as evidence that had no established nexus to the crime denying defendants right to a fair trial.

Ground 2: Abuse of discretion by trial judge for suppressing ballistics experts testimony while still allowing gun in as evidence, which limited defendant's defense in rebutting gun testimony.

Supporting facts: Defense counsel argued motion in limine objecting to the prosecutions offering a gun as evidence that had no established nexus to the crime. See A-1, 1/9/04 T.S. pgs. 1-183, A-1, 1/9/04 T.S. pgs. 21-24, 32-34 also A-01 2/3/04 T.S. pgs 97-113 + A-11 2/3/04 T.S. pgs. 47-57

Memorandum of law PCR G1 in support of Ground 1

On the date of 9/12/01 the defendant & his then co-defendant Maurice Weight were arrested & charged with attempted robbery 1st degree, Possession of a firearm during the commission of a felony, Conspiracy 2nd degree, Possession of a weapon with a removed, obliterated/altered serial number. See A-00 report date 9-12-01. Because of this incident the apartment of Earl Evans & Wayne Hall was searched in an effort to retrieve a gun that the victim alleged was used by the defendants. See A-8 report date 9/13/01 (consent to search form) The gun retrieved was described as a BLK revolver handgun with serial numbers filed off - loaded with 6 rounds See A-8 report date 9/13/01

The defendant was again arrested on the date of 3/11/03 along with Earl Evans for a robbery. Shortly after this arrest while trying to make an early deal for himself he claimed to be able to solve a murder & that the gun retrieved from his apartment about a year & a half prior was the murder weapon. See A-21.

On the date of 6/23/03 the defendant was arrested & charged with first degree murder, first degree murder during commission of a felony, PFDCF, Attempted robbery 1st degree, PFDCF.

Shortly after the defendant recieved court appointed counsels Jerome Capone & Micheal Heyden in defense of the murder charge.

2

Defense counsel Jerome Capone on the date of 1/9/04 argued motion in limine to exclude references to a gun seized from an apartment. The state conceded that it could not link the gun in question to the bullets found at a murder crime scene as ballistics experts testified before court on the date of 1/9/04 that tests from bullets were inconclusive in matching with the gun in question. See ballistics test testimony A-1, date 1/9/04 TS. pgs. 1-133 This part of the case is similar to; Farmer V. State 698 A.2d 946. In that case the trial judge errored in admitting into evidence a handgun that had no established nexus to the offense charged, accordingly the supreme court of the state of Delaware remanded Farmer's case for a new trial. The Defendant Jason Hainey would like to demonstrate that the same has happened to him, trial judge William C. Carpenter ~~Errored~~ abuse of descretion in admitting into evidence a handgun that had no established nexus to the offenses charged and requests a order of remand for a new trial. The defendant argues as farmer did that since the state had failed to establish an evidentiary basis for asserting that the gun seized is the same gun used in the shooting the jury would be left to speculate about the significance of the testimony. The defendant requests that there be an examination of the ruling of the trial judge admitting or excluding evidence on Relevancy grounds under an abuse of discretion standard.

## 3.

Hovington v. State, Del. Supr. 616 A.2d 829 (1992) and D.R.E. 401 defines relevant evidence as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "Evidence which is not relevant is not admissible" as defined in D.R.E. 402.

In Farmer v. State 698 A.2d 946, "Farmer's" counsel tendered a specific + timely objection on the basis of relevancy to the state's efforts to introduce evidence that a gun was seized from "Farmers" apartment that could not be established as being the gun used in the shooting.

In the defendants case his court appointed counsel Jerome Capone, filed a motion in limine weeks before trial began and argued with timely objections to the states efforts to introduce evidence that a gun seized from an apartment that could not be established as being the gun used in the shooting. As state + defense ballistics experts agreed bullets from the crime scene could not be conclusively matched to the gun seized from the apartment of one of the state's chief witnesses Earl Evans. The Ballistics expert testified that judging from the bullets he examined from the crime scene either a .38 special or 357 magnum caliber gun could have been used in the shooting. See A-1, 1/9/04 T.S. pgs. 59, but stated that there wasn't enough evidence to say that the gun they were asked to test was the weapon used. Yet the state was still allowed to introduce the gun as evidence and the trial judge also ruled that neither state nor ballistics expert were allowed

B.4

to testify to these facts in front of a jury.
Generally speaking, relevancy is determined by examining the
purpose of which evidence is offered. As stated in Register
v. Wilmington Medical Center Del. Supr. 377 A.2d 8, 10 (1977)
That purpose must, in turn, accommodate the concepts of
materiality, ie be of consequence to the action + probative
value i.e advance the likelihood of the fact asserted. Getz
v. State, Del. Supr., 538 A.2d at 731

In the defendant's case the state claims for offering
evidence of the gun found in Evans + Hall's apartment;
See A-1, 1/9/04 T.S. pages 87, 88. Motion limine arguments;

6. The Court: But nobody else was present,
7. Right? The would be people who the defendant
8. must have told that he did it? I mean --
9. Ms. Kelsey: Monia said it was his gun. He
10. gave it to the defendant. He drove the defendant
11. over there. The defendant went in with the gun,
12. came back out, said they got shot. So he
13. didn't actually see the shooting, but he saw him go
14. in with it + come back out with it.
15. The court: Okay all right I'm sorry I
16. interrupted you.
17. Ms. Kelsey: That was my next point, is that
18. given that there is that confirmation that
19. this is, in fact, the gun, I think its not as
20. unfair — its not unfairly prejudical for the
21. state to be able to present evidence which shows
22. that there are some scientific consistencies with which

5

23. Support what these people said. I mean thats
1. Basically what we want it for.

With all due respect to the court, the defendant feels
that legally it was not the proper purpose in offering a
gun found in Evans & Hall's apartment to say it is in
fact the gun that was used in the murder of Mercer.
No nexus was established by ballistics experts. SEE A-1 1/9/04
T.S. pgs. 1-133. Also the description varied from the time ~~that~~
it was initially seized to the time the gun was introduced
at trial as evidence. Furthermore, the states only link in
connecting the defendant to the gun was the statement/
testimony of Monia Tann who is an admitted liar who has
motive to corroborate the state's theory.

The "nexus requirement", must be satisfied as a predicate to
admissibility. As stated in Whitfield v. State Del. Supr.,
524 A. 2d 13 (1987)

The superior court trial judge admitted the gun in as
evidence over the defenses initial objection (motion in limine)
& support of ballistics experts evidence that bullets from the
murder scene couldn't be conclusively matched to the gun
the state offered as evidence. See, A-1 1/9/04 T.S. pgs 1-133
On the date of 2/3/04 a balancing analysis was held to
determine if there was a satisfactory link to the defendant
& the gun being offered as evidence. Due to the perjured
testimony of Detective Spillian it was determined that the
gun would be allowed in as evidence based solely on the
fact that detective Spillian testified that state witness Earl
Evans confirmed that the gun found was the defendants. See
A-11 2/3/04 T.S. pgs. 16-63; (A-11, 2/3/04 T.S. pgs. 47-57 for judges ruling )

6

But shortly after the balancing analysis, this testimony of detective Spillian was proven perjured when state witness Earl Evans testified that he never told detective Spillian who the gun belonged to. See A-12 2/3/04 T.S. pgs. 75, 76.

It's clearly displayed that the trial judge made plain error and abuse of descretion by hanging his decision to allow inadmissible evidence in from the sole testimony of detective Spillian See A-11 2/3/04 T.S. pgs. 47-57 with clearly establishing it to be "absolute fact", dueing his analysis as stated in D.R.E. 403 & not speculating. It is a reasonable probability that had the trial judge included the testimony of Evans into the analysis of determing relevancy of evidence, he may have came to the conclusion that the evidence would remain inadmissible because state witness Earl Evans conteridicted the testimony of detective Spillian. The defendant feels this was extremly prejudical, because once the gun was offered in any type of compacity, the jury is left to speculate & speculation leads to prejudice. "A verdict or conclusion only weakly supported by the record is more likely to have been a effected by errors than one with overwhelming record support". Id at 696, 104 S.CT. at 2069 (The jury sent a note after 2 days of deliberations saying they were deadlocked 6-6, for most of that 2 days before being sent back for further deliberations.) See A-22 T.S. pgs 2-9, 2/11/04

The state has failed to establish a nexus on all levels its required to have established that the gun in question is the murder weapon. Admission of the gun was abuse of descretion In violation of D.R.E 901 (a) & D.R.E 403. The State

7

⊙ ⊙ ⊙

may contend that the defendant did not base his objections on D.R.E 403 + D.R.E 901 (a) + that the defendant cannot assert that claim on Rule 61 on appeal. However the State of Delaware Supreme court ruled that evidence that a defendant charged with a shooting, had a firearm in his possession is surely probative if that firearm is tied to the criminal act. But without a satisfactory evidentiary link, such evidence carries the risk that the jury may associate mere ownership of instruments adaptable for use in a crime subjects the defendant to the same risks that impermissible character or bad act evidence may pose equating disposition with guilt. See, State v. Onofrio, Conn. Supr., 179 Conn 23, 425 A.2d 560, 564, (1979); See also, Getz v. State, 538 A.2d at 730

Evidence that is speculative, however, carries the potential for permitting the jury to draw unwarranted inferences. Where those inferences reflect adversely on the defendant by portraying him as having a gun available to him, without establishing that the gun was used in the shooting, admissibility is barred because speculation creates prejudice, even apart from the weighing process required by D.R.E 403. Concluding that it was abuse of discretion for the trial judge to admit into evidence a gun that the state concededly could not link to the shooting in question + indeed varied in appearance from the gun described by the states own witnesses (Tann + Detective Spillian) added the fact that ballistics experts could not link the gun to the bullets found at the crime scene.

8

As stated in Barbee v. Warden, Maryland Penitentiary, 331 F.2d 842; "In our view, all of this evidence tending to exculpate the petitioner became highly relevant the instant his revolver was produced in open court, formally marked for identification & witnesses interrogated about it. Presenting the gun, without explanation or qualification, could not fail to suggest an inference that this was the weapon used to commit the offense for which Barbee was on trial. If this was not meant to be suggested, there was no reason, indeed no justification, whatever for its formal production at trial. Once produced, it became not only appropriate but imperative that any additional evidence concerning the gun be made available either to substantiate or to refute the suggested inferences. If the pistol was pertinent for any purpose, so also was the opinion of the ballistics expert that it was not the weapon used in the fisher shooting. We cannot say that the trier of fact would have given no weight to the ballistics report or the experts testimony."

The fact that the superior court trial judge ruled to admit into evidence a gun that ballistics experts agreed couldn't be matched to bullets found at crime scene, is believed to be an abuse of discretion by the trial judge, on behalf of the defendant. Also when it was further ruled that the ballistics experts could not testify at trial is believed to be an abuse of discretion that prejudiced the defendant & also limited his defense in being able to rebute testimony about the gun with the absolute facts that would have been provided by the ballistics experts.

9

The defendant contends that the admission of the gun was abuse of descretion in light of, (1.) Due to the perjured testimony of Detective Spillan + Mecia Tuan. (See Ground 5 of p.c.r (a) memorandum) + (2.) due to insufficient authentication or Identification under D.R.E. 901 (a) In general, the descion of whether to admit evidence in particular circumstances is within the trial judges discretion. See Ciccaglione v. State Del. Supr., 474 A.2d 126, 130 (1984)

Defendant also argues that the gun the state offered as evidence is described differently that the gun that was initially seized from Evans Apartment. See detective Spillan consent to search form A-8 report date 9/13/01 where the gun is described as a black revolver (no caliber) with obliterated serial numbers

Yet the state offered a brown handled black .38 revolver with serial numbers on it. See A-1 1/9/04 T.S pgs. 1-133 specifically T.S. pg. 13 Also the gun that was initially seized on 9/12/01 was ordered may be destroyed see A-9 report date 3/28/02. So the question is, was that gun destroyed? And if not, how can one be sure when the descriptions of the gun are different? And when you add the fact that the ballistics experts could not conclusively match the bullets at the crime scene to the gun offered as evidence, the defendant feels that the admission of the gun into evidence was prejudicial + an abuse of descretion.

Federal appellate courts reviewing trial rulings concerning authentication or identification apply a deferential abuse of descretion standard. See U.S. v. Coleman (10th cir) 524, F.2d 593

10.

594 (1975) Because D.R.E. 901 (a) tracks F.R.E 901 (a)
decisions construing the latter rule and our analysis here.
The defendant contends that there is nothing whatsoever to link him
to the gun that was introduced as evidence, there was not
even enough evidence to link the gun that was introduced as
evidence to the murder. The defendant submits that he has
thoroughly demonstrated the facts + asks that the court set
aside his convictions + reversed + remand for a new trial.

Memorandum of law P.C.R in Support of Ground 3

Ground 3: Judge abuse of discretion by not permitting evidence of State witness Monia Tann's juvenile burglary conviction (prior bad acts)

Supporting Fact: Judge ruled Tann's juvenile burglary conviction as not being a crime of dishonesty, + didn't allow defense counsel to tell the jury about it on cross examination of Tann to show the jury Tann's dishonesty See A-3 2/4/04 T.S. pgs. 1-26

1.

Memorandum of law P.C.R. 61 in support of Ground 3

To attack the credibility of Monia Tann, the defense sought to introduce evidence that Tann was convicted of burglary as a juvenile. Using evidence of other crimes to prove character is controlled by D.R.E. 609. The rule states that evidence of juvenile adjudications is generally not admissible. However, such evidence may be admissible to attack the credibility of an adult if the court is satisfied that the evidence is necessary for a fair determination of the issue of guilt or innocence. D.R.E. 609 (d).

The rule therefore indicates situations may arise when a witnesses juvenile conviction should be admissible. The defendant submits that this case is one of those situations. In the instant case, the State's case was premised entirely on the credibility of Earl Evans + Monia Tann. The trial court recognized that Tann's credibility was key in regards to the matter of guilt or innocence.

That very consideration formed the basis for the trial court's decision to allow evidence of a prior felony conviction of "eluding the police", even though the court was "not confident" it was a crime of dishonesty. See A-3, 2/4/04 T.S. pgs. 5-7

The defendant submits that when the credibility of a prosecution witness is so central to the jury's determination, it is an abuse of discretion to limit a defendants ability to fairly attack the credibility of the witness. Evidence of prior felonies + crimes of dishonesty are recognized by rule + case law as pertinent to issues of credibility. In the instant case, Tann's juvenile conviction for burglary was not an isolated teenage

2.

indiscretion. He had adult convictions for possession of marijuana conviction (not admissible), receiving stolen property conviction (admissible) see A-3 2/4/04 T.S. pgs 5-7. at the time of his testimony, where Tann was awaiting sentencing + facing nearly 250 years in jail, the trial courts decision to protect Tann's family court adjudication for burglary does not seem reasonable in light of the importance of Tann's credibility to the case. Especially when you look at the nature of the defendant's crime in which he was charged + convicted (i.e. home invasion which turned into a murder) The admission of Tann's juvenile burglary conviction would have aided the defenses theory that Tann + Evan committed the crime by showing that Tann was no stranger to a home invasion.

The recent case of Rhodes v. State is distinguishable. Del. Super., 825 A.2d 239 (2003). In that case, the witness was a victim of a home invasion robbery which occured in 2001. The victim, a paraplegic, had a 1994 conviction for burglary in family court + no crimes in the intervening period. Though he was an important states witness, under those circumstance the court affirmed the trial judge's decision not to allow introduction of his family court conviction. In Harris v. State Del. Super, 695 A.2d 239 (1997) The court upheld the trial judge's decision not to allow evidence of a witnesses juvenile conviction. In Harris, the witness in question was a person on the street who happened to witness the crime, not a co-conspirator. The court noted that the witness's credibility was therefore not a real issue in the case, Therefore the court concluded that since the credibility of the witness was not

3.

Central to his testimony, the trial judge had a basis for excluding the witness's family court conviction. See, also: Rash v. State, 612 A.2d 159 (1992)

D.R.E. 609 Impeachment by evidence of conviction of crime (a) General rule. For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted but only if the crime (1) constituted a felony under the law which the witness was convicted, + the court determines that the probative value of admitting this evidence outweighs its prejudicial effect or (2) involved dishonesty or false statement, regardless of the punishment. D.R.E. 609 (d) Juvenile adjudications. Evidence of juvenile adjudications is generally not admissible under this rule. The court may, however in a criminal case, allow evidence of a juvenile adjudication of a witness other than the accused if conviction of the offense would be admissible to attack the credibility of an adult + the court is satisfied that admission of evidence is necessary for a fair determination of the issue of guilt or innocence, and (E) Pendency of appeal. The pendency of an appeal therefrom does not render evidence of a conviction inadmissible. Evidence of the pendency of an appeal is admissible. The defendant contends his counsel was denied a right to defend defendant with D.R.E. 609 (a)(1)(2)(d)(E) concerning cross-examination of Monia Tann to further show through his Juvenile burglary conviction that Tann is dishonest. "In Gregory v. State, Del. Supr, 616 A.2d 1198 (1992), this court defined a crime of dishonesty + statement as contemplated by D.R.E. 609 (a)(2). The phrase "dishonesty or false statement" is construed to mean that crimes involving dishonest conduct as well

4.

As crimes involving false statements are admissible impeachment purposes.

Id. at 1204; Tinnen v. State Del. Supr., No. 70, 1986, Horsey, J. (1/27/1987) (and receiving stolen property conviction admissible under D.R.E. 609 (a) (2) Also see, Tucker v. State 692 A.2d 416, 1996 WL 539802 (Del. Supr.). Super. Ct. noted that robbery, burglary + theft all have been held in Delaware to be crimes of dishonesty.

In the instant case, Tann was not indicted as co-conspirator. However, even by his own testimony, he probably could have been convicted as a codefendant. In other words, Tann's credibility was more important than that of a noninvolved fact witness. As the trial judge noted, his credibility was "Key to this matter". If a juvenile conviction is not admissible when the credibility of a witness is "Key" to the issue of guilt or innocence, then the defendant cannot envision any case when the juvenile conviction of a witness will ever be admissible.

The defendant asks that his conviction be reversed + remanded.

Memorandum of law P.C.R 61 in Support of ground 4

Ground 4: Ineffective assistance of counsel when trial lawyer Jerome Capone failed to interview, subpoena a key witness that would have rebutted prosecution witness testimony.

1.

Memorandum of law P.C.R. 61 in Support of ground 4

On the date of 2/4/04 state witness Monia Tann testified that
Phil "Free" Kizee was in the car with Earl Evans, Monia Tann
+ the defendant after the murder of Mike Mercer on
the date of August 21, 2001. See A-10 2/4/04 T.S. pgs. 73, 74
At which time the defendant supposedly admitted to the
occupants of the car that he Killed Mercer.
Phil "Free" Kizee was interviewed at the police station about
this incident in Glassboro, N.J. See A-24 dated 5/29/03 + 6/5/03
During this interview Phil "Free" Kizee stated that he Knew
nothing of this particular incident. (The defendant read Kizee's
statement during trial + has vigorously tried to obtain this
Interview for his supporting facts for his P.C.R. 61 claim but
has continuously been ignore See A-24 letters asking for
Phil Kizee's statement.) Yet Kizee was never interviewed or
subpoened to testify by defense counsel Jerome Capone. It
was especially odious that Phil "Free" Kizee's testimony would
have been damaging to the state when the state failed to
call Kizee to testify even though they had him listed as
a witness.
The defendant feels this prejudiced him because Phil "Free" Kizee
was the person State witness Monia Tann said was there when
the defendant allegedly admitted to the murder of Mercer +
if Kizee would have been called upon to testify there is a
reasonable probability that the jury would have rendered a
different verdict especially in light of the case being so
close. The jury sent a note saying they were deadlocked
6-6 after 2 days of deliberating. (Despite the defense not

2.

putting one single person on the stand.) SEE A-22 2/9/04 T.S
pgs. 2-9 for jury note. The defendant contends that by failing
to introduce the testimony of Phil "Free" Kizee the jury
was left to decide the defendants fate without the benefit
of supporting or corroborating evidence by the defense.
"If the verdict is already of questionable validity, additional
evidence of relatively minor importance might be sufficient
to create reasonable doubt." See United States v. Agurss 427,
U.S 97, 113, 96 S.Ct. 2392, 2402, 49 L.Ed. 2d 342 (1974)
"A lawyer who fails to adequately investigate & to introduce
into evidence, information that demonstrates his clients factual
innocence, or that raises sufficient doubt as to that question
to undermine confidence in the verdict, renders deficient
performance." See Lord v. Wood 184 F.3d 1083
Furthermore when the defendant's counsel Jerome Capone
failed to interview/Subpoena the witness that the states chief
witness claimed that the defendant told about the murder,
constitues deficient performance that was prejudical to the
defendant & thus was ineffective assistance of counsel, in
view of weakness of the states case & the fact that calling
Phil Kizee would not have entailed significant cost in terms
of defense strategy.
"Counsel is not obligated to interview every witness personally
in order to be adjudged to have performed effectively; However
where a lawyer does not put a witness on the stand, his
decision will be entitled to less deference than if he interviews
the witness, because a lawyer who interviews the witness
can rely on his assesment of their articulateness & demeanor,
factors which a reviewing court is not in a position to

3.

Second guess. See Jord v. Wood 184 F.3d 1083

Defense counsel Jerome Capone's failure to interview + present the testimony of Phil "Free" Kizer was all the more questionable in light of the weakness of the states case against the defendant. The prosecution had no DNA evidence, no actual eye witness to the murder, no fingerprints or any other forensic/scientific evidence linking the defendant to the crime even though the defendant was supposedly in the home of the victim. Furthermore when you look at the fact that Tann was facing nearly 250 years See A-10 2/4/04 T.S. pgs. 101 and also the fact that Tann's a self admitted liar, See A-10 2/4/04 T.S. pgs. 88-91 the defendant feels it would have been in the best interest of the defense to have Phil Kizer testify to further expose state witness Monia Tann's motive oriented testimony.

As stated in, Jord v. Wood 184 F.3d 1083 "We would nevertheless be inclined to defer to counsels judgement if he had made the decision not to present the 3 witnesses after interviewing them in person. Few decisions a lawyer makes draw so heavily on professional judgement as whether or not to proffer a witness at trial. A witness testimony consist not only of the words he speaks or the story he tells, but also of his demeanor + reputation. A witness who appears shifty or biased + testifies to X may persuade the jury that not X is true + along the way cast doubt on every other piece of evidence proffered by the lawyer who puts him on the stand. But counsel cannot make such judgements about a witness without looking him in the eye + hearing him tell his story."

Also in, Sullivan v. Fairman 819 F.2d 1382 "The district court determined

A ⅃
Use in Rebuttal
→

4.

that trial defense counsel's performance was constitutionally deficient because he did not do more to obtain the testimony of the 5 occurrence witnesses. The court held that, in assessing the reasonableness of defense counsel's investigation, it must consider the availability of the witnesses, the importance of their testimony & the degree of difficulty in locating them. The district court stressed that they were the only persons outside of petitioner family, who could have offered exculpatory evidence. Their testimony directly contradicted the States chief witnesses testimony". These issues are similar to the defendants case because the defendant's counsel Jerome Capone did not obtain/secure the testimony of Phil "Fese" Kizee (counsel didn't even interview him) Kizee's address was on the police report in which he gave a statement saying he knew nothing of this crime. So there isn't any reason this witness couldn't have been interviewed/subpoenaed to testify. Furthermore Kizee's testimony was extremly important because he was the only person outside of the defendant who could directly contradict the already questionable testimony of the States chief witness Monia Tann. Since Kizee was listed as a witness for the state but was never called to testify the defendant feels it was imperative for the defense counsel to pursue Kizee's testimony because at that point (after the State rested their case) it was obvious that Kizee didn't corroborate Tann's allegations because if so the prosecution who have called on Kizee to testify. The States whole case hung on the testimony of Monia Tann & Earl Evans so it was very important to expose their testimony at every possible opportunity, the defendant contends that Phil Kizee's testimony would have went a long

5.

way in doing that.

At a minimum counsel has a duty to interview potential
witnesses + to make a independant investigation of the facts +
circumstances of the case. This duty is reflected in the
A.B.A standard for criminal Justice 4-4.11 (2d Ed. 1980) "The
defense function"

didn't we yet? → In Harris v. Reed 894 F.2d 871 the court stated the following;
under the circumstances, we concluded that counsel's overall
performance, including his decision not to put on any witnesses
in support of a viable theory of defense, falls outside the
wide range of proffessionally competent assistance.

In United States Ex rel Cosey V. Wolff 727 F.2d 656, 658 (7th cir
1984) the defendant's trial counsel stated that he failed to
investigate even one of the 5 potential witnesses whose names
the defendant had given him because he believed the states
case against the defendant was so weak that it would be
entirely unnecessary to call any witnesses to take the stand
other than Cosey + his co-defendant the court held that
counsel's out-of-hand rejection of the proffered witnesses
without even interviewing or investigating them fell below
minimum standards of professional competence.

Representation involves more than the courtroom conduct of the
advocate, the excercise of the utmost skill during the trial is
not enough. if counsel has neglected the necessary investigation +
preparation of the case or failed to interview essential witnesses
or to arrange for their attendance" See 432 F.2d at 739

A.B.A standards 4.1 states it is the duty of the lawyer to
conduct a prompt investigation of the circumstances of the case
+ explore all avenues leading to facts relevant to quilt +

6.

degree of guilt or penalty.

Didn't use yet →  "The lawyer who does not probe, does not inquire + does not seek out all the facts relevant to his clients case is prepared to do little more than stand still at the time of trial" See Smotherman v. Beto 276, F. Supp. 579, 588 (W.D Tex, 1967) "Where testimony of missing witnesses directly contradicted prosecution witnesses + supported defenses theory of the case, defendant met his burden of showing prejudice". See Nealy 764, F.2d at 1180

not yet →  Strickland v. Washington 104 S.CT. 2052 states if there is only one plausible line of defense the court concluded, counsel must conduct a "reasonably substantial investigation", into that line of defense. Since there can be no strategic choice that renders such an investigation unnecessary".

In Strickland, the supreme court noted that information supplied by the defendant is a prime source of the factual bedrock upon which counsel must rely in making strategic choices Id at 691, 104 S.CT at 2066. This fundamental principle has been stressed by this circuit + by other circuits in cases following Strickland

In this case, unlike so many cases involving a similar claim of failure to call potential witnesses, the defendant has pointed to a specific witness (Phil Kizee) whose missing testimony would have been extremely damaging to an otherwise already weak case presented by the state. In fact the testimony of Phil "Free" Kizee was significant to the defendant in a couple of respects.

First it directly contradicts the testimony of the States chief witness Monia Tarin that testified that Phil Kizee was present shortly after the murder of Mercer at which time the defendant supposedly

7.

admitted to shooting + killing the victim. Thus the testimony of Phil Kizee had a direct bearing on the state's chief witness's veracity, a witness upon whose testimony the state heavily depended on in order to secure a conviction.

Secondly, the jury may have ~~entered~~ viewed the otherwise questionable testimony of state witness Monia Tann in a more unfavorable light had the jury also heard the testimony of Phil "Free" Kizee, thus making an already weak case by the state into an even weaker case for the state by contradicting the testimony offered by State witness Tann.

The Strickland two-component standard to be applied when reviewing a claim of ineffective assistance of counsel is; First, the defendant must show that counsel's performance was deficient. This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. The defendant submits that the first requirement was met by showing that the trial counsel (Jerome Capone) NEVER EVEN interviewed Phil Kizee NOT to mention NEVER calling him to testify despite state witness Monia Tann's testimony stating that Kizee was present when the defendant supposedly admitted to killing Mercer + despite the fact that Kizee denied knowing anything about what Monia Tann was alleging during his Police Statement. This error was even more damaging when you look at the fact that the states whole case <u>literally</u> hung on the testimony + veracity of Monia Tann + Earl Evans, so Phil "Free" Kizee's testimony was all the more important because the case was virtually the defendants word against the states 2 witnesses.

And the second component from Strickland states that the defendant

8.

must show that the deficient performance prejudiced the defendant/defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial. The defendant would like to reiterate a couple of things earlier stated to show he was prejudiced.

Phil Kizee was the only person outside of the defendant who could directly contradict Tow's testimony & by not calling Kizee to testify the defense counsel (Jerome Capone) left the jury to believe that the only account offered by the state witness was true since it was never challenged. Had Kizee been called to testify the state would have had absolutely nothing nor anybody to corroborate the motive oriented testimony of Tow & Evans. The defendant would like to add that the 6th Amendment guarantees the right to have a compulsory process for obtaining witnesses in his or her favor. This constitutional right was violated the moment defense counsel (Jerome Capone) neglected to interview/subpoena Phil Kizee. Furthermore the fact that the jury was deadlocked 6-6 after 2 days of deliberating (SEE A-22 2/9/04 T.S. pgs. 2-9 for jury note) despite the defense not putting 1 single witness on the stand aids the defendants argument that any error small or large could have had a determining factor in the juries' verdict. "If the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt". SEE UNITED STATES V. AGUARS 427, U.S. 97, 113, 96 S.CT. 2392, 2402, 49 L.Ed. 2d 342 (1976)

Also, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors

9.

that one with overwhelming record support." SEE Id at 696, 104 S.CT, at 2069

In light of the facts demonstrated by the defendant, the defendant asks that his conviction be set aside + REVERSED + REMANDED for a new trial.

Memorandum of law P.C.R. 61 in Support of Ground 5

Ground 5: The prosecution used perjured testimony to convict the defendant therefore violating the defendant's 5th & 14th amendment Right to due process + a fair trial.

Supporting facts: Detective Spillian testified that he found a gun during the search of state witness Earl Evans Apt. SEE A-11 2/3/04 T.S. pgs. 33-35 but that testimony was proven perjured because the initial report is recorded as a officer Whitmarsh finding the gun SEE A-0 report date 9/20/01. Also during a balancing analysis to determine relevancy of evidence, detective Spillian also testified that upon retrieving the gun state witness Earl Evans confirmed that the gun seized was the defendant's. SEE A-11, 2/3/04 T.S. pgs. 16-63 but this testimony was also proven perjured when state witness Earl Evans testified that he never told detective Spillian who the gun belonged to. SEE A-12 2/3/04 T.S - pgs. 75-76

Memorandum of law PCR 61 in support of Ground 5

1.

On the date of 9/12/01 the defendant & his then co-defendant were arrested & charged with attempted robbery 1st degree, PFDCF, Conspiracy 2nd degree, Possession of a weapon with a removed/obliterated/Altered serial number. See A-00 report date 9/12/01. During the search of the apartment the gun was retrieved by a officer Whitmarsh. See A-0 report date 9/30/01. The apartment of which the gun was found belonged to Earl Evans & Wayne Hall.

When the victim of this incident was interviewed he described the defendant's co-defendant Maurice Wright as the person who possessed the gun that was recovered from the apartment. See A-11, 2/3/04 T.S. pgs. 31, 32. That gun was described as a black revolver with filed off serial # See A-8 report date 9/13/01 & ordered may be destroyed A-9 report date 3/28/02 The defendant was again arrested on 3/11/03 along with Earl Evans on robbery charges. At which time Evans stated he could help the police solve a murder in exchange for some type of leniency on his robbery charges. He further stated that the gun retrieved from his apartment 1 year & a half earlier was the murder weapon. See A-21. After a brief investigation, on the date of 6/23/03 the defendant was charged with the murder of Mike Mercer.

On the date of 1/9/04 the defendants court appointed counsel Jerome Capone had a hearing for motion in limine to exclude the gun that was seized from Evans apartment on 9/13/01 as evidence of Mercer's murder. During this motion in limine the defense and also the states ballistics experts testified

2.

that there was not enough evidence to conclude that the gun offered as evidence was the gun used to murder Mike Mercer. See A-1 1/9/04 T.S. pgs. 1-133. But despite this conclusion the ballistics experts weren't allowed to testify to these fact in fount of a jury. See A-1 1/9/04 T.S. pgs. 1-133 & A-01 2/3/04 T.S. pgs. 97-113 Yet the gun was allowed to be introduced as evidence, mainly due to the perjured testimony of detective spillian.

State witness Detective Spillian testified that he found a gun during the search of state witness Carl Evans apartment in response to a robbery that occured on 9/12/01 See 2/3/04 A-11 T.S. pgs 33-35 but detective Spillian didn't actually find the gun. Officer Whitmaash found the gun in Evans Apt. See A-0 whitmaash report 9/30/01. This gun is the gun the State claims was used to murder Mike Mercer, More importantly detective Spillian testified during an balancing analysis to determine relevancy, that upon retrieving the gun from Evans Apt. Evans told him that the gun belonged to the defendant. See A-11 2/3/04 T.S. pgs. 16-63, specifically T.S. pg. 35. Unfortunately, it was determined that the gun would be allowed in as evidence based solely on detective Spillian testimony that Evans linked the defendant to the gun. See A-11 2/3/04 T.S. pgs 47-57

But shortly after this ruling detective Spillian's testimony was proven perjured when State witness Carl Evans testified that he never told detective spillian who the gun belonged to. See A-12 2/3/04 T.S. pgs. 75, 76

3.

The defendant believes that it was detective Spillian's intention to make his role in recovering the gun from State witness Earl Evans apt. more significant in order to help the gun in question become admissible evidence. If you read A-11 2/3/04 T.S. pgs. 47-57 you'll see that the trial judge admitted that he expected the link to be more stronger in terms of connecting the defendant with the gun in question, but assuming that state witness Evans would coroborate detective Spillian's balancing analysis testimony, allowed the gun to be introduced as evidence. The defendant contends that if it were not for detective Spillian's perjured testimony then there would have been no need whatsoever to assume state witness Evans would link the defendant to the gun and if there is no need to assume state witness Evans would link the defendant to the gun, the defendant believes that the gun would have remained inadmissible, and there is a reasonable probability that had the gun remained inadmissible the jury may have rendered a different verdict. Especially in light of the case being so close. (The jury sent a note stating they were deadlock 6-6 for the majority of 2 days. See A-22 2/11/04 T.S. pgs. 2-9 )

"A verdict or conclusion only weakly supported by the record is more likely to have been effected by errors then one with overwhelming record support". Id. at 696, 104 S.Ct. at 2069 The defendant contends that the perjury by detective Spillian was prejudical + violated the defendants ▬▬▬▬▬ Right to a fair trial. Therefore the defendant asks that in light of this that his conviction be reversed + remanded for a new trial.

4.

The gun the state offered as evidence was described as black with a brown handle .38 revolver handgun with SERIAL NUMBER on it. This gun was offered as evidence during trial in 2/04. The problem is this gun doesn't match the "supposed" same gun that was initially seized 9/13/01 for a seperate incident, The gun that was initially seized was described as a black revolver handgun with SERIAL numbers filed off, SEE A-8 9/13/01 detective Spillan consent to SEARCH form compared to the gun offered as evidence with serial numbers on it SEE A-1 1/9/04 T.S pgs 1-133 specifically T.S. pg. 13 This violated D.R.E. 901(a). Authentication or Identification under D.R.E. 901(a) requires "evidence sufficient to support a finding that the matter in question is what its proponent claims". The state may authenticate a weapon it claims was the actual instrumentality of a crime in 2 ways. It may have witnesses visually identify the weapon as the actual instrument of the crime, or it may establish a "chain of custody", which indirectly establishes the identity + integrity of the evidence.

Contrary to the state's contention, no witness could possibly identify the admitted gun as the weapon used in the murder, Mainly because the gun that was initially seized was described + recorded as a black revolver with the serial number filed off. SEE A-8 report date 9/13/01 + also ordered may be destroyed SEE A-9 report date 3/28/02 as opposed to the "supposed same" gun the state offered as evidence that was described as a black, brown handled .38 revolver with serial numbers on it. SEE A-1 1/9/04 T.S. pg. 13, for serial #. So the question is was that initially seized gun destroyed? and

5.

...if not, how can one be sure when the descriptions of the supposedly same gun is different in descriptions? Thus further proving that any positive identification of the gun offered as evidence is perjured testimony, which is further supported by the ballistics experts inability to match the bullets from the crime scene to the gun offered as evidence.

Also consequently, to authenticate the weapon sufficiently, the State was required adequately to trace its continuous whereabouts i.e., its physical location from the time of the commission of the the underlying offense until the time of the trial. This requirement places a lenient burden on the State. The State was required to ~~elim~~ Eliminate possibilities of misidentification & adulteration, not absolutely, but as a matter of reasonable probability. See Tatman v, State Del. Supr, 314 A.2d 417, 418 (1973) See also U.S. v. Jones E.D. PA, 404 F.Supp. 529, 542 (1975) aff'd, 538 F.2d 321 (3rd cir, 1976)

It had to "convince the court that is improbable that the original item had been exchanged with another or otherwise tamper with". See U.S. v. Howard-Arias 679 F.2d at 366 See also U.S. v. Mendel 746 F.2d at 167. The state failed in both respects required by authentication or Identification under D.R.E. 901(a)

The defendant contends that since the gun varies in description from the time it was initially seized on 9/13/01 to the time it was offered as evidence in 2/04 (for an entirely different incident) added to the facts that it was ordered may be destroyed in 3/02, that is not possible for the gun offered

G.

as evidence to be identified as the weapon used in the shooting of
Mercer + any positive identification of the gun is perjury in
which the defendant contends is prejudicial + violated his 14th
amendment right to due process + a fair trial + therefore
asks the court to reverse + remand the defendant's conviction
for a new trial.

Memorandum of law P.C.R Col in Support of Ground 6

Ground 6: Ineffective assistance of counsel for failing to file motion 29 on all charges in support of motion in limine, perjured testimony + a lack of overall Evidence.

Supporting facts: See ballistics test A-1, 1/9/04 T.S. pgs. 1-133 shows that the tests of the gun was inconclusive in determining if the gun the murder weapon, yet gun was still offered as Evidence due to detective Spillians perjured testimony during a balancing analysis to determine relevancy of Evidence. See A-11, 2/3/04 T.S pg. 16-63

I.

Memorandum of law P.C.R 61 in Support of Ground 6

The defendant was arrested 3/11/03 on Robbery & other related charges. At the time of the arrest in an attempt to save himself the defendant's co-defendant Earl Evans told the police that the defendant committed a murder nearly 2 years prior & that a gun seized from his apt. (in a seperate incident) was in fact the murder weapon. Evans claimed to know these things because the defendant allegedly told him about the murder. During a brief investigation following Evans allegations Monis Tani was found (He was locked up in Virginia) and corroborated Evans allegations of the defendant killing mike Mercer. The defendant was arrested for this crime 6/23/03.

On the date of 1/9/04 a motion in limine was held to determine if the gun the state planned to offer as evidence could be linked to the bullets found at the crime scene. Both, state & defense experts concluded that it couldn't be determined conclusively that the gun in question was in fact the gun used to murder the victim. Yet the state made numerous re-arguments to get the gun introduced as evidence. Finally a balancing analysis to determine relevancy of evidence was held 2/3/04. During the analysis detective Spillian testified that he found the gun during the initial search of Earl Evans apt, he also testified that upon finding the gun Earl Evans confirmed that the gun was the defendant's. See A-11, 2/3/04 T.S. pgs 16-47, based solely on the illusion that state witness Earl Evans would corroborated detective Spillian's testimony it was determined that the gun would be allowed in as evidence SEE A-11 2/3/04 T.S. pgs. 47-57, because

2.

Evans was a sufficient enough link although a weak one.
Shortly after this ruling it was proven that detective
Spillian's testimony was perjured. Detective Spillian never
found the gun during the search of Evans apt. the record
shows that officer Whitmarsh found the gun, SEE A-9 report
date 9/30/01. Also detective Spillian's was further proven perjured
when Earl Evans testified that he never told detective Spillian
who the gun belonged to upon its retrieval. SEE A-12, 2/3/04
TS pgs 76. (This was the person that was supposed to be able
to link the gun to defendant.)

Furthermore the gun that was initially seized was described as
a black revolver with serial numbers filed off. (no caliber was
recorded) SEE A-8 report date 9/13/01. Yet the gun the state offered
as evidence at trial 2 1/2 years later was described as a brown
handled black .38 revolver with serial numbers on it. SEE A-1 report
date 1/9/04 TS pgs 13

The defendant contends that the only thing remotely linking him
to the murder was the motive orented testimony of Monia Taul
& Earl Evans that was proven questionable & contradictory when
cross examined. SEE Memorandum, P.C.R (e) ground 11 as the defendant
thoroughly points out the inconsistant testimony of Evans & Taul.
Citing case law, Monroe v. State 652 A.2d 560 (1) Supreme Court
would review defendants insufficiency of evidence claim even though
it had been waived, in interests of justice. (2) Presence of finger
print on outersurface of sheed of glass at point of entry was
insufficient to convict; and (3) retrial of defendant, following
determinatin that evidence was insufficient to convict, would violate
double jeopardy clause of Federal & State constitution.
Reversed & remanded for entry of judgement of aquittal.

3.

Trial court may excuse a defendants waiver of right to challenge sufficiency of evidence, arising out of failing to make timely motion for judgement of aquittal, if the supreme court finds that trial court committed plain error requiring review in interest of justice. Sup. Ct. Rules, Rule 8; Super. Ct. Crim. Rule 29

In ~~court~~ Standard review for assessing insufficiency of evidence claim is whether any trier (rational) of fact, viewing evidence in light most favorable to the state, could find defendant guilty beyond a reasonable doubt.

As an initial matter the state may contend that the defendant waived his insufficiency of evidence claim by failing to move timely for a judgement of aquittal in the superior court. But the defendant contends that his counsel refused to contact him to discuss his options after the trial + penalty phase were over, counsel (Jerome Capone) even refused to meet with the defendant to discuss his direct appeal options + neglected to acknowledge the defendants numerous letters. See A-24, A-27 unanswered letters to counsel Jerome Capone. The defendant submits that if his counsel refuses to meet with him to discuss his options + doesn't act in the defendants best interest the defendant is virtually helpless until he files his P.C.R. 61 in which the defendant prays the court acknowledges. The defendant asks that the superior ct. excuses the waiver under the circumstances of this case as was the case in Monroe v. State 652 A.2d 560.

Rule 8 of Del. Supr. Ct. requires only that a "question be fairly presented to the trial court". Supr. Ct. Rule 8

1. The defendant presented the insufficiency claim to the trial court

4.

in this Post conviction motion under Super. Ct. Crim. Procedure
Rule 61. In this motion the defendant seeks relief from the
court appointed counsels (Jerome Capone) failure to file
motion 29 on all charges within the time frame provided.

As stated in Monroe v. State of Del. 652 A.2d 560; (In granting
relief from the dereliction of Monroe's trial counsel, the Super. Ct.
Reviewed the time to file a direct appeal. Such reviewal, however,
Placed "Monroe" in only as good a position as he would
have been absent the trial counsel's dereliction with regards to
the filing of the appeal. See Dixon v. State Del. Supr., 581 A.2d
1115, 1117 (1990)

Though the Super. Ct. granted Monroe a fresh opportunity to
meet the requirements of Rule 6 (a) (ii), which he did, the
failure to move originally for a judgement of aquittal under
the time frame provided for in Rule 29 was not excused.
Nonetheless, the Court finds that, in view of its holding
infra that Monroe would have been entitled to an entry
of a judgement of aquittal if that motion had been made
at the conclusion of the State's case, the interest of justice
require that we review Monroes claim on Plain Error.
Scope of review.) The defendant asks that he be afforded
the same opportunity.

Super. Ct. Rule 6 (a) (ii): That Rule states in relevant part: "a
notice of appeal shall be filed within 30 days after a sentence is
imposed in a direct appeal of criminal conviction.

Robertson v. State, Del. Supr, 596 A.2d 1345, 1355 (1991) "In
making this determination the fact that most of the State's evidence
is circumstantial is irrelevant; the court does not distinguish

5.

between direct + circumstantial evidence" Robertson 596 A.2d at 1355 (quoting Shipley v. State Del., Supr. 570 A.2d 1159 1170)(1990)

In the defendants case, the state's evidence though purely circumstantial, was sufficient to sustain the jury's finding that the murder of Michael Mercer occurred. The key question however, is despite the fact that the gun in question couldn't be linked to the murder, the ~~suppression of the~~ ballistics experts ~~conclusion from the jury~~, the perjured testimony of detective Spillian that in turn allowed the inconclusive gun in as evidence, the fact that there were no eye witness to sird crime, no scientific/forensic evidence to support the states case + the ~~contradictory~~ motive oriented testimony from the state's 2 chief witnesses, was the evidence sufficient to establish, a prima facie dueing the state case. The defendant contends that in light of these issues no rational trier of fact could have concluded that the defendant committed the charged offenses based on the evidence presented during the states case, that is further supported by the fact that the jury sent a note saying they were deadlocked after 2 days of deliberating. See A-22 2/9/04 T.S. pgs 2-9. The defendant contends that his convictions + sentence should be reversed because of the insufficiency of evidence as to each charged offense.

The state will more than likely respond that although the evidence against the defendant is only circumstantial, it is sufficient to sustain the guilty verdicts. But how could this be when not only was the ballistics experts testimony about the gun suppressed from the jury, but also the states usage of perjured testimony to get the gun in as evidence, was ~~instroment~~ instrumental in

6.

Convicting the defendant. The defendant contends that the facts demonstrated in this ground, along with the fact that his counsel Jeromm Capone refused to meet with the defendant to discuss his options the defendant submits that his conviction should be set aside + reversed + remanded with instructions, for entry of judgement of aquittal.

Memorandum of law P.C.R. 61 in Support of Ground 11

Ground 11: Jury's verdict not supported by sufficient evidence.

Supporting facts: See P.C.R. 61. ground 1 Demonstrates that the gun offered to the jury as evidence for murder weapon failed ballistics test. See A-1, 1/9/04 T.S. pgs. 1-133. Yet was still allowed in as evidence due to the perjured testimony of detective Spillian during an balancing analysis to determine relevancy of evidence. See A-11 2/3/04 T.S. pgs. 16-63 as demonstrated on P.C.R. 61 ground 5. Also P.C.R. 61 ground 4 demonstrates that the states chief witnesses had contradictory testimony + that a 3rd party had he been called to testify would have further contradicted the already contradictory testimony of the state's main witnesses.

I.

Memorandum of law P.C.R. (e) in Support of ground 11

A couple of years before the murder, Mercer (the victim), the defendant + state witness Monia Tann had all worked at Citibank in the corporate commons complex in New Castle. The other state witness Earl Evans claims to have never met the victim. Tann + Evans described the murder as a robbery committed by the defendant which had gone awry. However since the victim knew the defendant from Citibank, + since Tann worked at Citibank the same time as the victim + defendant, it is unlikely that either defendant or Tann could enter the victims house undisguised + rob the victim, without being identified. So, if this was just going to be a robbery, as state witnesses Tann + Evans claimed, it had to be committed by someone with whom the victim was not familiar with. That logic would exclude Tann + the defendant. The defendants theory of the case was that Tann + Evans carried out the robbery gone away. Tann called up the victim to find out if he was home, drove Evans over to the victims house, + sat in the car as Evans went in + botched the robbery. Since they were both culpable, Tann as the accomplice + Evans as the principle, they developed a story to throw the blame on someone should the need ever arise.

The story which Evans + Tann gave the police had 3 parts: (A) The events leading up to the murder; (B) The details of the murder; and (C) The events after the murder. It was in the states interest to corroborate each part of their story. The record proves that only <u>one</u> of the 3 parts could

2.

be corroborated, + thats the details of the murder. Which doesn't come close to proving the defendant killed the victim. According to Evans, on the day of the murder, Evans, Tann + the defendant had all driven up to New Jersey at some point during the day to pick up a guy named "fly", (who was never proven to even be a person) They were using a car rented by Tann. See A-6, 2/2/04 T.S pgs. 44, 45

Evans further testified that after picking up "fly" they drove back to Tann's apt. in Wilmington. After they got back to tann's house Evans + "fly" went to buy some marijuana while the defendant + Tann alledgedly left to go someplace in Tanns car. See A-6, 2/2/04 T.S pgs. 45-46 A little while later the defendant + Tann returned to Tann's apt. where the defendant got halfway out of the car to tell Evans + "fly" to lets go we're going back to Jersey. Evans testified that on the drive back to N.J the defendant admitted that he had just killed Mercer. Evans also testified that the defendant stayed in N.J the night of murder + That he (Evans) + Tann were the only ones to return to D.E that night, after the murder of Mercer. See A-6, 2/2/04 T.S pgs. 46-51

Tann says the opposite of Evans in ~~this~~ every aspect during his testimony except for the details of the murder. Tann testified that there was only one trip to N.J that day + it took place after the murder. See A-10 2/4/04 T.S. pg. 74

Tann also testified that a guy named Phil Kizee AKA "Free" was with the defendant, Tann + Evans on the day of the murder not "fly", in fact Tann testified that he doesn't even know a "fly". See A-10 2/4/04 T.S. pgs. 73, 74 At this point it is important to note that Evans knows Phil "Free" Kizee also. Detective Barry Mullins testified that he showed Evans a photograph of Phil "Free" Kizee + that Evans told him that he knew Phil Kizee

3.

but that Phil Kizee ♦ was not "fly" + that "fly" + Phil were 2 different people. (although he couldn't provide anything about "Fly" but an alias) See A-23, 2/5/04 T.S. pg 27

Tann also testified that the defendant called the victim, + the he + the defendant then took a ride over to the victims house. on the ride over the defendant showed them that he had Tann's gun in his possession. Tann said that he parked on the victims street + waited while the defendant went into the victims home. a short while later the defendant came out + told Tann that he shot Mercer. They then drove back to Tann's Apt. where they went inside for about 5 min. They then drove to N.J where they dropped off Phil "Free" Kizee + then returned back to D.E with the defendant. (Tann also testified that he had bought the marijuana not Evans) See A-4, 2/4/04 T.S. pgs. 33-40 Also see, A-7, 2/4/04 41-44

Aside from the fact that Tann's identification of the fourth person was Phil "Free" Kizee, while Evans identification was a different person named "Fly". The state never called "Fly" or Phil "Free" Kizee to testify as witnesses to corroborate the testimony of Tann + Evans. In fact the prosecution had Phil Kizee listed as a witness but upon being question by the police learned that Kizee couldn't corroborate Tann's accusation decided not to call him to testify. Numerous attempts by the defendant to get Phil Kizee's police statement went ignored by counsel Jerome Capone + the trial judge. See A-24 for letters written to Counsel + Court

Defendant would like to reiterate that every aspect of the events that took place before + After the murder was contradicted by the states own chief witnesses. From the total trips to N.J the day of the murder, to who was the "alleged" fourth person with defendant, Tann + Evans that day, to whether the defendant came back to D.E on

4.

the night of the murder, even as to who actually purchased the marijuana that day.

In addition to the fact that their stories where so substantially inconsistent, the evidence also showed that both Evans + Tann had the time + opportunity to concoct their story. See A-10, 2/4/04 T.S. pgs. 69-71

In fact, they even found themselves in each others presence during the trial. During their encounter, Evans asked Tann if he was going to "Do what they want us to do?" See A-7, 2/4/04 T.S. pgs. 53,54

The jury also heard evidence that, at the time the states witnesses testified that they both were looking at significant jail time on other robbery charges. See A-3, 2/4/04 T.S. pgs. 27,28 Tann; See A-6, 2/2/04 T.S. pgs. 83,84 Evans.

Also on the date of 2/3/04 detective Spillian testified during an balancing analysis to determine relevancy of evidence, that he found a gun during a search of state witness Earl Evans Apt + that upon finding this gun State witness Earl Evan indicated that the gun found was the defendant's. See A-11, 2/3/04 T.S. pgs. 13-63 Because of detective Spillians testimony during the balancing analysis it was determined that the gun would become admissible evidence. But that testimony was later proven perjured when it was shown that detective spillian didn't find the gun in question, officer whitmarsh did. See A-D report date 9/30/01 officer whitmarsh's report. Also detective Spillian's balancing analysis testimony was proven perjured when State witness Earl Evans later testified that he never told detective Spillian who the gun belonged to. See A-12 2/3/04 T.S. pgs 75, 76

Furthermore the gun in question that was offered as evidence during the defendants murder trial in 2/04 was different in the description of the initially seized gun in 9/13/01 (although its the supposed same gun)

5.

SEE A-8 report date 9/13/01 for the initially seized gun description described as a black revolver with serial numbers filed off. Compared to the gun offered as evidence thats described as a black, brown handled .38 Hangun with serial number on it. SEE A-11, 2/3/04 T.S. pgs. 28-31

Also during the motion in limine on the date of 1/9/04 it was determined by both State + defense ballistics experts that the gun in question couldn't be conclusively linked to the bullets found at the crime scene. SEE A-1, 1/9/04 T.S. pgs. 1-133 Yet the gun was still allowed to be introduced as evidence, after detective Spillians balancing analysis testimony on the date of 2/3/04.

The defendant submits that no rational trier of fact could have determined to have found the essential elements of the crime beyond a reasonable doubt based on the testimony of Tann + Evans as well as the other questionable evidence. SEE Monroe v. State, 652 A.2d. 560 (Del. 1995)

The jury retired to deliberate on 2/9/04, on 2/11/04 they sent a note stating they were deadlocked 6-6 they were sent back for further deliberation + on 2/12/04 return a guilty verdict on all counts. SEE A-22 2/11/04 - 2/12/04 T.S. pgs. 2-9 + 1-6.

During the direct appeal the supreme court acknowledged that defense counsel Jerome Capone failed to preserve the issue of Jury's verdict not supported by sufficient evidence by not moving for a "judgement of aquittal at trial" in regard to the sufficiency of evidence as to all of his convictions. SEE A-25 direct appeal decision pg. 4,5 for the supreme Court to acknowledge there was a prejudicial plain error in the defendants case is a fundemental defect which inherently resulted in a complete miscarrage of justice, would be a clear violation of the defendants due process of equal protection of law.

6.

clause deemed by the 14th amendment. The due process clause of the 14th amend. Requires that the accused in a criminal prosecution be accorded that degree of fundemental faieness essential to the very concept of justice, SEE CURRAN V. State 154 F. Supp 27

Also the state turned over the interview of Phil "Feee" Kizee to defense counsel Jerome Capone which was considered Exculpatory/Bagley material since State witness Monia Town stated Phil Kizee was present shortly after the murder.

In this police statement/interview Phil Kizee didn't have any knowledge of what Town was alleging (Defendant had tried to recover this statement to no avail. SEE A-24 letters requesting Kizee's statment)

For the prosecution to ~~offer~~ know there was incompetent testimony offered repertedly, with knowledge of its character & for the purpose of prejudicing the jury, such an offer should not stand unrebuked. SEE BENNETT V. State 164 A.2d 442

Therefore the defendant asks the court to REVERSE & remand his conviction for a new trial.


The state may argue that it is up to the jury to resolve inconsistencies in witness testimony but the def contends that he has thoroughly showed such an accumulation of inconsistencies one of which led to a unreliable gun being introduced as evidence that the evidence in totality was insufficient to convict. (Furthermore when looking at the bottom line of what this case consists of the state presented a case in which the only proof they offer is Tawni d. Evans saying that the defendant admitted to the crime).

Memorandum of law P.C.R. 61 in Support of Ground 12

Ground 12: The trial judge committed plain error when he did not give a Getz instruction when the state introduced evidence that the defendant possessed a .38 caliber revolver at the time of his arrest in an unrelated incident

1.

Memorandum of law P.C.R. 61 in Support of Ground 12

On 9/12/01, the New Castle police were conducting an investigation in to an attempted robbery case which occurred near abbey walk apartments. The victims told police that they were assaulted by 2 men carrying handguns. The police went to the apt. of Earl Evans + Wayne Hall & obtained permission to search. See A-8 report date 9/13/01 consent to search form

In the living/dining area they found a plastic bag which contained a black revolver with filed off serial numbers. (as described on the consent to search form.)

Subsequently the defendant + a man named Maurice Wright were arrest for this crime.

When Evans eventually told the police about the Mercer murder, he told them that they had already seized the murder weapon during the abbey walk attempted robbery investigation in 9/01. The police then sent bullet fragments taken from the murder scene along with this gun to the ATF lab. The ATF ballistics examiner could not say that the gun fired any of the bullets found at the mercer scene. See A-1, 1/9/04 T.S. pgs. 11-33

As a result of a pretrial hearing, the trial court excluded the State's ballistics evidence, described above. State v. Hainey, Del, Super. J. Carpenter (1/20/04) No 0306015699

The jury heard that the defendant had been staying at Evans apt. + the gun was found near the defendants belongings. The police officer who investigated the abbey walk attempted robbery (detective Spillian) testified that Evans told him the gun was the defendants upon it being seized from the apt. See A-11 2/3/04 TS pgs. 35

2.

Evans later testified that he never to detective Spillian who the gun belonged to. See A-12 2/3/04 75, 76

Tann was shown the gun during his testimony + identified it as the gun the defendant had when Mercer was killed. Other than Tann's testimony, there was no evidence linking this gun to the mercer murder.

The evidence regarding the police search of Evans apt. was sanitized to the point where the jury did not hear that the search was being conducted as part of another robbery investigation. However, the jury must have been aware that the search for the gun was part of another police investigation.

The defense did not ask for a Getz instruction when the gun was introduced, nor during the prayer conference, therefore, this argument must be judged by the plain Error standard. However, since the fact that introduction of the gun into evidence had such little probative value for the state (since it was not linked to the murder except through Tann's testimony), + because this was such a close case, (jury sent note saying they were deadlocked 6-6) the jury should have been instructed on the limited purpose for its admission (i.e., Identity) + should also have been instructed that the gun could not be used to show that the defendant was a bad person because he inferentially possessed the gun.

Getz V. State, Del. Supr., 538 A.2d 726 (1988), set out a 5 step test for determining if evidence of other bad acts should be admitted:

1. The evidence must be material to an issue in dispute in the case;

2. The evidence must be for a purpose sanctioned by rule 404(B);

3.

3. The other crimes must be proved by evidence that is plain, clear & conclusive;

4. The other crimes must not be too remote in time; and

5. Because such evidence is admitted for a limited purpose, the jury should be instructed about the purpose for which it is being offered/admitted.

Farmer v. State, Del. Supr., 698 A.2d 946 (1997) ("Evidence that a defendant, charged with a shooting, had a firearm in his possession is surely probative if that that firearm is linked to the criminal act. But without a satisfactory ~~link~~ evidentiary link, such evidence carries the risk that the jury may associate mere ownership of a firearm with disposition to use it".).

In the defendants direct appeal the court denied the claim asserting that, "the mere fact that the defendant had possession of Tawn's gun is not evidence of a bad act or crime". And second, "assuming that a limiting instruction should have been given because the jury could infer that the police were investigating another crime, that the failure to give such an instruction did not jeopardize the fairness of the defendants trial". The court also stated, "There was testimony that the defendant used the gun to murder messer. The possibility that the defendant might have committed another crime is not so prejudicial as to require reversal". With all due respect to the court, the ruling in this case is totally inaccurate according to D.R.E. 401, 402, 403 & goes against the prior ruling in the similar case of ~~Farmer v. State 698 A.2d 946~~ which was decided by, Veasey, C.J., Walsh & Hartnett, JJ. In ~~farmer's~~ case also as it was in this case where unwarranted inferences reflect adversely

4.

on the defendant by portraying him as having "a gun" available to him, without establishing that the gun was used in the shooting, admissibility is barred because speculation created prejudice, even apart of the weighing process required by evidentiary rule. (Rules of evidence 403) This rule alone shows this court made plain error upon deciding the first reason for denying the defendants claim. In a capitol case where the possible outcome could be death, the court should act extremely at the highest level of justice to assure the defendant is guaranteed a fair trial.

"If the trial court is satisfied that evidence in dispute meets the standard for the limited purpose of admission, the evidence should be of a jury instruction explaining the limited purpose for which it was introduced. See Smith V. State, Del. Supr, 669 A.2d 1 (1995)

The defendant may not have made a request for a limiting instruction but he did object to the admittance of the gun. See Motion in limine A-1, 1/9/04 T.S. pgs 1-133 which the court practically agreed by excluding ballistics testimony See State V. Henry Del. Super J. Carpenter (1/20/04 No. 0306015699 + evidence of why the gun was initially retrieved from Evans Apt. without giving a limiting instruction upon doing so. This is therefore clearly "plain error" by the trial judge.

The defendant contends that even if the gun is admissible under Rule 404(B), there remained a need for a Getz instruction. In this very close case, the subject never came up, + the 5th requirement (jury instruction) of Getz analysis was never met, amounting to plain error, in which the defendant asks that his conviction be reversed + remanded for a new trial

Memorandum of law P.C.R 61 in Support of ground 13

Ground 13: Prosecutorial Misconduct for misrepresentation of evidence Supporting facts. See memorandum P.C.R61 ground 5 perjured testimony of detective Spilliari. See memorandum P.C.R ground 11 state witnesses contendicting testimony. See A-1 1/9/04 T.J. pgs 1-133 for inconclusive gun test.

1.

Memorandum of law P.C.R 61 in Support of Ground 13

The defendant claims it was Prosecutorial Misconduct for misrepresentation of evidence to the jury when the prosecutor purposely offered the perjured testimony of Detective Spillias (see memorandum P.C.R.6 ground 5) with malice, abuse & misconduct causing an illegal conviction which should be reversed & remanded for a new trial. Moreover the evidence presented did not prove essential Elements, Malice, Malice after-thought, Premeditation & deliberation of a prior design to commit the offense.

To justify reversal of a conviction, it is not enough that the prosecutors remarks or conduct were improper. The relevant question is whether the prosecutors actions so infected the trial with unfairness as to make the resulting conviction a denial of due process. See, Darden v. Wainwright 477 U.S. 168, 181 (1986 quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) See Also; U.S. v. Young, 470 U.S. 1, 11-12 (1985).

The defendant contends that the prosecution set out to maliciously prosecute/convict him with virtually no evidence. Except for the contradictory testimony of 2 motive oriented witnesses. The State offered 2 witnesses, Monia Tann & Emil Evans who testified to the details of Mercer's murder but when they were asked to recall the events before & After the murder they could not corroborate each others stories. See Memorandum P.C.R.61 ground 11. These 2 witnesses were also facing substantial jailtime prior & during the defendants trial See A-3, 2/4/04 T.S pgs 27, 28 Tann; See A-6 2/2/04 T.S. pgs. 83-84 Evans. Despite these facts the prosecution put them on the stand in

2.

pursuit of a conviction. Furthermore the gun in question that was introduced as evidence could not be conclusively linked to the murder by ballistics experts for the state or defense. See A-1, 1/9/04 T.S. pgs 1-133

Yet the state's prosecution persistently made numerous re-arguement to get the gun admissible, finally there was a balancing analysis held to determine if there was a sufficient link to the gun + defendant. During this analysis the state offered testimony from detective Spillian who testified that not only did he find the gun during the search of state witness Earl Evans Apt. but also that Evans told him that the gun found was the defendants. It was determined that because of these supposed facts testified to from detective Spillian that the gun would become admissible. See balancing analysis A-11 2/3/04 T.S. pgs. 16-57 But this testimony of detective Spillian was later proven perjured when (A) I was proven through record that officer Whitmarsh not detective Spillian found the gun in Evans Apt. See A-0 report date 9/30/01 officer Whitmarsh's report. (B) State witness Earl Evans testified that he never told detective Spillian who the gun belonged to See A-12 2/3/04 T.S. pgs 75,76. The prosecutors duty in a criminal prosecution is to seek justice, although the prosecutor should persecute with earnest + vigor he or she may not use improper methods calculated to produce a wrongful conviction See Berger v. U.S 295 U.S 78, 88 Generally the use of such methods is grounds for Mistrial or reversal of a conviction if it results in an unfair trial violating the due process clauses.

3.

a prosecuting attorney represents all the people _including_ the defendant who is being charged + tried. It is the prosecutors duty to see that the state's case is presented with earnest + vigor, but its equally its duty to see justice be done by giving the defendant a fair + impartial trial. The prosecutors actions by proceeding with a case of such little if any evidence + of such substantial inconsistencies is clearly a violation of A.B.A standards for prosecution. Standards 1, 2 (B) (c) (d) (e); 2.8 (a) (B); 3.1 (a); 3.2 (B) 3.4 (c); 3.6 (F); 3.9 (a); 3.11 (c) 5.6 (a)(B) (c) Therefore the defendant request at the very least a review to focus on the evidence presented by the prosecution. The evidence was presented without respect to the _Standard Jurisprudence_ + the requirements there of _Exculpatory Evidence_, _Hearsay Evidence_ test should all be argued. The exclusionary rule suppression of substantial + material evidence without the necessity of safeguards being applied by the trial court, defense and prosecution allowed irrelevant testimony, character evidence + perjured evidence to be presented by the prosecution.

The defendant submits that the prosecution based their case on the evidence presented to them by the local police + there 2 witnesses, Tann + Evan, with that being said the defendant believes that the prosecution should have done much more in terms of a thorough investigation + interviews of it's witnesses before subjecting the defendant to these kinds of prejudices. The state also had a Phil Kizee listed as a witness, Phil Kizee was the supposed other person that was present shortly after Mercer's murder. Kizee was supposed to have been able to corroborate Tann's testimony of the defendant admitting to

4.

Killing Mercer. The state sent police to interview Kizee. Kizee stated he knew nothing of a murder or what Tann was alleging. Unfortunately for the prosecution since he couldn't corroborate Tann's allegations they decided not to call on him to testify, even though they had him down as a witness. The defendant contends that all of these issues prove that the prosecutions set out to maliciously prosecute/convict the defendant with virtually no evidence. Further supported by the fact that the jury sent a note saying they were deadlock after 2 days of deliberating (deadlocked 6-6) despite the fact that the defense didn't put a single witness on the stand. So any small prejudical error could've contributed to causing a conviction which the defendant asks the court to reverse + remand for a new trial.

A-31

IN The Superior Court Of The State Of Delaware
IN And For New Castle County

State of Delaware
        v.

JASON A. HAINEY
Name Of movant on Indictment

No: _____
    (To be supplied by Prothonotary)

HONORABLE W. C. CARPENTER JR.

P.C.R. 61 Reply Brief

Notice:

Please take notice that the attached motion is in Response
to the State's answer motion to the defendants Rule 61 for
post conviction Relief is hereby submitted to the court for
consideration.

Dated: _____

                                        Jason A Hainey
                                        JASON A. HAINEY
                                        SBI# 383182 Unit 23
                                        D.C.C.
                                        1181 Paddock Rd.
                                        Smyrna, DE 19977

I.

In The Superior Court Of The State Of Delaware
In And For New Castle County

State of Delaware

v.

Jason A. Hainey

Defendant

I.D. # 0306015699

P.C.R 61 Reply Brief

Comes Now, Jason A. Hainey, Pro Se, ( Hereafter referred to as the "movant or the "Defendant") Pursuant To Super. Ct. Crim. Rule 61 (F) (3) Submits this "P.C.R. 61 Reply Brief"

Claims/ Grounds in Support

The State argues that the movants claims of 2: Trial Judge abuse of discretion by suppressing the testimony of ballistics Experts. 5: Prosecution used "misleading/perjured testimony violating the defendants right to a fair trial. 8: Confrontation clause was violated when defendant was not given the opportunity to cross-examine state witness Corporal Whitmarsh. 10: Trial Judge abuse of discretion by allowing the prosecution to use ATF testimony to speculate that the inconclusively tested gun may have been used as murder weapon.

13: Prosecutorial Misconduct for misrepresentation of evidence to the jury.

14: Trial Judge erred in instructing that the applicable mental state for the 1st degree felony murder count of the indictment was intentional.

9: Court erred in allowing the prosecutor to argue intentional murder in lieu of reckless murder.

2.

Should be precedurally defaulted due to not meeting the requirements of the Del. Super. Ct. Crim. R. 61 (i) (3). While these issues weren't brought up during trial or direct appeal, the defendant has presented letters that he wrote to his counsel + the court concerning counsel's negligence in responding to the defendants concerns + questions regarding his direct appeal, (SEE: A-27 + also see 3/18/05 - 4/8/05 - 7/20/05 docket sheet proving letters were sent.) Furthermore the defendant contends that if his counsel refuses to meet with him to discuss the options available on direct appeal + doesn't act in the defendants best interest, the defendant is virtually helpless until he files his P.C.R 61 in which he prays the court will acknowledge along with the attached amended claims.

In ground 5; Prosecution used misleading/perjured testimony to convict the defendant violating the defendants right to a fair trial. The state argued that, " At best he argues that inconsistencies in witnesses' testimony evidence perjury on the part of a states witness and, therefore, should be genited relief. His argument however, has no merit; it was the sole province of the fact finder to resolve any inconsistencies in witness testimony. Moreover, mere inconsistency in witnesses testimony does not, by itself constitute perjury. Accordingly claim 5 + 13 should be denied."

Starting with claim 5; The defendant contends that the claim **does** have merit. While the jury was shown some of detective Spillan's inconsistencies during cross-examination, the jury was not shown the most significant inconsistency which was the false/misleading/perjured testimony that in turn allowed a gun that

3.

has no established nexus to the crime is as evidence. During a balancing analysis to determine relevancy of evidence, which is held **outside** of the jurys presence detective Spillan testified that upon retrieving the gun in question during the search of State witness Earl Evans Apt. (For a seperate incident) Evans stated that the gun found was the defendants. SEE: _A-11 2/3/04 Ts.pgs.35_ Based **solely** upon the assumption that State witness Evans would corroborate this claim the gun in question was allowed to be offered as evidence. SEE _A-11 2/3/04 Ts.pgs. 47-57_ for judges ruling. Once trial resumed Evans testified that when the gun was initially retrieved from his Apt. he never said who the gun belonged to. SEE _A-12 2/3/04 Ts.pgs. 75-76_ mention motion in limine The _significance_ of this part of the testimony was never brought to the jury's attention, nor was it corrected by the state or objected to by defense counsel.

As stated by the movant in his P.C.R 61; "It is reasonable to assume that had it not been for the perjured testimony during the balancing analysis, there would have been no reason whatsoever to assume that State witness Earl Evans would link the defendant to the gun, & if there is no ~~error~~ reason to assume Evans would link the defendant to the gun, the defendant believes that the gun would have remained inadmissable, & there is a very real probability that had the gun remained inadmissable the jury may have rendered a different verdict, especially in light of the case being so close" (jury sent a note stating they were deadlocked 6-6. SEE _A-22 2/11/04 Ts. pgs. 2-9_ ) " a verdict or conclusion only weakly supported by the record is more likely to have been effected by errors than one with overwhelming record support" Id. at 696. 104 S. Ct.

4.

Being as though Earl Evans was a motivated state witness interested in making a deal for himself through his testimony against the defendant, it is reasonable to assume that he wouldn't purposely contradict Detective Spillans testimony, or try to sabotage the states case being as though he initiated the case against the defendant.

~~Perjury or alleged~~

It appears that detective Spillans intention was to make his role in recovering the gun from Evans Apt. more significant in order to help the gun in question become admissable evidence. Besides the balancing analysis perjury, Detective Spillan also testified that he initially found the gun during the search of Evans Apt. (See A-11 2/3/04 T.S pgs. 33-35)

But that was proven false/perjured because officer whitmarsh authored a report stating that he found the gun. (See A-0 whitmarsh report 9/30/01)

The state failed to address the significance of this specific allegation in their reply brief + chose to simply gloss over the issue, by merely adding it with the rest of the inconsistent testimony allegations, then asks the court to deny the claim because, among other things " inconsistency in witnesses testimony does not, by itself, constitute perjury." But obviously the claim described above had more of a bearing on the case than mere inconsistent witness testimony. This "mere inconsistency in witnesses' testimony," was the SOLE reason the unlinkable gun was allowed to be offered as evidence. The state would be hard pressed to argue that had it not been for Detective Spillans balancing analysis testimony concerning the gun, the gun would have still been allowed in as evidence.

*use in Amended Claim*

5.

USE in
Amended
Claim

As stated in, People v. Savvides, 1 N.Y. 2d 554, 557, 154 N.Y. S.2d 885, 136 N.E. 2d 853, 854-855: It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendants guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility + duty to correct what he Knows to be false + elicit the truth..... That the district attorneys silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair.

The defendant contends that if the state had researched/investigated properly this prejudice would not have occurred + even if they had missed this discrepancy during their pretrial investigation, once state witness Earl Evans testified that he never said who the gun belonged to, the state had a responsibility + fundamental obligation to correct & remedy the situation being as though their state witness (Evans) was the link in which the gun was admitted.

"A new trial is required if the false testimony could in any reasonable likelihood have affected the judgement of the jury," Id at 154, 92 S.Ct. at 766

With the prejudices + miscarriage of justice exhibited in this ground the defendant requests that his conviction be reversed + remanded for a new trial.

6.

Ground 13, thoroughly shows the accumulations of prejudice + injustice in the states case against the defendant.

The defendant was arrested on 3/11/03 along with Earl Evans for a robbery. Shortly after this arrest, while trying to make an early deal for himself, Evans claimed to be able to help solve a murder that occurred on or about 8/21/01. After a brief investigation, on the date of 6/23/03 the defendant was charged with, 1st degree murder, 1st degree murder during the commission of a felony, Possession of a firearm during the commission of a felony, Attempted robbery 1st degree.

The state also produced another witness Monia Tann who claimed to have driven the defendant to the victims home the day of the murder in a planned robbery attempt.

The defendant would like to point out that; 1. State witnesses Monia Tann + Earl Evans withheld knowledge of this crime for over 1½ + only came forward when they were charged with other offenses that entailed significant jail time. It is the defendants theory that Tann + Evans committed the murder, + being as though they were the only ones who knew what actually happened they were able to shift the blame at will to benefit them should the need arise. That explains why out of the 3 parts of the story needed to substantiate their claim only 1 was corroborated by the 2 witnesses — the actual murder.

2. Once Tann + Evans came forward it was in the states interest to corroborate each part of their story, especially in light of the case being purely circumstantial.

The story Tann + Evans gave had 3 parts (A.) The events

7.

leading up to the murder; (B.) The details of the murder; +
(C.) The events that occurred shortly after the murder. The
record proves that only one of the 3 parts could be corroborated
+ thats the details of the murder. (See: defendants P.C.R 61 ground
11.) Every other facet of their story was inconsistent + contradictory.
With obvious motive to pin the murder on someone else, +
consistently inconsistent witness accounts of the events
surrounding the murder, + also knowing that noone outside
of these two "witnesses" could corroborate their claim, the
State still continued to proceed with charging the defendant
with capitol murder.

Also before the trial, during the motion in limine the State learned
that it was a possibility that the gun in question may not
have been the gun used. (See: A-1 date 1/9/04 T.S. pgs 1-133 motion
in limine.) Yet continued to argue to get the unlinkable gun
admitted as evidence. Which led to the court holding an
balancing analysis to determine relevancy of evidence, at
which time State witness detective Spillan testified that Evans
confirmed the gun in question being the defendants upon
its recovery. (See: A-11 2/3/04 T.S. pgs 16-63 for detective
Spillan testimony + judges ruling as a result of that testimony.)
Due to that testimony the unlinkable gun was allowed to be
admitted as evidence. But that testimony was proven false/
Perjured when State witness Evans testified that he never
told the police who the gun belonged to upon its recovery.
(See: A-12 2/3/04 T.S. pgs. 75, 76 )

False testimony cases involve not only "prosecutorial misconduct";
but also "a corruption of the truth seeking function of the
trial process." U.S V. Agues Supr 427 U.S at 104, 96

8.

S.ct. at 2397

The state argues that it was the sole province of the fact finder to resolve any inconsistencies in witness testimony. But what the defendant is contending is that looking at the circumstances + lack of evidence surrounding this case, the jury should not have been put in a position to judge a case of such prejudice, inconsistence + contradiction on the states behalf.

Furthermore how can the jury RESOLVE INCONSISTENCIES in testimony that "they have no control over? (I.E. Balancing analysis testimony)

If its the prosecuting attorneys duty to protect all parties involved, + if its the prosecutors duty to see equal justice be done by giving the defendant a fair + impartial trial, then its inconceivable how + why the prosecution would vigorously prosecute a case of such controversy + contradiction with absolutely no evidence outside of the motive oriented testimony of Tann + Evans.

The defendant argues that the prosecution is clearly in violation of A.B.A standards for prosecution. Standards 1.2 B, c, d + E; 2.8 a + B; 3.1 a; 3.2 B; 3.4 c; 3.6 F; 3.9 a; 3.11 c; 5.6 a, B, C.

Therefore the defendant requests that at the very least a review to focus on the evidence presented by the prosecution be held. The evidence was presented without respect to the Standard Jurisprudence + the requirements there of Exculpatory Evidence + Hearsay Evidence tests should all be argued. In spite of the injustices described in the aforementioned ground the jury sent a note after nearly

9.

2 days of deliberating, stating that they had been deadlocked 6-6 for most of that time before coming back with a unanamous decision the very next day, without even being able to reexamine the evidence or testimony previously given. (SEE A-22 2/12/04 T.S pgs 2-9 & A-22 2/2/04 T.S. pgs 2-6 ) So any small or large prejudicial error could have contributed to causing the defendants conviction.

The defendant prays the court will provide the protection of justice that the prosecution failed to provide as a supposed unbiased party in the eyes of equal justice. The defendant respectfully requests that the court REVERSE his conviction in the interest of justice.

10.

Ground 1: Abuse of discretion when the trial judge allowed a gun to be introduced as evidence that had no established Nexus to the crime denying the defendants right to a fair trial. On the date of 1/9/04 defense counsel Jerome Capone argued motion in limine to exclude reference to a gun seized from state witness Earl Evans Apt. in a seperate incident from which the defendant was on trial (attempted robbery 9/12/01) Both, state ballistics experts Walter Dandridge & Defense Expert William Welch conceded that they could not conclusively match the bullets found at the crime scene to the gun in question. (See: ballistics testimony A-1 1/9/04 T.S. pgs 1-120) Accordingly the court granted the defendants motion to exclude ballistics experts testimony. Stating in part that, "Simply put, there is No way to identify the seized firearm as the murder weapon by ballistic testing."

On the date of 2/3/04 an balancing analysis to determine relevancy of evidence was held, at which time detective Spillan testified that upon recovering a gun from State witness Earl Evans Apt. Evans stated that the gun found was the defendants. Based soley on detective Spillans testimony that Evans linked the defendant to the gun the trial judge allowed the gun to be offered as evidence. Only to be later proved that detective Spillans testimony was false/perjured when State witness Earl Evans testified that he never told the police who the gun belonged to upon its retrieval.

In the States reply to this ground, the State misconceives certain points to benefit their position on the issue at hand. On pgs. 11 & 12 of the states reply brief they recite Tr. 2/3/04 T.S. pgs. 52-53 with added emphasis but fail to acknowledge

## II.

that various points of the next 3 pages of the transcript 54, 55, 56 mention the fact that state witness Earl Evans was the alleged person able to link the defendant & the gun in question. T.S. pg. 54 2/03/04 the court states; "The only thing that can happen here is the officer can say that while investigating an unrelated incident, during the investigation of that unrelated incident he had the occasion to search this Apt. & in the conducting of the search for that Apt. in which he was looking for a gun, in the search for that Apt. he found, he or another officer found this gun & <u>mr. Evans told him that the gun belonged to mr. Haisey.</u>"

also on T.S. pg. 55 2/3/04 the court goes on to say; "So to a large extent the jurys going to hear they found the gun in the Apt., which mr. Haisey visits periodically, <u>and the link to mr. Haisey is what may, I guess its mr. Evans or mr. weight told them. So I'll allow it to that extent.</u>"

And on T.S. pg. 56 2/3/04 the court continues; "<u>Now you have the part that Evans says its mr. Haisey gun.</u>"

This decision & statements were made due to detective Spillans testimony during the balancing Analysis that Evans told him the gun in question was the defendants. Furthermore when this decision was made state witness Earl Evans had not ~~been~~ yet been called to testify to confirm his ability to link the defendant & the gun in question. But when Evans took the stand <u>after</u> the decision was made to make the gun in question admissable he was asked; "<u>Okay. Now, they showed you the gun. And you told them it was Jason's gun?</u>" Evans replied; "<u>I never said who gun it was.</u>" He was then asked; "<u>Okay. So you didn't say whose gun it was?</u>" To which Evans answered;

12.

"No, I didn't". (See A-12 2/3/04 T.S. pg. 76)

Now, its blatantly obvious that the gun was allowed to be introduced soley because of the assumption that state witness Evans would be able to corroborate detective Spillans balancing analysis testimony. Now when Evans failed to corroborate detective Spillans claim, all basis for the reason of the guns admission fails because Evans alleged ability to link the defendant & gun never happen. Furthermore the defendant contends that had Evans been made a part of the balancing analysis this prejudice would have never happed.

Its not enough that the jury may have had the opportunity to see the contradiction between Spillans & Evans testimony. The fact of the matter is the gun was already produced in open court for the jury to speculate over, the inference that this was the weapon used was already made. As stated in Farmer v. State 698 A.2d 946, Handgun seized from defendants apt. five days after shooting was irrelevant & inadmissible without nexus connecting gun to charged offense of Attempted murder 1st degree, even if ~~inference~~ inference was permitted that defendant possessed the gun before the shooting, & even though similar gun was used in the shooting; State could not link gun to shooting, & gun varied in appearance from gun described by state's witness. Rules of Evidence, Rules 401, 402

Further stated in Farmer; where unwarranted inferences reflect adversely on defendant by portraying him as having "a gun" available to him, without ~~th~~ establishing that gun was probably used in shooting, admissibility is barred because speculation creates prejudice, even apart from weighing process required by Evidentiary rule. Rules of Evidence, Rule 403.

13.

The state goes on to argue that the Apt. occupants, Earl Evan + Wayne Hall identified the bag in which the gun was found as belonging to the defendant.

The defendant contend that besides the gun + additional rounds there wasn't anything else in the bag personal or otherwise to actually prove the bag was the defendants. As testified to by Detective Spillan. (See A-11 2/3/04 T.S. pg. 14 ) also, Evans + Hall identifying the bag in which the gun was found hardly constitutes the fact that the gun also belonged to the defendant. If so the gun would have been admissable under that premise alone.

lastly the State argues that state witness Monia Tann identified the gun recovered as the gun the defendant had when he shot Mercer.

The defendant contends that this is heresay + not true especially considering the fact that, 1. Tann is a self admitted liar. (See A-10 2/4/04 T.S pgs 88 -92 )

2, there is no way Tann could prove that allegation nor can anyone corroborate that claim

And 3, Tann was never considered or mentioned as a link in previous arguments or the trial judge's decision involving the gun.

The defendant contends that he has met the narrow burden for reconsideration of an Evidentiary ruling in the interest of justice + asks that at the very least that be granted but respectfully requests that his conviction be reversed + remanded for a new trial.

14.

Ground 11; Juey's verdict not supported by sufficient evidence.

A couple of yrs. before the murder, Mercer (the victim), the defendant + State witness Maria Tann had all worked at Citibank, in the corporate Commons complex in New Castle, DE. The other state witness Earl Evans claims to have Never met the victim. Tann + Evans described the murder as a robbery committed by the defendant which had gone awry. However since the victim knew the defendant from Citibank, + since Tann worked at citibank the same time as the victim + defendant, it is unlikely that either the defendant or Tann could enter the victims home undisguised, rob the victim, + not be identified. So if this was just going to be a robbery, as state witnesses Tann + Evans claimed, it had to be committed by someone with whom the victim was not familiar with. That logic would excluded Tann + the defendant. The defendants theory of the case is that Tann + Evans carried out the robbery gone awry. Tann called up the victim to find out if he was home, then drove Evans over to the victims house, + sat in the car as Evans went in + botched the robbery. Since they were both culpable, Tann as the accomplice + Evans as the principle, they developed a story to throw the blame on someone else should the need ever arise.

The story which Tann + Evans gave had 3 parts (a) the events leading up to the murder; (B) The details of the murder; + (c) The events after the murder. It was in the states interest to corroborate each part of their story. The record proves that only one of the 3 parts could be

(left margin, rotated text) The State obtained ... consciously co-obligate the record ... balance ... evidence to enhance the ... ... examination ... we brought to examine ... ... case ... that ... one ... sound ... evidence done ... ... ... establishing by

15.

coerroborated, + thats the details of the murder - which doesn't come close to proving the defendant killed the victim. According to Evans, on the day of the murder Evans, Tam + the defendant had all drived up to New Jersey at some point during the day to pick up a guy named "Fly"; (who was NEVER proven to be a person) They were using a car rented by Tam. SEE A-6 2/2/04 T.S. pgs. 44, 45 Evans further testified that after picking up "Fly" they drove back to Tam's Apt. in Wilmington, D.E. At that point Evans + "Fly" went to buy some marijuana while Tam + the defendant left to go someplace in Tam's car. SEE A-6 2/2/04 T.S. pgs. 45-46 a little while later the defendant + Tam returned to Tam's Apt. where the defendant "got halfway out of the car", to tell Evans + "Fly" to, "lets go we're going back to Jersey." Evans continued that on the drive back to New Jersey the defendant admitted that he just killed Mercer. Evans also testified that the defendant stayed in New Jersey the night of the murder + That he (Evans) and Tam were the only ones to return to D.E that night, after the murder of Mercer. SEE A-6 2/2/04 T.S. pgs. 46-51

Tam says the opposite of Evans in nearly every aspect during his testimony, exep EXCEPT for the details of the murder. Tam testified that there was only ONE trip to New Jersey that day + it took place after the murder. SEE A-10 2/4/04 T.S. pg. 74

Tam also testified that a guy named Phil "Free" Kizee was with Tam, Evans + the defendant on the day of the

16.

murder not "fly" in fact Tann testified that he doesn't even know a fly. See A-10 2/4/04 T.S. pgs. 73 + 74. At this point it is important to note that Evans knows Phil "Free" Kizee also. Detective Barry Mullins testified that he showed Evans a photograph of Phil "Free" Kizee + that Evans told him that he knew Kizee but that Kizee was not "fly" + that "fly" + Kizee were 2 different people. (although he couldn't provide anything about "fly" but an alias) See A-23 2/5/04 T.S. pg. 27 Tann further testified that the defendant called the victim, + then he + the defendant took a ride over to the victims house at which time the defendant showed Tann that he Tann's gun in his possession. Tann said that he parked down the street from the victims home + waited while the defendant went into the victim's home. A short while later the defendant came out + told Tann that he shot Mercer. They then drove back to Tann's Apt. where they went inside for about 5 minutes. They then drove to New Jersey where they dropped off Phil "Free" Kizee + then returned back to D.E with the defendant. (Tann also testified that he had bought the marijuana not Evans.) See A-4 2/4/04 T.S. pgs. 33-40; Also see A-7 2/4/04 T.S. pgs 41-44

Aside from the fact that Tann's indentification of the fourth person was Phil "Free" Kizee, while Evans identification was of someone who wasn't even proven to be a person named "fly". The State never called "Fly" or Kizee to testify as witnesses to corroborate the testimony given. In fact the prosecution had the opportunity to question Kizee + even had him listed as a witness, but upon being questioned by the

17.

police learned that Kizee was unable to corroborate Tawn's accusations + decided not to call him to testify. Numerous attempts by the defendant to get Phil Kizee's police statement went ignored by counsel Jerome Capone + Court, <u>See A-24 for written letters concerning request.</u>

The Defendant would like to reiterate that every aspect of the events that took place <u>before</u> + <u>After</u> the murder was contradicted by the states own chief witnesses. From the total trips to New Jersey the day of the murder, to who was the "alleged" fourth person with Tawn, Evan + the defendant, to if they actually entered Tawns Apt. upon returning from the crime, to whether the defendant came back to Die on the night in question, Even as to who purchased the marijuana that day.

In addition to the fact that their stories were so substantially inconsistent, the record also shows that both Tawn + Evans had the time + opportunity to concoct their story. <u>See A-10 2/4/04 T.S. pgs. 69-71</u>

Furthermore, they even found themselves in each others presence <u>during</u> the trial, at which time Evans asked Tawn if he was going to "do what they want us to do?" <u>See A-7 2/4/04 T.S. pgs. 53, 54</u>

Tawn + Evans were also looking at significant jail time on other robbery charges. <u>See A-3 2/4/04 T.S. pgs. 27 + 28 Tawn + See A-6 2/2/04 T.S. pgs. 83 + 84 Evans</u>

Also on the date of 2/3/04 State witness detective Spillan testified during an balancing analysis to determine relevancy of evidence, that he found the gun in question during the search of State witness Earl Evans' Apt. in an unrelated incident, +

18,

upon recovering the gun Evans told him the gun belonged to the defendant. See A-11 2/3/04 T.S. pgs 13-63. Based soley on this testimony it was determine that the gun in question (which had no established nexus) would be allowed to be offered as evidence. See A-11 2/3/04 T.S. pgs 47-57 for ruling. But that testimony was later proven false/perjured when it was shown that detective Spillan didn't find the gun officer whitmarsh authored a report stating that he found the gun. See A-12 9/30/01 whitmarsh report. Also state witness Earl Evans testified that upon the guns discovery he never said who the gun belonged to, thus destroying the whole premise for which the gun was allowed to be introduced. See A-12 2/3/04 T.S. pgs 75, 76

The defendant contends that the admission of the unlinkable gun alone is enough to prove that the jury's verdict was not supported by sufficient evidence. Especially in light of the fact that after 2 days of deliberating the jury sent a note stating that they were deadlocked 6-6.

The defendant argues that there was an irreconcilable conflict that prejudiced the defendants right to a fair trial once the gun in question was admitted as evidence based soley on the testimony of detective Spillan that state witness Evans would be able to link the gun to the defendant, only to later have evans destroy that assumption by contradicting detective Spillan's balancing analysis testimony.

The defendant submits that no rational trier of fact could have determined to have found the essential elements of the crime beyond a reasonable doubt based on the testimony of Tann & Evans as well as the other questionable evidence. See

19.

Monroe v. State, 652 A.2d 560 (Del. 1995)
As a result the defendant requests that his conviction
be reversed & remanded for a new trial.


Next the State argues that claims 3; Abuse of discretion by
trial judge by not permitting evidence of State witness
Maria Tanki's juvenile burglary conviction. And 12; Trial
Judge committed plain error when he did not give a
Getz instruction when the State introduced evidence that
the defendant possessed a .38 caliber revolver at the
time of his arrest in an unrelated incident. Repeat
arguments advanced, considered & affirmed during direct
appeal to the Del. Supreme court.
The defendant simply requests that the court reconsider
its discretion concerning these 2 grounds in the interest
of justice.
As for claims 4; ineffective assistance of counsel when counsel
failed to interview, subpoena, a key witness that would
have rebutted prosecution witness testimony. And 6; Ineffective
assistance of counsel for failing to filed a motion 29
on all charges. The defendant respectfully resubmits his
reply brief that was submitted Oct. 06 in response
to counsel Jerome Capone's reply to the defendants
P.C.R (6) claims since the State is just reiterating the
defendants counsel's previous response to the ineffective
assistance of counsel claims. The defendant also contends
that ground 4 & 6 were thoroughly argued in the P.C.R (6)
memorandum & humbly requests that those facts be
revisited upon decision. The defendant prays the court

20.

REVERSE + REMANDS his CONVICTION after CONSIDERING the
INEFFECTIVE assistance of COUNSEL claims.

A-32

In The Supreme Court Of the State Of Delaware

Jason Hainey,
    Defendant Below -
    Appellant,

      V.

State of Delaware,
    Plaintiff Below,
    Appellee.

Defendant Below Appellant
Jason Hainey's Appendix to opening brief

Jason Hainey SBI 383182
Delaware Correctional Center
1181 Paddock Road
Smyrna, DE 19977
Jason Hainey

Dated: _____

Table of Contents - Appendix

Page

1/9/04 Pretrial Hearing Transcript.............. ... A-1

1/20/04 Pretrial Hearing ruling (Partial).............. A-00

2/4/04 Trial transcript - Taw Direct .............. A-3

2/4/04 Trial transcript - Taw Direct .............. A-4

2/2/04 Trial transcript - Evans Direct............ A-6

2/4/04 Trial transcript - Taw Direct............. A-7

2/4/04 Trial transcript - Taw Cross ............. A-10

2/3/04 Balancing Analysis - Spillan Direct + Cross... A-11

2/3/04 Balancing Analysis - Judge's Ruling......... A-11

2/3/04 Trial transcript - Evans Redirect + Recross.. A-12

2/11/04 Jury note + Jury verdict ............. A-22

2/5/04 Trial transcript - Mullin Direct + Cross ..... A-23

7/05 + 8/05 letters concerning Kizee's Police statement A-24

5/29/03 + 4/5/03 showing Police Contact with Kizee A-26

2/11/04 Jury note ....................... A-28

Certified Superior Court docket............. A-29

Certified Superior Court docket ......... A-30

# Table of contents

Table of Citations . . . . . . . . . . . . . . . . . . . . . . Page.
Nature And stage of the Proceedings . . . . . . . . . Page.
Summary of Argument . . . . . . . . . . . . . . . . . Page.
Amended motion's summary of arguement . . . . . . Page.
Statement of facts . . . . . . . . . . . . . . . . . . . . Page.
Argument Section . . . . . . . . . . . . . . . . . . . Page.

Argument

    I. The prosecution used misleading/Perjured testimony and also misrepresented evidence to convict the defendant violating the defendants right to a fair trial . . . . . . Pg.

    II. Abuse of discretion when trial judge allowed a gun in as evidence that had no established nexus to the crime, violating the defendants right to a fair trial . . . . . . . Pg.

    III. Ineffective assistance of counsel when defense counsel failed to interview, Subpoena Key witness violating the defendants sixth amendment right . . . . . . Pg.

    IV. Ineffective assistance of counsel for failing to filed a motion 29 on all charges in Support of motion in limine, misleading/Perjured testimony + a lack of overall evidence. Violating the defendants sixth amendment Right . . . . Pg

    V. Jury's verdict not supported by sufficient evidence . . . . . . . . Pg.

VI. Appellate counsel was ineffective as he failed to present the facts, nor argue based upon the facts reflected in the record; Counsel also failed to present the arguments outlined in these amended claims/motion; this miscarriage of justice undermined the legality, reliability, integrity + fairness of the proceedings leading to the defendants judgment of conviction........ Pg.

VII. Ineffective assistance of counsel for failing to present the fact or argue that the prosecution used misleading/Perjured testimony And misrepresented evidence that in turn Resulted in the defendants conviction violating the defendants fifth, sixth + fourteenth Amendments, Right to due process, effective assistance of counsel, + a fair trial....... Pg.

Conclusion........ Pg.

## Nature And Stage of the Proceedings

On the date of June 15, 2006 the defendant filed a motion for Post Conviction Relief in Superior Court New Castle County. On the date of September 24, 2007 the honorable William C. Carpenter JR. denied the defendants request. The defendant then filed a notice of appeal to this Court of the Supreme Court appealing the September 24, 2007 denial of the defendants Post Conviction motion.

Pg. 1

## Summary of Argument

I. The prosecution used misleading/Perjured testimony + also misrepresented evidence to convict the defendant, by using uncorroborated testimony that in turn allowed a gun with No established Nexus to the crime to be introduced as Evidence.

II. Abuse of discretion when trial judge allowed a gun to be introduced as evidence that had No established Nexus to the crime. Ballistics test came back inconclusive (see _____ ) Also on the date of 2/3/04 An incomplete balancing Analysis to determine relevancy of evidence was held. The defendant contends that the balancing analysis should + could have been completed by verifying the uncorroborated hearsay testimony given, there is a reasonable probability that had this been done the gun in question would have been inadmissable.

III. Ineffective assistance of counsel when defense counsel failed to interview, subpoena a key witness that would have rebutted an already consistently inconsistent witness account of the events leading up to the crime + events thereafter. If trial counsel would have done more to secure this testimony, there is a reasonable probability that the outcome would have been different especially in light of the case being so close in outcome.

IV. Ineffective assistance of counsel for failing to file a motion 29 on all charges in support of the motion in limine, misleading/Perjured testimony + a lack of overall evidence. Trial counsel argues that he didn't think he could meet the Rule 29 standard that is why he didn't file it. But this is contradictory considering the fact that on direct appeal counsel argued that, the jury's verdict was not supported by sufficient evidence. The defendant contends that had the motion 29 been filed there would have been a reasonable probability the motion would have prevailed in light of the circumstances surrounding the case. ........

V. The State of Delaware presented insufficient evidence at the defendants February 2004 New Castle County Superior court jury trial for a rational trier of fact to find all of the essential statutory elements of each of the five criminal charges beyond a reasonable doubt. .....

VI. Appellate counsel was ineffective as he failed to present the facts, or argue based upon the facts reflected in the record; Counsel also failed to present the arguments outlined in these amended claims/motion; this miscarriage of justice undermined the legality, reliability, integrity + fairness of the proceedings leading to the defendants judgment of conviction.

VII. Ineffective assistance of counsel for failing to present the fact or argue that the prosecution used misleading/Perjured testimony + misrepresented evidence that in turn allowed a gun to be introduced as evidence that had no established Nexus to the crime.

Pg. 3

## Ground 1

Prosecution used misleading/Perjured testimony + also misrepresented evidence to convict the defendant violating the defendants right to a fair trial.

## Standard And Scope of Review.

Conviction obtained through use of false testimony, known to be such by representatives of the state, is a denial of due process, + there is also a denial of due process, when the state, though not soliciting false evidence, allows it to go uncorrected when it appears. <u>Napue v. State of Illinois 360 U.S. 264 79 S.ct. 1173</u>

## Argument

Concerning this particular ground the state may argue that, it was the sole province of the fact finder to resolve any inconsistencies in witness testimony, + that mere inconsistency in witness' testimony does not, by itself constitute perjury. But the defendant contends that while the jury was shown some of detective Spillan's inconsistencies during cross-examination, the jury was **not** shown or understood the most significant inconsistency which was the false, misleading/Perjured balancing analysis testimony that in turn allowed a gun that had no established nexus to the crime in as evidence. During a balancing analysis to determine relevancy of evidence, (which is held **outside** of the jury's presence.) detective Spillan testified that upon retrieving the gun in question during the search of state witness Earl Evans Apt. (For a seperate

Pg. 8

Incident) Evans stated that the gun found was the defendants.
(see A-11 2/3/04 T.S pg 35 ) Based soley upon this assumption
that Evans would corroborate this testimony, the gun in question
was allowed to be offered as evidence. (see A-11 2/3/04 T.spgs.
47-57 for judge's ruling) But once trial resumed, Evans
testified that when the gun was discovered by police in his
Apt. he never said who the gun belonged to. (see A-12 2/3/04
T.S pgs 75-76 )

The significance of this testimony was never brought to the
juey's attention, nor was it corrected by the state or objected
to by defense counsel.

Also on the date of 1/9/04 a motion in limine was held to
exclude reference to the gun by ballistics experts + on the
date of 1/20/04 the judge agreed by stating in Part that,
"Simply put, there is no way to identify the seized firearm
as the murder weapon by ballistic testing" (see A-00 1/20/04 )
As previously stated by defendant in his original P.C.R 61; Had
it not been for detective Spillan's misleading/Perjured balancing
analysis testimony, there would have been absolutely no reason
to believe Evans would link the defendant to the gun, + if
there's no reason to believe this, there are no grounds in
which to make the gun admissable, + had the gun been
inadmissable there is a reasonable probability that the juey
may have rendered a different verdict. Especially in light of
the case being so close. (juey sent note stating they were
deadlocked 6-6 after 2 days of deliberation See A-22 2/11/04 T.Spgs
2-9) "a verdict or conclusion only weakly supported by the record
is more likely to have been effected by errors that are with

Pg. 9

overwhelming record support." Id at 696, 104 S.ct

It appears that detective Spillan's intention was to make his role involving the gun recovered from Evans Apt. more significant in order to help the gun in question become admissable evidence. Besides the misleading/Perjured balancing analysis testimony Spillan also testified that he initially found the gun during the search of Evans Apt. (see A-11 2/3/04 T.S pgs 33-35.) But that was also proven false because officer Whitmarsh authored a report stating that he found the gun. (see A-0 Whitmarsh report 9/30/01) It is obvious that these actions had more of a bearing on the case than "mere inconsistent witness testimony." Detective Spillan's misleading/Perjured balancing analysis testimony was the **sole** reason the unlinkable gun was allowed to be offered as evidence. The defendant contends that, the state would be hard pressed to argue that had it not been for this descrepancy the gun would have still been allowed in as evidence.

It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendants guilt. A lie is a lie; no matter what its subject, and, if it is in any way relevant to the case, the district Attorney has the responsibility + duty to correct what he knows to be false + elicit the truth. That the district attorneys silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing as it did, a trial that could in any real sense be termed fair.

The defendant argues that if the state had researched/investigated properly, this prejudice would not have occurred, and even if they had missed this descrepancy during there pretrial

Pg. 10

investigation, once state witness Earl Evans testified that he never said who the gun belonged to, the state had a responsibility & fundemental obligation to correct & remedy the situation being as though their state witness (Evans) was the link in which the gun was admitted.

"A new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury." Id at 154, 92 s.ct. at 766

With the prejudices & miscarriage of justice exhibited in this ground the defendant requests that his conviction be reversed & remanded for a new trial.

## Ground II

Abuse of discretion when trial Judge allowed a gun in as evidence that had no established nexus to the crime, violating the defendants Right to a fair trial.

### Standard And Scope of Review

Handgun seized from defendants Apartment five days after shooting was irrelevant & inadmissable without nexus connecting gun to charged offense of Attempted murder in 1st degree, even if inference was permitted that defendant possessed the gun before the shooting, & even though similar gun was used in the shooting; state could not link gun to shooting, & gun varied in appearance from gun described by state's witness. Farmer v. State 698 A.2d 946

### Argument

On the date of January 9th 2004 defense counsel Jerome Capone argued a motion in limine to exclude reference to a gun seized from state witness Earl Evans' Apartment, in a seperate incident from which the defendant was on trial. (Attempted Robbery 9/12/01) Both, state ballistics expert Walter Dandridge & Defense's expert William Welch conceded that they could not conclusively match the bullets found at the crime scene to the gun in question. (see A-1 date 1/9/04 T.S. pg. 23 for W. Dandridge conclusion & A-1 date 1/9/04 T.S. pg. 61 for W. Welch conclusion)

Accordingly the court granted the defendants motion to exclude ballistics expert testimony. Stating in part; "Simply put, there is no way to identify the seized firearm as the murder weapon by ballistic testing." (see A-00 dated 1/20/04)

Then on the date of 2/3/04 a balancing Analysis to determine Relevancy of evidence was held because the gun had not yet become admissable evidence, at which time detective Spillan testified that upon recovering a gun from state witness Earl Evans' Apartment, Evans stated that the gun found was the defendants. (see A-11 dated 2/3/04 T.S. pg. 35) Based solely on detective Spillan's balancing Analysis testimony that Evans linked the defendant to the gun, the trial judge allowed the gun to be offered as evidence. (see A-11 dated 2/3/04 T.S. pgs. 52-57) Only to be later proved that detective Spillan's testimony was misleading/Perjured when state witness Earl Evans testified that he never told the police who the gun belonged to upon it's retrieval. (see A-12 dated 2/3/04 T.S. pgs 75,76)

It is blatantly obvious that the gun was allowed to be admitted as evidence solely because of the assumption that Evans would be able to link the defendant to the gun by corroborating detective Spillan's balancing Analysis testimony. Now when Evans failed to corroborate detective Spillan's claim, all basis for the reason of the guns admission fails because Evans alleged ability to link the defendant + gun never happened. It is also clear that the trial Judge made plain error + abuse of discretion by hanging his decision to allow inadmissable evidence in from the sole testimony of detective Spillan, with clearly establishing it to be "absolute fact", during his analysis as stated in D.R.E 403

Pg. 13

And not Speculating. It is a reasonable probability that had the trial Judge **included** the testimony of State witness Earl Evans into the balancing Analysis to determine relevancy of evidence, he would have come to the conclusion that the gun in question would remain inadmissible. During the ruling of that analysis the trial Judge even went as far as to say; "The representation I thought was going to be much Stronger as to the State's ability to connect the gun to Mr. Harvey. And some, Some additional effort by the law enforcement agencies to connect him would have been helpful, but that's not what we have here." (see A-11 dated 2/3/04 TB pgs 52,53)

As stated in <u>Farmer v. State 698 A.2d 946</u>; Handgun seized from defendants apartment five days after shooting was irrelevant & inadmissible without nexus connecting gun to charged offense of Attempted murder 1st degree, even if inference was permitted that defendant possessed the gun before the shooting, & even though similar gun was used in Shooting; State could not link gun to shooting, & gun varied in appearance from gun described by State's witness.

Further Stated in <u>Farmer</u>; where unwarranted inference reflect adversely on defendant by portraying him as having "a gun" available to him, without establishing that the gun in question is the murder weapon admission of the gun was abuse of discretion in violation of D.R.E 901(a) & D.R.E 403. The state may argue that the defendant did not base his objections on D.R.E 901(a) & D.R.E 403 & that the defendant cannot assert that claim on Rule 61. However the State of Delaware Supreme court ruled that evidence that

a defendant charged with a shooting, had a firearm in his possession is surely probative if that firearm is tied to the criminal act. But without a satisfactory evidentiary link, such evidence carries the risk that the jury may associate mere ownership of instrument adaptable for use in a crime subjects the defendant to the same risks that impermissable character or bad act evidence may pose equating disposition with guilt. (see State v. Onofrio Conn. Supr, 179 Conn 23, 425 A.2d 560, 564 (1979); Also; Betz V. State 538 A.2d At 730)

The state may also argue that Tami (the alleged owner of the gun) linked the defendant to the gun, but Tami was not a sufficient link for the admissability of the gun, furthermore Tami was never argued or offered as a link during the balancing Analysis therefore it should not be argued in hindsight. The defendant contends that had Tami been a sufficient enough link it would have been argued & granted during the balancing Analysis.

The state would be hard pressed to argue that had the gun in question been inadmissable the state would have still secured a guilty verdict, Especially in light of the case being purely circumstantial & also being so close. Jury sent a note after 2 days of deliberating stating that they were deadlocked 6-6 (see A-22 dated 2/11/04 T.S. pgs. 2-9)

"a verdict or conclusion only weakly supported by the record is more likely to have been effected by errors than one with overwhelming record support. (see Id at 696, 104 S.ct)

In light of the facts submitted in this ground the defendant requests that his conviction be reversed & remanded for a new trial.

Ground III

Ineffective assistance of counsel when defense counsel failed to interview or subpoena a key witness violating the defendants sixth Amendment Right.

Standard And Scope of Review

A convicted defendants claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components: First, defendant must show that counsel's performance was deficient, requiring showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed defendant by the sixth amendment and, second, defendant must show that deficient performance prejudiced the defense by showing that counsel's errors were so serious as to deprive defendant of a fair trial. See Strickland v. Washington 466 U.S. 668, 104 S. ct. 2052.

Argument

On the date of 2/4/04 state witness Maxia Town testified that Phil "Free" Kizee was in a car with him, Earl Evans, & the defendant after the murder of Micheal Mercer on the date of 8/21/01. (See A-10 dated 2/4/04, TS pgs 73, 74) at which time the defendant allegedly admitted to killing Mercer. Kizee was interviewed at the police station about this incident

in Glassboro, New Jersey. (see A-26 dated 5/29/03 + 6/5/03) During this interview Kizee basically stated that he knew nothing of this particular incident. (The defendant read Kizee's statement during trial + has vigorously tried to obtain this interview for his supporting facts but has been continuously ignored. See A-24 letters to counsel + court requesting Kizee's statement.) Yet Kizee was never interviewed or subpoenaed to testify by defense counsel. It was especially obvious that Kizee's testimony would have been damaging to the state when they decided not to call Kizee to testify even though they had him listed as a witness.

The defendant feels that this prejudiced him because Kizee was the person state witness Tawn said was there when the defendant allegedly admitted to the murder of Mercer + if defense counsel would have interview/called Kizee to testify to his earlier police statement there is a reasonable probability that the jury may have rendered a different verdict, especially in light of the contradictory testimony given by state witnesses Tawn + Evans, + in light of the case being purely circumstantial + close in verdict. (see A-22 dated 2/9/04 T.S. pgs. 2-9 for jury's initial 6-6 deadlock.) The defendant contends that by failing to introduce the testimony of Kizee the jury was left to decide the defendants fate without the benefit of supporting or corroborating evidence by the defense.

"If a verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create reasonable doubt. (see U.S. v Aguars 427, US 97, 113, 96 S.Ct. 2392, 2402, 49 L.Ed 2d 342 (1976)

Pg. 17

Also, "a lawyer who fails to adequately investigate & to introduce into evidence, information that demonstrates his clients factual innocence, or that raises sufficient doubt as to that question to undermine confidence in the verdict, render deficient performance (see lord v. wood, 184 F.3d 1083 )

Defense counsel Jerome Capone's failure to interview & present the testimony of Kizee was all the more questionable in light of the weakness of the states case against the defendant. The state had no DNA evidence, no actual eye witness to said crime, no fingerprints or any other forensic/scientific evidence linking the defendant to the crime even though the defendant was supposedly in the home of the victim. Furthermore when looking at the motive behind Tau's testimony, (He was facing nearly 250 years, See A-10 dated 2/4/04 T.S. pg. 101 ) & the fact that he's a self admitted liar, (see A-10 dated 2/4/04 T.S. pgs. 88-91 ) the defendant feels it would have been in the best interest of the defense to have Kizee testify to further expose Tau's motive oriented testimony.

"Counsel is not obligated to interview every witness personally in order to be adjudged to have performed effectively; However where a lawyer does not put a witness on the stand, his decision will be entitled to less deference than if he interviews the witness, because a lawyer who interviews the witness can rely on his assessment of their articulateness & demeanor, factors which a reviewing court is not in a position to second guess. (see lord v. Wood 184 F.3d 1083 )

In, Sullivan v. Fairman 819 F.2d 1382 " The district court determined that trial defense counsel's performance was

Constitutionally deficient because he did not do more to obtain the testimony of the 5 occurences witnesses. The court held that; in assessing the reasonableness of defense counsel's investigation, it must consider the availability of the witnesses, the importance of their testimony & the degree of difficulty in locating them. The district court stressed that they were the only persons outside of petitioners family, who could have offered exculpatory evidence. Their testimony directly contradicted the states chief witnesses testimony." These issues are similar to the defendants case because the defendants counsel did not obtain/secure the testimony of Kizee. (Kizee wasn't even interviewed by counsel) Kizee's address was on the police report of his statement. So there isn't any reason this witness couldn't have been interviewed/subpoenaed to testify. Furthermore Kizee's testimony was extremely important because he was the only person outside of the defendant who could directly contradict the already questionable testimony of Tawn. Since Kizee was listed as a witness for the state but was never called to testify the defendant feels it was imperative for the defense counsel to pursue Kizee's testimony because at that point (after the state rested their case) it was obvious that he didn't corroborate Tawn's allegations because if so the state would have called on him to testify. The states whole case hung on the testimony of Tawn & Evans so it was very important to challenge & expose their testimony at every possible opportunity.

Pg. 19

At a minimum counsel has a duty to interview potential witnesses & to make a independant investigation of the facts & circumstances of the case. The duty is reflected in the A.B.A Standard for criminal Justice 4-4.11 ( 2d ed. 1980 ) (" The defense function ")

" Where testimony of missing witnesses directly contradicted prosecution witnesses & support defense theory of the case, defendant met his burden of showing prejudice ( see Healy 764 F. 2d at 1180 )

In this case, unlike so many cases involving a similar claim of failure to call potential witnesses, the defendant has pointed to a specific witness whose missing testimony would have been extremely damaging to an otherwise already weak case presented by the state. In fact Kizee's testimony was significant to the defendant in a couple of respects. First, it directly contradicts the testimony of the states chief witness. Thus the testimony of Kizee had a direct bearing on the states chief witness' (Tann) veracity, a witness upon whose testimony the state heavily depended on in order to secure a conviction. Second, had the jury heard Kizee's testimony they may have viewed Tann in a more unfavorable light making a already weak case by the state into an even weaker case.

The Strickland two-component standard to be applied when reviewing a claim of ineffective assistance of counsel is, First, the defendant must show that counsel's performance was deficient. This requires showing that counsel was not functioning as the "Counsel" guaranteed the defendant by the sixth amendment.

Pg. 20

The defendant contends that the first requirement was met by showing that the trial counsel never interviewed/subpoenaed Kizee to testify despite Tawn testifying that Kizee was present when the defendant allegedly admitted to killing Mercer & despite the fact that Kizee denied knowing about what Tawn was alleging during his police statement. This error was even more damaging considering the states whole case literally hung on the veracity of Tawn & Evans, so Kizee's testimony was all the more important because the case was virtually the defendants word against the states two witnesses.

The second component from <u>Strickland</u> states that the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial. The defendant established the second component by showing that Kizee was the only person outside of the defendant who could directly contradict Tawn's testimony & by not calling Kizee to testify counsel left the jury to believe that the account offered by the states witnesses was true since it was never sufficiently challenged. Had Kizee been called to testify the state would have been hard pressed to recover from the damage done to the already inconsistent, motive oriented testimony of Tawn & Evans. The defendant would like to add that the sixth amendment guarantees the right for a defendant to have a compulsory process for obtaining witnesses in his or her favor, meaning the right of a defendant to have the resources of the court (i.e. the ~~sup~~ subpoena power)

utilized on his behalf to compel the appearance of witnesses before such court.

This constitutional right was violated the moment defense counsel neglected to subpoena Kizee. Furthermore the jury was deadlocked 6-6 after 2 days of deliberating (see A-22 2/9/04 T.S. pgs 2-9 for jury note) despite the defense not putting 1 single witness on the stand, aids the defendant's argument that any error small or large could have been a ~~determing~~ determining factor in the jury's verdict.

"If the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create reasonable doubt. (see U.S. v. Agues 427 US 97, 113 96 S.ct 2392, 2402, 49 L.Ed. 2d 342 (1976)

In light of the facts demonstrated by the defendant, the defendant requests that his conviction be reversed + remanded for a new trial.

Ground IV

Ineffective assistance of counsel for failing to file a motion 29 on all charges in support of motion in limine, misleading/perjureed testimony & a lack of overall evidence. Violating the defendants Sixth amendment eight.

## Standard and Scope of Review

A motion for judgment of acquittal must be presented either before a case is submitted to a jury or within seven days of the jury's discharge. Super. Ct. Crim. R. 29 ("Rule 29). A claim of insufficiency of evidence is reviewable only if the defendant first presented it to the trial court, either in a motion for a directed verdict or a Rule 29 motion for judgment of acquittal. Absent any such motion, the claim is waived. Gordon v. State Del. Supr., 604 A.2d 1367, 1368 (1992)

## Argument

The defendant presented the insufficiency claim to the court in his P.C.R. 61 ground 5. In this ground the defendant seeks relief from the court appointed counsels failure to file a motion 29 on all charges within the time frame provided. In the defendants case, the state's evidence though purely circumstantial, was sufficient to sustain that the murder of Micheal Mercer was indeed committed by someone. The key question however,

is despite the fact that the gun in question could not be linked to the murder, (see A-1 dated 1/9/04 T.S. pg. 23 & 61 for state + defense ballistics experts conclusions.)

the misleading/perjured testimony of detective Spillan that in turn allowed a gun that had no established nexus to the crime in as evidence. (see A-11 dated 2/3/04 T.S. pg. 35 for detectives testimony that Evans linked the defendant to gun; then see A-11 dated 2/3/04 T.S. pgs. 47-57 for courts ruling due to that testimony; + See A-12 dated 2/3/04 T.S. pgs. 75 + 76 for Evans contradiction which destroys the link/reason for the guns admittance.)

And also the fact that there were no eyewitness' to said crime, no scientific/forensic evidence to support the states case or the motive oriented/consistently contradictory testimony from the states 2 chief witnesses, was the evidence sufficient to establish, a prima facie during the states case.

The defendant contends that in light of these issues no rational trier of fact could have concluded that the defendant committed the charged offenses based on the evidence presented by the state. That is further supported by the fact that the jury sent a note stating that they were deadlocked 6-6 after 2 days of deliberating before coming to a conclusion the very next day without the benefit of rereviewing transcripts of testimony as they requested. (See A-22 dated 2/11/04 for jury's deadlock note; then see A-28 dated 2/11/04 for request to review portions of testimony via transcript; + See A-22 dated 2/12/04 for verdict.)

Pg. 24

The state will more than likely respond that although the evidence against the defendant is only circumstantial, it is sufficient to sustain the guilty verdicts. But the defendant argues that the evidence cannot be sufficient due to the misleading/Perjured testimony that in turn allowed a gun that had no established nexus to the crime to be introduced as evidence.

Also, in the counsels Reply brief to the defendants Ineffective claim counsel stated, "while I felt this was a close case where we had a good ~~chance~~ chance for acquittal, I did not make a motion for judgment of acquittal because I did not think that we could meet the Rule 29 Standard requiring that the state's evidence viewed in the light most favorable to the state must be insufficient to sustain a conviction." The defendant contends that first, counsel has a moral & professional obligation to at **least** inform the client of any & all options available regardless of counsels own opinion. Counsel did not due this. Second & most importantly, counsel's Reason for not filing a motion 29 is even more puzzling & contradictory in light of the fact that in the direct appeal brief counsel argued that the jury's verdict was not supported by sufficient evidence. The defendant contends that a motion 29 & jury's verdict not supported by sufficient evidence claim goes hand & hand. In fact the standard in which the requirement has to be met is the Same for **both**. Also, you have to preserve the insufficient evidence claim by first filing a motion 29 or a directed verdict.

Pg. 25

So for counsel to claim that he didn't think he could meet the rule 29 standard yet argue the jury's verdict was not supported by sufficient evidence is contradictory I also ineffective assistance of counsel.

Under rule 29 a motion for judgment of acquittal should only be granted when the state has offered insufficient evidence to sustain a guilty verdict. If this is the case then the state certainly offered insufficient evidence in regards to the unlinkable gun that was allowed to be offered as evidence along with the other claims described in ground 5 of this motion.

The defendant believes that had counsel filed the motion 29 timely & argued the issues that the defendant has brought forth in grounds 1,2,4 & 5 there is a reasonable probability that the motion 29 would have prevailed. In light of the facts asserted the defendant requests that he be granted an entry for a judgment of acquittal.

## Ground I

The Jury's verdict was not supported by sufficient evidence.

### Standard And Scope of Review

Viewing the evidence in the light most favorable to the state, could a rational trier of fact have found the essential elements of the crime beyond a reasonable doubt? Lopez v. State, Del. Super., 2004 WL 2743545

<u>Argument</u>

A couple of years before the murder, Mercer (the victim) the defendant & State witness Monia Tann had all worked at Citibank, located in New Castle, DE. The other state witness Earl Evans claims to have never met the victim. Tann & Evans described the murder as a robbery committed by the defendant which had gone awry. However since the victim knew the defendant from work & since Tann also worked at Citibank the same # time as the victim & defendant, it is unlikely that either the defendant or Tann could enter the victims home undisguised, Rob the victim & not be identified. So if this was just going to be a robbery, as Tann & Evans claimed, it had to be committed by someone with whom the victim was not familiar with. That logic would exclude Tann & the defendant. The defendants theory of the case is that Tann & Evans carried out the robbery gone awry. Tann called up the victim to find out if he was home, then drove Evans over to the victims house, & sat in the car as Evans went in & botched the robbery. Since they were both culpable, Tann as the accomplice & Evans as the principle, they developed a story to throw the blame on someone else should the need ever arise. The story which Tann & Evans gave had 3 parts; (A) The events leading up to the murder; (B) The details of the murder; and (C) The events after the murder. It was in the states interest to corroborate each part of their story.

<u>Pg. 27</u>

The record proves that only one of the 3 parts could be corroborated, & thats the details of the murder, which does not come close to proving the defendant killed the victim.

According to Evans, on the day of the murder, Evans, Tami & the defendant had driven up to New Jersey at some point during the day to pick up a guy named "fly", (who was never proven to be a real person) they were using a car rented by Tami. Evans further testified that after picking up "fly" they drove back to Tami's Apartment in Wilmington, DE. At that point Evans & "fly" went to by some marijuana while Tami & the defendant left to go someplace in Tami's car. A little while later the defendant & Tami returned to the Apartment where the defendant, "got halfway out of the car," to tell Evans & "fly" to, "Lets go we're going back to Jersey." Evans further stated that on the drive back to New Jersey the defendant admitted to killing Mercer. Evans also testified that the defendant stayed in New Jersey the night of the murder & that he (Evans) & Tami were the only ones to return to Delaware that night after the murder of Mercer. (see A-6 date 2/2/04 T.S. pgs. 44-51)

Now Monin Tami says the opposite of Evans in nearly every aspect during his testimony. Tami testified that there was only one trip to New Jersey that day & it took place after the murder. Tami also testified that a guy named Phil "free" Kizee was with him, Evans & the defendant on the day of the murder not "fly", in fact Tami testified that he doesn't even know a "fly". (see A-10 2/4/04 T.S pgs. 73, 74)

Pg. 28

At this point it is important to note that Evans knows Phil "free" Kizee also. Detective Barry Mullins testified that he showed Evans a photo of Kizee & that Evans told him that he knew Kizee but that Kizee & "fly" were two different people. (although he couldn't provide anything about "fly" but a alias) (see A-23- 2/5/04 T.S. pg. 27 for Det. Mullins) Tann further testified that he parked down the street from the victims home & waited while the defendant went into the victims home. A short while later the defendant came out & told Tann that he shot the victim. They then drove back to Tann's Apartment where they went inside for about five minutes. They then drove back to New Jersey where they dropped off Phil Kizee & then returned back to Delaware with the defendant. (Tann also testified that he brought the marijuana not Evans) (see A-4 2/4/04 T.S. pgs. 33-40 & A-7 2/4/04 T.S. pgs. 41-44 for Tann testimony.)

Aside from the fact that Tann's identification of the fourth person was Phil Kizee, while Evans identification was of someone who wasn't even proven to be a person, named "fly." The state never called "fly" or Kizee to testify as witnesses to corroborate the testimony given. In fact the state had the opportunity to question Kizee, & even had him listed as a witness, but upon being questioned by the police learned that he was unable to corroborate Tann's accusations & decided not to call on him to testify. Numerous attempts by the defendant to get Kizee's police statement went ignored by defense counsel & unfulfilled by the court. (see A-24 for written letters concerning request of statement)

Pg. 29

The defendant would like to reiterate that every aspect of the events that supposedly took place before & After the murder was contradicted by the states own chief witnesses. From the total trips to New Jersey that day, to who the alleged fourth person with Tail, Evans & the defendant was, to if they actually entered Tail's Apartment upon returning from the crime, to whether the defendant come back to Delaware the night in question, Even as to who purchased the marijuana that day. In addition to the fact that their stories were so substantially inconsistent, the record also shows that both Tail & Evans had the time & opportunity to concoct their story. (SEE A-10 2/4/04 T.S. pgs 69-71) Furthermore, they even found themselves in each other presence during the trial, at which time Evans asked Tail if he was going to, "Do what they want us to do?" (SEE A-7 2/4/04 TS pgs 53-54) They were also looking at significant Jail time on other robbery charges. (SEE A-3 2/4/04 T.S. pgs. 27-28 Tail & A-6 2/3/04 T.S. pgs. 83-84 Evans) Also on the date of 2/3/04 detective Spillan testified during a balancing analysis to determine relevancy of evidence, that upon retrieving the gun in question (For a seperate incident) State witness Earl Evans stated that the gun found was the defendants. Based Soley on this balancing analysis testimony the trial judge ruled that the gun would be allowed to be introduce. (SEE A-11 2/3/04 TS. pgs. 16-63 for testimony & Judges ruling.) That testimony was later proven misleading/Perjured when Evans later testified that he never told the police who the gun belonged to upon it discovery. (SEE A-12 2/3/04 T.S. pgs. 75-76)

Pg. 30

The defendant contends that the admission of the unlinkable gun alone is enough to prove that the jury's verdict was not supported by sufficient evidence, considering the fact that neither state or defense ballistics experts could link the gun in question to the murder. (See A-1 1/9/04 T.S. pg 23 state & T.S pg. 61 defense ballistic conclusion) Also the misleading/Perjured balancing analysis testimony & the jury sending a note stating that they were deadlocked 6-6 before coming to a unanomous verdict despite not being able to Review the transcripts of the testimony given as requested. (See A-22 2/11/04 T.S pgs. 2-9 for deadlock note; See A-28 2/11/04 for request to review testimony via transcript, & A-22 2/12/04 for verdict )

Considering the issues described in this motion, the defendant argues that no rational trier of fact could have determined to have found the essential elements of the crime beyond a reasonable doubt. As a result the defendant requests that his conviction be overturned.

In The Supreme Court Of The State Of Delaware

State of Delaware                    I.D. # 0306015699
        v.
Jason A. Hainey
            Defendant                    motion to Amend

Comes Now, Jason A. Hainey, Pro Se, ( Hereafter referred to as
the defendant ) Pursuant to Super. Ct. Crim. Rule 61 (B) (6),
Submits this "Motion to Amend". Defendants motion for Post
Conviction Relief previously filed 10/9/07. In support the
defendant offers the following:

## Facts

1.) On 6/15/06 defendant, filed a motion for P.C.R. under rule 61
2.) After Recieving defense counsel's affidavit of 8/23/06 + States
reply brief of 1/31/07 The defendant had cause to amend
his P.C.R. 61 in this matter + did so on 5/11/07, (see
A-29 docket sheet showing motion to amend was sent to court)
the amended motion was never denied/granted or even acknowledged
before or during the courts 9/24/07 denial of the defendants
P.C.R. 61. (see A-29) Therefore the defendant Resubmits his
amended motion for the supreme courts decision.
3.) The defendant is unskilled in the area of law + is Pro Se
Pro Se pleadings are to be liberally construed/Interepted.
4.) The court pursuant to Del. Super. Ct. Crim. Rule 61(B) (6), +
Del. Super Ct. Civil Rule 15, clearly directs the liberal granting

Pg. 32

of amendments, even <u>After</u> a response has been filed..... "By leave of court, which shall be freely given when justice so requires." In further support the defendant offers:

A.) Motion to Amend is not brought in bad faith & includes the defendants final efforts to cure any deficiencies in the motion for P.C.R 61 before the court.

B.) Defendant asserts there is no prejudice to the partys' involved.

C.) That as a direct result of ineffective assistance of counsel the defendant suffered a miscarriage of justice that undermined the legality, reliability, integrity & fairness of the proceeding leading to the defendants judgment of conviction.

D.) Defendant is actually Innocent, legally Innocent, of the charged offenses.

E.) That prejudice amounting to manifest injustice exist, & these claims, & facts must be evaluated by the court & written reasons given in evaluation of these claims. See: <u>Semick v. State Del. Supr.</u>, 451 A.2d 1155 (1982); <u>Allen v. State, Del. Supr.</u> 509 A.2d 87,88 (1986); <u>Albury v. State, Del. Supr.</u> 551 A.2d 53,58 (1988)

Claims/Grounds in Support

VI. Appellate counsel was ineffective as he failed to present the facts, or argue based upon the facts reflected in the record; counsel also failed to present the arguments outlined in these amended claims; this miscarriage of justice undermined the legality, Reliability, integrity & fairness of the proceedings leading to the defendants judgment of conviction.

This claim is not Procedurally barred, as this is a colorable claim that there was a miscarriage of justice that undermined

Pg. 33

the fundamental legality, reliability, integrity & fairness of the proceedings leading to the judgment of conviction in accordance with Super. Ct. Crim. R. 61 (i) (5) The due process clause of the 14th amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as a matter of Right. See: Evitts v. Lucey, 469 u.s. 387 (1985); Erb v. State, 332 A.2d 137 (Del. 1974) ( Holding defense counsels ineffective prosecution of appeal required the court to deny the states motion to dismiss appeal where defense counsel failed to be diligent in prosecuting defendants appeal; The state is not permitted to benefit from defense counsels ineffective representation. ) Appellate counsel failed to argue, or even present all of the facts & also failed to raise other state & federal constitutional issues that were likely to succeed, despite repeated efforts by the defendant to meet with counsel concerning direct appeal that were ignored. (see: A-30 dated 3/14/05, 6/8/05 & 7/20/05 docket sheet Showing letters written to counsel & court concerning counsels neglect.)

**VII** Appellate counsel failed to present the fact or argue that the prosecution used misleading/Perjured testimony & misrepresented evidence to convict the defendant violating the defendants 5th, 6th, & 14th amendments, Right to due process, effective assistance of counsel & a fair trial.

Counsels failure to raise this issue fell below an objective standard of reasonableness & caused actual prejudice to the defendant. Counsel should have known that, this issue had a Reasonable likelihood of success before the Del. Supreme Court, as the ~~defendants~~ states actions violated the defendants state

+ federal constitutional rights. Counsels performance in this case fell below an objective standard of reasonableness & was not sound strategy, when evaluated from counsels perspective at the time & in light of the totality of the circumstances. See: lockhart v. Fretwell, 506 u.s 364 (1993); Kimmelman V. Morrison, 477 u.s 365 (1986); Strickland v. Washington 466 u.s 668 (1984) "A system of appeal as of right is established precisely to assure that only those who are validly convicted have their freedom drastically curtailed. a state may not extinguish has been violated." Evitts v. lucey, 469 u.s at 399-400 (1985)

## Argument for Ground VII

Counsel failed to present the fact or argue that prosecution used misleading/perjured testimony & misrepresented evidence to convict defendant. This claim should not be procedurally barred as this is a colorable claim that there was a miscarriage of justice that undermines the fundamental legality, reliability, integrity & fairness of the proceedings leading to the judgment of conviction in accordance with Super. Ct. Crim. R. 61 (i) (5)

On the date of 2/3/04 detective Spillan testified during a balancing analysis to determine relevancy of evidence, that he found a gun during the search of state witness Earl Evans apt. in response to an attempted robbery. (which is a seperate incident from which defendant is now charged) Because of this testimony the trial judge allowed the gun in question to be admitted as evidence during trial, under the assumption that Evans would be able to link the defendant to the gun as detective Spillan alleged. See A-11 2/3/04 TS. pg. 35 for Spillan alleging Evans told him gun

Pg. 35

was defendants & see A-11 2/3/04 T.S. pgs. 47-57 for judges ruling as a result, of that testimony.) This testimony was later proved misleading/Perjured when Evans testified that he never told police who the gun belonged to upon its discovery. (See A-12 2/3/04 T.S. pgs 75-76.) The defendant contends that once state witness Earl Evans testified that he never said who the gun in question belonged to upon its discovery, defense counsel should have objected to the offering of the gun as evidence because the sole link for which the gun had been admitted had been destroyed. Had it not been for detective Spillan's misleading/Perjured balancing analysis testimony, there would have been absolutely no reason to believe Evans would link the defendant to the gun, & if there is no reason to believe Evans would link the defendant to the gun, there are no grounds in which to make the gun admissible, & had the gun been inadmissable there is a reasonable probability that the jury may have rendered a different verdict. Especially in light of the case being so close. (jury sent note stating that they were deadlocked 6-6 after 2 days) (See A-22 2/11/04 T.S. pgs 2-9) "A verdict or conclusion only weakly supported by the record is more likely to have been effected by errors than one with overwhelming record support." Id at 696. 104 S.ct

Defendant argues that by counsel not contesting the misleading/Perjured testimony that in turn allowed a gun that had no established nexus to be admitted as evidence, & by allowing the prosecutors misconduct to go uncontested was a deficient performance that prejudiced the defendant. It cannot be said with absolute certainty that had counsel objected to these descrepencies the

outcome of the trial would have been the same.

"A new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury." See Id. at 154, 92 S.ct 766

False testimony case involve not only "Prosecutorial misconduct" but also "a corruption of the truth-seeking function of the trial process." See US v. Agues Supr. 427 US at 104, 96 S.ct at 2397 In, Napue v. Illinois 360 US. 264, 79 S.ct. 1173, the supreme court made it clear in no uncertain terms that due process is violated when the prosecutors obtain a conviction with the aid of false evidence which it knows to be false + allows to go uncorrected. It is immaterial whether or not the prosecution consciously solicited the false evidence. It is also immaterial whether the false testimony directly concerns an essential element of the Governments proof or whether it bears only upon the credibility of the witness, as the court explained in Napue "the jury's estimate of the truthfulness + reliability of a given witness may well be determinative of guilt or innocence, + it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendants life or liberty may depend." 360 US at 269 79 S.ct 1177.

Defendant contends that the state had to know perjured/ misleading testimony was given once state witness Evans denied ever telling the police who the gun in question belonged to. Evans directly contradicted detective Spiller's testimony + directly contradicted the basis for which the gun was introduced, yet the state never moved to correct or remedy this discrepancy + defense. Counsel never objected to this blatant prejudice nor argue

<u>Pg. 37</u>.

on direct appeal this misscarriage of justice violating the defendants right to effective assistance of counsel, due process + a fair trial.

The court is not the body which, under the consitation, is given the responsibility of deciding guilt or Innocence. The jury is that body, + again under the constitution, the defendant is entitled to a jury that is not laboring under a state sanctioned false impression of material evidence when it decides the question of guilt or Innocence with all of it Ramifications. In this case, in which credibility weighed so heavily in the balance, it cannot be concluded that had the unlinkable gun remained inadmissable the jury would have still found that the states case + the defendants guilt had been established beyond a reasonable doubt. Therefore the defendant respectfully requests that his conviction be reversed + remanded for a new trial.

## Conclusion

Based upon the arguments presented herein, along with the facts + law which support said arguments, the defendant respectfully asks the court to reverse his conviction.

Date: _____

Jason Harvey #383182
Jason Harvey #383182
Delaware Correctional Center
1181 Paddock Rd.
Smyrna, DE 19977

A - 33

IN THE SUPREME COURT OF THE STATE OF DELAWARE

JASON HAINEY,                    )
                                )
        Defendant Below,        )
        Appellant,              )
                                )   No. 252,2004
v.                              )
                                )
STATE OF DELAWARE,              )
                                )
        Appellee.               )

COPY

---

**DEFENDANT BELOW APPELLANT
JASON HAINEY'S OPENING BRIEF**

---

ON APPEAL FROM THE SUPERIOR COURT
OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY
NO. 0306015699

Jerome M. Capone                Michael C. Heyden
No. 742                         No. 2040
1823 W. 16th Street             1201 King Street
Wilmington, DE  19806           Wilmington, DE  19801
(302) 654-3260                  (302) 654-0789
Attorney for Jason Hainey       Attorney for Jason Hainey

Dated:  March 8, 2005      A-33

A33

## TABLE OF CONTENTS

|  | Page |
|---|---|
| TABLE OF CITATIONS | i |
| NATURE AND STAGE OF THE PROCEEDINGS | 1 |
| SUMMARY OF ARGUMENTS | 2 |
| STATEMENT OF THE FACTS | 3 |

ARGUMENTS

I.   THE JURY'S VERDICT WAS NOT SUPPORTED
     BY SUFFICIENT EVIDENCE                                   8

II.  THE TRIAL JUDGE COMMITTED PLAIN ERROR
     WHEN HE DID NOT GIVE A GETZ INSTRUCTION
     WHEN THE STATE INTRODUCED EVIDENCE THAT
     THE DEFENDANT POSSESSED A 38 CALIBER RE-
     VOLVER AT THE TIME OF HIS ARREST IN AN
     UNRELATED INCIDENT.                                      13

III. THE TRIAL JUDGE SHOULD HAVE PERMITTED
     EVIDENCE OF MONIA TANN'S JUVENILE BURGLARY
     CONVICTION.                                              18

CONCLUSION                                                    22

A-33

## TABLE OF CITATIONS

                                                              **Page**

*Farmer v. State*
Del. Supr., 698 A2d 946 (1997)                                  16

*Getz. v. State*
Del. Supr., 538 A2d 726 (1988)                                  16

*Harris v. State*
Del. Supr., 695 A2d 239 (1997)                                  20

*Lopez v. State*
Del. Supr., 2004 WL 2743545                                      8

*Monroe v. State*
652 A2d 560 (Del. 1995)                                         11

*Rash v. State*
6112 A2d 159 (1992)                                             20

*Rhodes v. State*
Del. Supr., 825 A2d 239 (2003)                                  19

*State v. Jason Hainey*
Del. Super., J. Carpenter 1/20/2004
No. 0306015699                                                  14


*D.R.E. 609(d)*                                                 18

A-33

## SUMMARY OF ARGUMENTS

I.    THE JURY'S VERIDCT WAS NOT SUPPORTED BY
      SUFFICIENT EVIDENCE.

II.   THE TRIAL JUDGE COMMITTED PLAIN ERROR WHEN
      HE DID NOT GIVE A GETZ INSTRUCTION WHEN THE
      STATE INTRODUCED EVIDENCE THAT THE DEFENDANT
      POSSESSED A 38 CALIBER REVOLVER AT THE TIME
      OF HIS ARREST IN AN UNRELATED INCIDENT.

III.  THE TRIAL JUDGE SHOULD HAVE PERMITTED EVIDENCE
      OF MONIA TANN'S JUVENILE BURGLARY CONVICTION.

## $A$-33

### I.   THE JURY'S VERDICT WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE.

#### Standard and Scope of Review

Viewing the evidence in the light most favorable to the State, could a rational trier of fact have found the essential elements of the crime beyond a reasonable doubt? *Lopez v. State*, Del. Supr., 2004 WL 2743545.

#### Argument

A couple of years before the murder, Mercer, Hainey and Tann had all worked at Citibank in the Corporate Commons complex in New Castle. A77. Evans had never met Mercer.  Tann and Evans described the murder as a robbery committed by Hainey which had gone awry.

However, since Mercer knew Hainey from Citibank, and since Tann worked at Citibank at the same time as Mercer and Hainey, it is unlikely that either Hainey or Tann could enter the Mercer's house undisguised and rob Mercer without being identified.  So, if this was just going to a robbery, as Tann and Evans claimed, it had to be committed by someone with whom Mercer was not familiar.  That logic would exclude Tann and Hainey.

The defense theory of the case was that Tann and Evans carried out the robbery. Tann called Mercer up to find out if he was home, drove Evans over to Mercer's house, gave

8

## A-33

Evans his gun, and sat in the car as Evans went in and
botched the robbery. Since they were both culpable, Tann
as the accomplice and Evans as the principle, they
developed a story to throw the blame on someone else should
the need ever arise.

The story which Evans and Tann gave the police had
three parts – a) the events leading up to the murder; b)
the details of the murder; and c) the events after the
murder. It was in the State's interest to corroborate each
part of their story. Record proves that only 1 of 3 parts of their story was corroborated.

According to Evans, on the day of the murder, Evans,
Tann and Hainey had all driven up to New Jersey at some
point during the day to pick up a guy named Fly. They were
using a car rented by Tann. Evans was never able to provide
any other name for Fly, or an address or phone number. A36-
41.

They drove back to Tann's house in Wilmington. The
trip to New Jersey lasted 2 ½ to 3 hours. After they got
back to Tann's house, Evans and Fly went to buy some
marijuana while Hainey and Tann left to go someplace in
Tann's car. A little while later, Hainey and Tann returned
to Tann's house where they picked up Evans and Fly and
headed back to New Jersey where they dropped off Hainey and
Fly. Evans testified that while they were driving, Hainey

$A-33$

admitted that he had just killed Mercer. Evans  described
the seating arrangement in the car as Tann driving, Evans
directly behind Tann, Hainey in the front passenger seat,
and Fly directly behind Jason. A35-39.

Tann's testimony was significantly different.  He said
that on the afternoon of August 21st, he was at his
apartment with Hainey, Evans and a guy named Phil Kizzee
aka Free (hereinafter referred to as "Free/Kizzee").  At
this point, it is important to note that Evans knows
Free/Kizzee.  Police Detective Barry Mullins testified that
he showed Evans a photograph of Free/Kizzee and that **Evans
told him that he knew Free/Kizzee but that Free/Kizzee was
not Fly.  Fly and Free/Kizzee were two different people.**
A103; A72.

Tann said that Hainey called Michael Mercer, and that
he and Hainey then took a ride over to Mercer's house.  On
the ride over, Hainey showed Tann that he had Tann's 38
revolver in his possession.  Tann said he parked on
Mercer's street and waited while Hainey went in Mercer's
house.  A short while later, Hainey came out and told Tann
that he had shot Mercer.  They then drove back to Tann's
apartment and picked up Free/Kizzee and Evans.  They then
drove to New Jersey where they dropped of Free/Kizzee.

$A - 33$

Tann, Evans and Hainey then returned to Wilmington.   A63-70.

Aside from the fact that Tann's identification of the fourth person was Free/Kizzee while Evans' identification was a different person – Fly – the State never called Fly or Free/Kizzee as witnesses to corroborate the testimony of Tann and Evans.

In addition to the fact that their stories were so substantially inconsistent, the evidence also showed that both Evans and Tann had the time and opportunity to concoct their story.   A71.   In fact, they even found themselves together, briefly, in cell block during the trial.   During their encounter, Evans asked Tann if he was going to "do what they want us to do?" A69.   The jury also heard evidence that, at the time they came to court to testify, Tann and Evans were looking at significant jail time on other robbery charges.   A78-101; A42.

The Defendant submits that no rational trier of fact could have determined that the have found the essential elements of the crime beyond a reasonable doubt based on the testimony of Tann and Evans.   *Monroe v. State*, 652 A2d 560 (Del. 1995).

The jury retired to deliberate on February 9, 2004 at 1:40 PM..   At 10:30 AM on February 11, 2004, they sent out

11

## $A - 33$

a note that they were deadlocked at 6-6.    At 3:30 PM on

February 12, 2004, they returned a guilty verdict on all

counts.

## A-33

II.  **THE TRIAL JUDGE COMMITTED PLAIN ERROR WHEN
HE DID NOT GIVE A *GETZ*[2] INSTRUCTION WHEN THE
STATE INTRODUCED EVIDENCE THAT THE DEFENDANT
POSSESSED A 38 CALIBER REVOLVER AT THE TIME
OF HIS ARREST IN AN UNRELATED INCIDENT.**

### Standard and Scope of Review

The Court should use the plain error standard in
assessing this argument.

### Argument

On September 12, 2001,  the New Castle Police were
conducting an investigation in to an attempted robbery case
which occurred near Abbey Walk Apartments.  The victims
told police that they were assaulted by two men carrying
hand guns.  The police went to the apartment of Earl Evans
and Wayne Hall and obtained permission to search.  In the
living/dining area they found a plastic bag which contained
a 38 caliber revolver.  Near the bag were clothes which
Evans said belonged to Jason Hainey.  Hainey was located in
a back bedroom.  Hainey and a man named Earl Wright were
arrested for these crimes.  A53-55.

When Evans eventually told the police about the Mercer
murder, he told them that they had already seized the
murder weapon during the Abbey Walk attempted robbery
investigation in September 2001.  Police sent bullet

---

[2] *Getz v. State*, 538 A2d 726 (Del. 1988)

13

A-33

fragments taken from the murder scene along with this gun

to the ATF lab.  The ATF ballistics examiner could not say

that the gun fired any of the bullets found at the murder

scene, but told the police that the gun had 6 lands and

grooves and the bullets were shot by a gun with 6 lands and

grooves.  He also said that the gun could have fired the

same caliber bullet found at the crime scene. A11-33.

As a result of a pretrial hearing, the trial court

excluded the State's ballistics evidence, described above.

State v. Hainey, Del. Super. J. Carpenter (1/20/04) No.

0306015699.  However, the State made several re-arguments

during the trial.  Finally, while the issue was being

debated the last time, the defense advised that judge that

they would not object to evidence that the gun found at

Evans apartment was the same caliber as the gun which shot

Mercer.  The judge did not allow evidence regarding the

lands and grooves, nor did he allow the jury to be told

that the gun was seized as part of a robbery investigation.

A11-33; A104-126; A46-50; A56-60.

The jury heard that Hainey had been staying at Evans

apartment and the gun was found near his belongings. Evans

testified that he told the police that the bag in which the

police found the gun was Jason Hainey's bag.  A51.  The

police officer who investigated the Abbey Walk robbery

14

## A-33

testified that he thought the gun had been used by Earl
Wright during the Abbey Walk robbery, but that Evans told
him the gun was Hainey's. A54. Tann was shown the gun
during his testimony and identified it as the gun Hainey
had when Mercer was killed. Other than Tann's testimony,
there was no evidence linking this gun to the Mercer
murder.

The evidence regarding the police search of Evans'
apartment was sanitized to the point where the jury did not
hear that the search was being conducted as part of another
robbery investigation. A35. However, the jury must have
been aware that the search for the gun was part of another
police investigation.

The defense did not ask for a *Getz* instruction when
the gun was introduced, nor during the prayer conference,
therefore, this argument must be judged by the plain error
standard. However, since the fact that introduction of the
gun into evidence had such little probative value for the
State (since it was not linked to the murder except through
Tann's testimony), and because this was such a close case,
the jury should have been instructed on the limited purpose
for its admission (i.e., identity) and should also have
been instructed that the gun could not be used to show that

15

## A-33

Hainey was a bad person because he inferentially possessed the gun.

*Getz v. State*, Del. Supr., 538 A2d 726 (1988), set out a five step test for determining if evidence of other bad acts should be admitted:

> 1. The evidence must be material to an issue in dispute in the case;
> 2. The evidence must be for a purpose sanctioned by Rule 404(b);
> 3. The other crimes must be proved by evidence that is plain, clear and conclusive;
> 4. The other crimes must not be too remote in time; and
> 5. Because such evidence is admitted for a limited purpose, the jury should be instructed about the purpose for which it is being admitted.

*Farmer v. State*, Del. Supr., 698 A2d 946 (1997) (Evidence that a defendant, charged with a shooting, had a firearm in his possession is surely probative if that that firearm is linked to the criminal act.  But without a satisfactory evidentiary link, such evidence carries the risk that the jury may associate mere ownership of a firearm with disposition to use it.")

Even with the Defendant's concession that the gun was admissible under Rule 404(b), there remained a need for a *Getz* instruction.  In this very close case, the subject never came up, and the fifth requirement (jury instruction)

A-33

of the *Getz* analysis was never met, amounting to plain

error.

## III. THE TRIAL JUDGE SHOULD HAVE PERMITTED EVIDENCE OF MONIA TANN'S JUVENILE BURGLARY CONVICTION.

### Standard and Scope of Review

The Court must determine whether the trial judge abused his discretion.

### Argument

To attack the credibility of Monia Tann, the defense sought to introduce evidence that Tann was convicted of Burglary as a juvenile. Using evidence of other crimes to prove character is controlled by D.R.E. 609. The rule states that evidence of juvenile adjudications is *generally not admissible*. However, such evidence may be admissible to attack the credibility of an adult if the court is satisfied that the evidence is necessary for a fair determination of the issue of guilt or innocence. D.R.E. 609(d). The Rule therefore indicates situations may arise when a witnesses juvenile conviction should be admissible. The Defendant submits that this case is one of those situations.

In the instant case, the State's case was premised entirely on the credibility of Earl Evans and Monia Tann. The trial court recognized that "[Tann's] credibility is key in regards to the matter [of guilt or innocence]."

18

$A-33$

That very consideration formed the basis for the trial court's decision to allow evidence of a prior felony conviction of "eluding the police", even though the Court was "not confident" it was a crime of dishonesty. A62.

The Defendant submits that when the credibility of a prosecution witness is so central to the jury's determination, it is an abuse of discretion to limit a defendant's ability to fairly attack the credibility of the witness.  Evidence of prior felonies and crimes of dishonesty are recognized by rule and case law as pertinent to issues of credibility.  In the instant case, Tann's juvenile conviction for burglary was not an isolated teenage indiscretion. He had adult convictions for possession of marijuana conviction (not admissible), receiving stolen property conviction (admissible) and an eluding the police conviction (admissible). A62.  At the time of his testimony, where Tann was awaiting sentencing and facing over 200 years in jail, the trial court's decision to protect Tann's Family Court adjudication for burglary does not seem reasonable in light of the importance of Tann's credibility to the case.

The recent case of *Rhodes v. State* is distinguishable. Del. Supr., 825 A2d 239 (2003).  In that case, the witness in that case was the victim of a home invasion robbery

19

## $A-33$

which occurred in 2001. The victim, a paraplegic, had a 1994 conviction for burglary in Family Court in 1994 and no crimes in the intervening period. Though he was an important State's witness, under those circumstances the Court affirmed the trial judge's decision not to allow introduction of his Family Court conviction. In *Harris v. State*, Del. Supr., 695 A2d 239 (1997), the Court upheld the trial judge's decision not to allow evidence of a witnesses juvenile conviction. In Harris, the witness in question was a person on the street who happened to witness the crime, and not a coconspirator. The Court noted that the witness's credibility was therefore not a real issue in the case. Therefore, the Court concluded that since the credibility of the witness was not central to his testimony, the trial judge had a basis for excluding the witnesses Family Court conviction. See, also: *Rash v. State*, 6112 A2d 159 (1992).

In the instant case, Tann was not indicted as coconspirator. However, even by his own testimony, he probably could have been convicted as a codefendant. In other words, Tann's credibility was more important than that of a noninvolved fact witness. As the trial judge noted, his credibility was "key to this matter."

20

A-23

If a juvenile conviction is not admissible when the credibility of a witness is "key" to the issue of guilt or innocence, then the defendant cannot envision any case when the juvenile conviction of a witness will ever be admissible.

A-33

## CONCLUSION

Based upon the arguments presented herein, along with the facts and law which support said arguments, the Defendant respectfully asks the Court to reverse his conviction.

Dated:   March 8, 2005

JEROME M. CAPONE
No. 742
1823 W. 16th Street
Wilmington, DE 19806
(302) 654-3260
Attorney for Appellant
Jason Hainey

MICHAEL C. HEYDEN
No. 2040
1201 King Street
Wilmington, DE   19801
(302) 654-0789
Attorney for Appellant
Jason Hainey

A-33

**IN THE SUPREME COURT OF THE STATE OF DELAWARE**

| | |
|---|---|
| JASON HAINEY, | ) |
| | ) |
| Defendant below, | )   No.   252, 2004 |
| Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| STATE OF DELAWARE, | ) |
| | ) |
| Plaintiff below, | ) |
| Appellee. | ) |

### AFFIDAVIT OF SERVICE

BE IT REMEMBERED that on this 8TH day of March, 2005, personally appeared before me, a Notary Public for the State and County aforesaid, Cathlyn Cantelmi, legal secretary to Jerome M. Capone, who being by me duly sworn did depose and say as follows:

1.    That she caused two copies of Appellant Jason Hainey's Opening Brief and Appendix in the above-captioned matter to be hand delivered to:

> Loren C. Meyers, Esquire
> Deputy Attorney General
> Department of Justice
> State Office Building
> 820 N. French Street
> Wilmington, DE  19801

Cathlyn Cantelmi

SWORN TO AND SUBSCRIBED by me the day and year aforesaid.

JEROME M. CAPONE
ATTORNEY AT LAW

A - 34

## IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JASON HAINEY, | § | |
| | § | No. 252, 2004 |
| Defendant Below, | § | |
| Appellant, | § | |
| | § | |
| v. | § | Court Below: |
| | § | Superior Court |
| STATE OF DELAWARE, | § | of the State of Delaware |
| | § | in and for New Castle County |
| Plaintiff Below, | § | Cr. I.D. No. 0306015699 |
| Appellee. | § | |

Submitted: June 8, 2005
Decided: July 5, 2005

Before **STEELE**, Chief Justice, **BERGER** and **JACOBS**, Justices.

Upon appeal from the Superior Court. **AFFIRMED**.

Jerome M. Capone, Esquire (argued), of Wilmington, Delaware, and Michael C. Heyden, Esquire, of Wilmington, Delaware, for Appellant.

John Williams, Esquire, of the Department of Justice, Dover, Delaware, for Appellee.

**BERGER**, Justice:

This is Jason Hainey's direct appeal from his convictions of first degree murder and several related charges. He argues that there was insufficient evidence to support the jury's verdict. In addition, he challenges: (i) the trial court's failure to give a limiting instruction with respect to evidence that Hainey possessed a revolver at the time of a police search in an unrelated incident; and (ii) the trial court's decision to exclude evidence of a witness's prior conviction. After carefully reviewing the record, we are satisfied that there is sufficient evidence to support the convictions and that there was no abuse of discretion or plain error in the trial court's evidentiary rulings. Accordingly, we affirm.

Factual and Procedural Background

On August 21, 2001, Hainey was "chilling" at Monia B. Tann's house, along with Earl Evans, and another man, who was identified as "Fly" or "Phil." Hainey called the victim, Michael Mercer, and arranged to buy a CD from him. Tann then drove Hainey to see Mercer, who was living at his fiancé's house. Before leaving Tann's house, Hainey took Tann's Special Cobra handgun from Tann's kitchen cabinet. En route, Hainey told Tann that he was going to rob Mercer.

When they arrived at Mercer's house, Tann waited in the car for about ten minutes. During that time, Tann heard two noises, although he did not think they

2

sounded like gun shots. Hainey returned to the car and told Tann that Mercer had reached for the gun and that Hainey shot him.

At the time of the shooting, Mercer's fiancé's teen-aged daughter, Talirra Simmons, was in her bedroom. When she heard the gunshots, she hid in her closet, and did not come out until she heard someone leaving. She found Mercer lying on the floor and ran to a neighbor's home to call the police. The autopsy established that Mercer had been shot six times, and that three of those shots were fired into his back.

After the shooting, Hainey and Tann drove back to Tann's house. They picked up the other two men, and then drove to New Jersey for a few hours. At some point that evening or the next day, Hainey returned Tann's gun and placed it back in the kitchen cabinet. The day after the shooting, Hainey, Tann, Evans, and Evans' roommate, Wayne Anthony Hall, were talking about a newspaper article describing Mercer's death. Hainey told them that he was relieved because there was not much information in the article.

About a week later, after the police learned that Mercer received a call from Tann's house on the afternoon of the murder, the police went to Tann's house to investigate. By that time, however, the murder weapon was gone. On September 12, 2001, the police discovered the gun at Evans' house, during a search undertaken in connection with an unrelated criminal investigation. The gun was found in a room

3

that Hainey had been occupying, together with some of Hainey's clothing. The police did not immediately connect the gun found in Evans' house with the Mercer killing. In March 2003, however, when Evans was arrested for robbery, Evans told the police that the gun they had taken when they searched his house in 2001 was the Mercer murder weapon.

At trial, Tann and Evans were the principal witnesses for the prosecution. Both men have criminal records and stood to benefit from cooperating with the State. In addition, their stories were not entirely consistent. Hainey defended the case by trying to establish that Tann and Evans were the perpetrators and that they made up the story about Hainey to protect themselves. The jury deliberated for almost two days before sending a note saying that they were deadlocked at 6 - 6. The following day, however, they reached a verdict and found Hainey guilty on all charges. After the penalty phase, the jury recommended against the death penalty by a vote of 7 - 5, and the trial court imposed a life sentence. This appeal followed.

Discussion

Hainey challenges the sufficiency of the evidence as to all of his convictions. He bases this argument on the inconsistencies in the witnesses' accounts and on the fact that the jury found it difficult to reach a verdict. Because it does not appear that Hainey properly preserved this issue by moving for a judgment of acquittal in the trial

4

court, our standard of review is plain error.[1] Even under a *de novo* standard, however, we find that there is sufficient evidence for a rational finder of fact, viewing the evidence in the light most favorable to the State, to find Hainey guilty beyond a reasonable doubt.[2]

Tann testified that: (i) Hainey took Tann's gun; (ii) they drove to Mercer's house; (iii) Hainey told him that Hainey was planning to rob Mercer; (iv) while waiting outside, Tann heard two noises from inside the house; and (v) when Hainey got back in the car, he said that he had shot Mercer. Evans did not drive to the house with Tann and Hainey, but he was at Tann's house when the two men returned. Evans testified that: (i) during the car ride to New Jersey after the shooting, Hainey told him that he pulled a gun on Mercer, but that Mercer grabbed for the gun and it went off; (ii) Hainey also told Evans that he put five more bullets into Mercer because he did not want to leave any witnesses; and (iii) they were driving to New Jersey in order to give Hainey an alibi. There was additional, corroborating testimony from Anthony Wayne Hall, Evans' roommate. Hall testified that, the day after the murder, Evans showed him a newspaper article about the shooting and told him that Hainey had done it. In addition, Hall testified that Hainey had been staying at his house when

---

[1] *Liket v. State*, 719 A.2d 935, 939 (Del. 1998).

[2] *Ibid.*

5

the police discovered the gun among Hainey's possessions on the living room floor. We are satisfied that a rational trier of fact could have believed this testimony, which was sufficient to establish Hainey's guilt on all charges.

The fact that the jury deliberated for a long time, and that it was deadlocked at one point during the deliberations, does not change the analysis. Where, as here, there is competent evidence supporting a guilty verdict, this Court does not weigh that evidence or evaluate the inconsistencies in witnesses' stories. That is the jury's function.[3]

Hainey next argues that the trial court committed plain error by failing to give a limiting instruction, as mandated in *Getz v. State*.[4] The gun that was found at Earl's house approximately one month after Mercer's murder was introduced into evidence. The jury heard that the gun was discovered during a search of Evans' house. In addition, Evans testified that it was Hainey's gun, and Tann testified that it was his gun, but that Hainey used it to shoot Mercer. Hainey made no request for a limiting instruction at trial. Now he argues that the trial court, *sua sponte*, should have instructed the jury that it could not use the fact that Hainey may have possessed the gun as evidence that Hainey is a bad person.

---

[3]*Zutz v. State*, 160 A.2d 727, 729 (Del. 1960).

[4]538 A.2d 726 (Del. 1988).

6

Plain error is error that is "so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[5]  Generally, the failure to give a limiting instruction in relation to prior bad acts is not plain error.[6]  Hainey argues that, because this was a close case, the general rule does not apply.  We disagree.  First, the mere fact that Hainey had possession of Tann's gun is not evidence of a bad act or crime.  Thus, it is not clear that a *Getz* limiting instruction would have been required even if Hainey had requested it.  Second, assuming that a limiting instruction should have been given, because the jury could infer that the police were investigating another crime that Hainey might have committed, we find that the failure to give such an instruction did not jeopardize the fairness of Hainey's trial.  There was testimony that Hainey used the gun to murder Mercer.  The possibility that Hainey might have committed another, unidentified, crime was not so prejudicial as to require reversal.

Finally, Hainey contends that the trial court abused its discretion by excluding evidence of Tann's juvenile burglary conviction.  Hainey points out that Tann's testimony was critical to the State's case, and argues that he should have been allowed to impeach Tann's credibility with evidence of his criminal record.  The trial

_____

[5] *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986).

[6] *Williams v. State*, 796 A.2d 1281, 1290 (Del. 2002).

7

court agreed that Tann's credibility was "key," and admitted evidence of two adult

felony convictions in Virginia as well as evidence that Tann was facing two sets of

robbery charges in Delaware. After noting that juvenile criminal records generally

are inadmissible, the trial court decided that evidence of Tann's juvenile record was

not necessary "for a fair determination of [Hainey's] guilt or innocence."[7]

We conclude that the trial court acted well within its discretion in excluding

Tann's juvenile record. The important facts, for impeachment purposes, were that

Tann had a history of committing crimes of dishonesty, and that he had a strong

incentive to testify in a way that pleased the State because of the pending charges.

The jury heard evidence of Tann's adult criminal record, and knew that he was facing

many years of incarceration if convicted of the two robbery charges then pending

against him. Little, if anything, would have been gained if the jury also heard that

Tann had a juvenile record.

## Conclusion

Based on the foregoing, the judgments of the Superior Court are affirmed.

---

[7]D.R.E. 609 (d).

8

A-34

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| v. | ) | ID No. 0306015699 |
| | ) | |
| JASON HAINEY, | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: June 7, 2007
Decided: September 24, 2007

**On Defendant's *Pro Se* Motion for Postconviction Relief.  DENIED.**

## <u>ORDER</u>

Allison Texter, Deputy Attorney General, Wilmington, Delaware 19801.

Jason Hainey, Delaware Correctional Center, 1181 Paddock Road, Smyrna, Delaware 19977. *Pro se.*

**CARPENTER, J.**

A-34

On this 24th day of September 2007, upon consideration of Defendant's Motion for Postconviction Relief it appears to the Court that:

1.     On June 15, 2006 Jason Hainey ("Defendant") filed a *pro se* Motion for Postconviction Relief pursuant to Superior Court Criminal Rule 61 ("Rule 61"). For the reasons set forth below, Defendant's Motion for Postconviction Relief is **DENIED**.

2.     The Defendant was indicted and charged with two counts of First Degree Murder, Attempted First Degree Robbery, and two counts of Possession of a Firearm During the Commission of a Felony. Following a jury trial, the Defendant was convicted of all counts. The jury recommended a life sentence by a vote of 7-5, and the Court sentenced the Defendant on May 14, 2004 to life imprisonment. Upon subsequent appeal, the Delaware Supreme Court affirmed Mr. Hainey's convictions and a mandate was issued on July 28, 2005. Thereafter, the Defendant filed this timely motion for postconviction relief. At the Court's request, Defendant's trial attorneys, Jerome M. Capone, Esquire, and Michael C. Heyden, Esquire ("Counsel"), filed affidavits in response to the claims of ineffective assistance of counsel.

3.     Mr. Hainey states fourteen grounds for relief in his motion:

      1. The Court abused its discretion by admitting evidence without an established nexus to the crime.

2

2. The Court abused its discretion by suppressing the testimony of a ballistics expert.

3. The Court abused its discretion by excluding impeachment of a witness with a juvenile burglary adjudication

4. Counsel was ineffective for failing to interview and subpoena a key witness.

5. The prosecutor's use of misleading and perjured testimony amounted to prosecutorial misconduct.

6. Counsel was ineffective because he failed to move for a judgment of acquittal.

7. The Defendant's right to a fair trial was unduly prejudiced by a witness's statement that Defendant was "locked up."

8. Mr. Hainey's right to confront the witnesses against him was violated when he was not able to cross-examine Corporal Whitmarsh, the author of a police report that conflicted with another witness's testimony.

9. The Court erred by allowing the prosecutor to argue an intentional murder theory, rather than reckless murder.

10. The Court abused its discretion when it admitted testimony linking a gun to the murder without conclusive evidence.

3

11. There was insufficient evidence to support the jury's verdict.

12. The Court erred in failing to *sua sponte* give a *Getz* instruction to the jury.

13. The prosecutor's misrepresentation of evidence amounted to misconduct.

14. The Court incorrectly instructed the jury on the charge of first degree murder.

4.    Before assessing the merits of Mr. Hainey's postconviction claim, the Court must determine whether the procedural requirements of Rule 61(i) have been met.[1] Rule 61 bars claims which the defendant failed to assert in prior proceedings leading to his judgment of conviction, unless cause and prejudice are shown by the movant.[2] Under this standard, several of the claims raised by Mr. Hainey in his motion are procedurally defaulted.

5.    As to grounds 5, 7, 9, 10, 13 and 14 listed above,  the Defendant failed to object to these issues at trial or to raise them on direct appeal, and is thus barred under Rule 61(i)(3) from raising them now.   Additionally, Mr. Hainey failed to show cause or prejudice in any of these claims.[3]

---

[1] *Bailey v. State*, 588 A.2d 1121, 1127 (Del. 1991); *Younger v. State*, 580 A.2d 552, 554 (Del. 1990)(citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)).

[2] Super. Ct. Crim. R. 61(i)(3).

[3] Mr Hainey claims counsel failed to discuss his options for appeal.  However, both Mr. Capone and Mr. Heyden state in their affidavits that appeal issues were discussed at trial and sentencing. Capone Aff., at ¶2; Heyden Aff., at ¶¶1-2.

4

6.    In ground 2, Mr. Hainey claims the trial court abused its discretion by granting the Defendant's own motion in limine to suppress the testimony of the state's ballistic expert. Counsel had no reason to raise this issue on direct appeal, and Mr. Hainey cannot meet the required showing of prejudice because he benefitted from having the suppression motion granted at trial. Thus, this claim too is procedurally defaulted.

7.    In ground 8, Mr. Hainey claims he was denied his right to confront the witnesses against him when he was not permitted to cross-examine Corporal Whitmarsh about a statement he made in a report indicating that he (Whitmarsh) found the murder weapon. It appears Mr. Hainey is asserting that he would have been allowed to present to the jury Corporal Whitmarsh's statement, and to point out its inconsistency with the testimony of Detective Spillan, who testified it was he who found the gun. Because this issue was not presented on the Defendant's direct appeal, he cannot claim it now. But there are two other problems with the Defendant's claim. First, Corporal Whitmarsh was never called to testify, but that was not caused by any ruling by the Court. A defendant cannot assert that he was unable to cross-examine a witness when that witness was never called to the stand. Without some obstacle that prevents Corporal Whitmarsh from testifying, the Defendant's right to confront under *Crawford* is not triggered. [4]    Additionally, Mr. Hainey makes no showing of

---

[4]*See generally Crawford v. Washington*, 541 U.S. 36 (2004).

cause and prejudice, as this inconsistency was thoroughly examined during the cross-examination of Detective Spillan and this dispute was presented to the jury. As such, this claim is therefore barred.

8.     Rule 61(i) also bars any ground for relief that was formerly adjudicated, unless the interest of justice requires reconsideration.[5]  A number of Mr. Hainey's grounds have already been presented and resolved either at trial or on direct appeal, including, the admissibility of the gun (ground 1); admissibility of a witness's juvenile robbery conviction (ground 3);  insufficiency of the evidence (ground 11); and the trial court's failure to give a *Getz* instruction to the jury (ground 12). Because Mr. Hainey's claims do not meet the narrow "interest of justice" exception, they are barred and do not warrant further consideration.[6]

9.     The remaining claims asserted by Mr Hainey are claims for ineffective assistance of counsel, and these claims are not barred by Rule 61.  Specifically, he sets forth two grounds: 1) counsels' failure to interview and subpoena a key witness, and 2) counsels' failure to move for a judgment of acquittal at trial.

---

[5] Super. Ct. Crim. R. 61(i)(4).  A claim can be formerly adjudicated in the proceedings leading to the judgment of conviction, in an appeal, in a postconviction proceeding, or in a federal habeas corpus proceeding. State courts are not required to relitigate in postconviction those claims which have been previously resolved. *Younger v. State*, 580 A.2d 552, 556 (Del. 1990), *Flamer v. State*, 585 A.2d 736, 745-46 (Del. 1990).

[6] In order to invoke the "interest of justice" provision of Rule 61(i)(4), a movant must show that "subsequent legal developments have revealed that the trial court lacked the authority to convict or punish him." *Flamer*, 585 A.2d at 746. Mr. Hainey's claims fail to meet this narrow exception.

6

10.    To establish a claim of ineffective assistance of counsel, a defendant

must meet the two-part test set forth in *Strickland v. Washington*.[7] Mr. Hainey must

show both that: 1) Mr. Capone's and Mr. Heyden's representation fell below an

objective standard of reasonableness, and 2) a reasonable probability exists that Mr.

Hainey would not have been convicted but for his trial counsels' error.[8]  Both of Mr.

Hainey's claims fail under the *Strickland* analysis.

11.    First, counsels' failure to interview and subpoena Phil Kizee does not

qualify as objectively unreasonable.[9]  Counsels' affidavits cites numerous attempts

to contact Mr. Kizee.[10]  Not only was Kizee unresponsive to counsel's requests, but

his criminal history made him a less than desirable witness. Thus, counsels' decision

not to subpoena Kizee was a tactical one. Second, even if counsels' conduct had been

deemed unreasonable, Mr. Hainey's claim does not satisfy the prejudice prong of

*Strickland*. Hainey alleges that Kizee's testimony would have contradicted that of the

---

[7]466 U.S. 668 (1984).

[8]*Wright v. State*, 608 A.2d 731 (Del. 1992), citing *Strickland v. Washington*, 466 U.S. 668 (1984) and *Albury v. State*, 551 A.2d 53, 58 (Del. Super. Ct. 1988).

[9] Phil "Free" Kizee was an acquaintance of Mr. Hainey who, according to trial testimony, was present when Mr. Hainey confessed to State's witnesses Tann and Evans that he killed Mr. Mercer. Mr. Hainey asserts in his motion that Kizee was listed as a witness for the State, but was never called to testify. Mr. Hainey then draws the conclusion that because Kizee was never called "it was obvious" that Mr. Kizee's story did not corroborate that of the other State's witnesses. Def. Mot., D.I. 78, Ground 4, at 4.

[10]Capone Aff., at ¶3. ("Hainey was not helpful in providing us with information about where we might locate Phil Kizee. . . Repeated phone calls were made to a New Jersey phone number believed to be Kizee's, and a message was left with a woman believed to be his mother. There was no response to these phone calls.  A letter was sent to a New Jersey address believed to be Kizee's.  There was no response to this letter."); Heyden Aff., at ¶2.

7

state's witnesses. While this is mere conjecture on Mr. Hainey's part, it is clear that if Kizee was found and testified, that his testimony would have placed Mr. Hainey in an even less desirable light, as he had told counsel that he and Kizee had been involved in similar armed robbery conduct in the past. [11] The potential danger of Kizee's testimony far outweighed any potential benefit. Thus, the Defendant's first ineffective assistance of counsel claim fails.

12.    Similarly, Mr. Hainey's contention that his counsel was ineffective for failing to move for acquittal pursuant to Rule 29 fails the *Strickland* test as it is not objectively unreasonable conduct. [12]    Counsel provide ample explanation in their affidavits for the decision not to move for acquittal.[13] In addition, the Court finds that even if the motion had been made, it would have been denied as the state had clearly established its burden when the evidence was considered in the light most favorable to them. Thus, Mr. Hainey cannot claim   prejudice under the second prong of *Strickland*, and this claim also fails.

---

[11]Capone Aff., at ¶3.

[12] Super. Ct. Crim. R. 29. ("The Court. . . shall order the entry of judgment of acquittal. . . if the evidence is insufficient to sustain a conviction. . .").

[13] "I did not make a Motion for Judgment of Acquittal because I did not think that we could meet the Rule 29 standard..." Capone Aff., at ¶3; "The motion in limine had been extensively briefed, argued and reargued. Inconsistencies in testimony do not mean that there is perjury. Credibility of the witnesses is in the province of the jury." Heyden Aff., at ¶3.

13.    For the foregoing reasons, Mr. Hainey's Motion for Postconviction Relief is hereby denied.

IT IS SO ORDERED.

Judge William C. Carpenter, Jr.

A-34

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| JASON HAINEY, | § |
| | § No. 538, 2007 |
| Defendant Below- | § |
| Appellant, | § |
| | § Court Below—Superior Court |
| v. | § of the State of Delaware |
| | § in and for New Castle County |
| STATE OF DELAWARE, | § Cr. ID No. 0306015699 |
| | § |
| Plaintiff Below- | § |
| Appellee. | § |

Submitted: March 28, 2008
Decided: March 31, 2008

Before **STEELE**, Chief Justice, **JACOBS** and **RIDGELY**, Justices.

## O R D E R

This 31st day of March 2008, upon consideration of the briefs on appeal and the record below, it appears to the Court that:

(1)    The defendant-appellant, Jason Hainey, filed an appeal from the Superior Court's September 24, 2007 order denying his motion for postconviction relief pursuant to Superior Court Criminal Rule 61. We find no merit to the appeal. Accordingly, we affirm.

(2)    In February 2004, a Superior Court jury found Hainey guilty of two counts of Murder in the First Degree, Attempted Robbery in the First Degree, and two counts of Possession of a Firearm During the Commission of a Felony. After the penalty phase hearing, the jury recommended a life

A-34

sentence by a vote of 7-5. The Superior Court sentenced Hainey to life in prison. This Court affirmed Hainey's convictions and sentences on direct appeal.[1]

(3)    In this appeal from the Superior Court's denial of his postconviction motion, Hainey claims that a) the prosecutor used perjured testimony and misrepresented the evidence, depriving him of a fair trial; b) the judge improperly permitted a gun to be admitted into evidence, depriving him of a fair trial; c) there was insufficient evidence to support the jury's verdict; d) his trial counsel provided ineffective assistance by failing to interview and subpoena a key witness, file a motion for judgment of acquittal, and properly present the facts at trial; and e) his appellate counsel provided ineffective assistance by failing to assert the appropriate claims on appeal. To the extent that Hainey has not argued other grounds to support his appeal that were previously raised, those grounds are deemed waived and will not be addressed by this Court.[2]

(4)    When considering a postconviction motion pursuant to Rule 61, the Superior Court must first determine whether the procedural requirements

---

[1] *Hainey v. State*, **878 A.2d 430** (Del. 2005).

[2] *Murphy v. State*, 632 A.2d 1150, 1152 (Del. 1993). In his postconviction motion, Hainey also argued that: the trial judge abused his discretion by excluding evidence, admitting prejudicial testimony, and failing to properly instruct the jury; and his right to confront his accuser was violated when he was not allowed to cross-examine the author of the police report.

2

of the rule have been met before reaching the merits of the claims.[3]  The record reflects that Hainey's first claim of prosecutorial misconduct was never presented at trial or on direct appeal.  Therefore, the claim is procedurally defaulted unless Hainey can demonstrate either cause and prejudice[4] or a colorable claim of a constitutional violation.[5]  In the absence of any such evidence, we conclude that Hainey's first claim is without merit.  The record also reflects that Hainey's second and third claims of improper evidentiary rulings and insufficiency of the evidence were previously adjudicated, at trial and in his direct appeal.  These claims are procedurally barred unless Hainey can demonstrate that reconsideration of the claims is warranted in the interest of justice.[6]  In the absence of any such evidence, we conclude that these claims, too, are without merit.

(5)   Hainey's two final claims are that his trial counsel and his appellate counsel provided ineffective assistance.  In order to prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that his counsel's representation fell below an objective standard of reasonableness and that, but for his counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceedings would have

---

[3] *Bailey v. State*, 588 A.2d 1121, 1127 (Del. 1991).

[4] Super. Ct. Crim. R. 61(i) (3) (A) and (B).

[5] Super. Ct. Crim. R. 61(i) (5).

[6] Super. Ct. Crim. R. 61(i) (4).

been different.[7]    Although not insurmountable, the *Strickland* standard is highly demanding and leads to a "strong presumption that the representation was professionally reasonable."[8]    The defendant must make concrete allegations of ineffective assistance, and substantiate them, or risk summary dismissal.[9]    Because Hainey has failed to demonstrate that either his trial counsel or his appellate counsel committed errors resulting in prejudice to him, we conclude that his claims of ineffective assistance are also unavailing.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED.

BY THE COURT:

/s/Henry duPont Ridgely
Justice

---

[7] *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

[8] *Flamer v. State*, 585 A.2d 736, 753 (Del. 1990).

[9] *Younger v. State*, 580 A.2d 552, 556 (Del. 1990).

4

A - 36

# Jerome M. Capone
Attorney-At-Law

1823 West 16th Street
Wilmington, Delaware 19806

at the corner of 16th & Lincoln Sts.

Phone (302) 654-3260
Fax (302) 654-4281
jerrycapone@comcast.net
www.jerrycapone.com

August 23, 2006

The Honorable William C. Carpenter, Jr.
Superior Court
New Castle County Courthouse
500 North King Street
Wilmington, DE  19801

**RE: State v. Jason Hainey; ID No. 0306015699**

Dear Judge Carpenter:

As per your request, enclosed please find my affidavit in response to Mr. Hainey's Rule 61 Motion.

Respectfully submitted,

Jerome M. Capone

Enclosure

Cc:  Michael Heyden, Esq. (w/encl.)
     Allison Texter, Esq. (w/encl.)
     Jason Hainey (w/encl.)

A-36

A-3ω

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| **STATE OF DELAWARE** | : | |
| | : | |
| **v.** | : | **ID No. 0306015699** |
| | : | |
| **JASON HAINEY,** | : | |
| **Defendant.** | : | |


### AFFIDAVIT OF JEROME M. CAPONE

STATE OF DELAWARE    :
                              : SS
NEW CASTLE COUNTY   :


Jerome M. Capone, having been duly sworn in accordance with the law, stated the following on August 23, 2006:

1. Mike Heyden and I represented Jason Hainey at his murder trial. I have reviewed his Rule 61 Motion and respond to the sections which relate to me as follows.

2. In regards to Hainey's claim that we did not consult with him about appeal issues, we did discuss appeal issues with him during the trial and at the time of his sentencing. Counsel raised the issues on appeal that we thought were appropriate and which we felt had a valid legal basis.

3. Insofar as Hainey claims that we failed to interview or subpoena Phil Kizee, these are the facts as I recall them. Prior to trial, Hainey told us that he and Phil Kizee and Earl Evans had committed numerous armed robberies in Delaware around the time of the murder of Mike Mercer. They were never arrested for these robberies. Hainey was not

$A - 36$

helpful in providing us with information about where we might locate Phil Kizee. Based

upon these factors, we felt that Kizee would be reluctant to cooperate with us and

unwilling to testify. We were also concerned about whether Kizee's criminal activities

with Hainey and Evans would make him a less than credible witness.    Nevertheless, we

asked our investigator, Lou Dempsey, to try and locate Kizee to interview him. The

investigator was able to obtain possible addresses and phone numbers for Kizee in New

Jersey. Repeated phone calls were made to a New Jersey phone number believed to be

Kizee's, and a message was left with a woman believed to be his mother. There was no

response to these phone calls. A letter was sent to a New Jersey address believed to be

Kizee's. There was no response to this letter. Since Kizee was not cooperating with our

attempts to interview him, we decided not to try to subpoena him, especially since Earl

Evans and Monia Tann gave different stories about the identity of the fourth person in

Tann's car after the murder when they all drove to New Jersey. One of them said a man

named Fly was in fourth person in the car and the other said Free (Phil Kizee) was the

fourth person. Evans told the police that Fly and Kizee were two different people. So,

there was a major inconsistency in Tann's story and Evan's story.

Based on these factors, we felt that the defense was in a better position exploiting

this significant inconsistency in the testimony of Evans and Tann than trying to subpoena

Kizee, an uncooperative witness.

3. Hainey's Rule 61 Motion also complains that defense counsel failed to make a

Motion for judgment of acquittal under Superior Court Criminal Rule 29. While I felt

this was a close case where we had a good chance for an acquittal, I did not make a

Motion for Judgment of Acquittal because I did not think that the we could meet the Rule

A-36

29 standard requiring that the State's evidence, viewed in the light most favorable to the

State, must be insufficient to sustain a conviction.

Jerome M. Capone, Esq.

Sworn to and subscribed before me August 23, 2006

Attorney at Law Delaware
#2649

SBI# 383182 _____ UNIT Bldg 23
DELAWARE CORRECTIONAL CENTER
1181 PADDOCK ROAD
SMYRNA, DELAWARE 19977



Office of the Clerk
United States District Court
844 N. King St. Lockbox 18
Wilmington, DE 19801
_____

